Irina Shpigel
Shpigel & Associates, P.C.
*Attorneys for Plaintiff*
250 Greenwich Street, 46th Floor
New  York, New York 10007
E-mail: ishpigel@iselaw.com
T 212-390-1913
F 646-355-0242

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AKHMED GADZHIEVICH BILALOV, an individual, | Civil Action No. |
| Plaintiff, | |
| - against- | **COMPLAINT FOR DAMAGES** |
| HERMAN GREF and KIRILL ANDROSOV, | **FILED UNDER SEAL** |
| Defendants. | |

Plaintiff, AKHMED GADZHIEVICH BILALOV (hereinafter referred to as "Plaintiff"), by and through undersigned counsel, alleges upon information and belief the following against Defendants HERMAN GREF and KIRILL ANDROSOV; (collectively referred to as "Defendants").

## PRELIMINARY STATEMENT

1.  This action arises out of a textbook case of Russian corporate raiding against Plaintiff and his company "Krasnaya Polyana."  (the "Company").

1

2.   From the Company's beginning, Defendants wanted nothing less than full control of Krasnaya Polyana based on the income potential it provided in the years leading up to and in the wake of the 2014 Olympics.

3.   While pretending to offer realistic restructuring options to Plaintiff, Defendants purposefully maneuvered Plaintiff into a position where he was essentially trapped.  Defendants then triggered a series of phony civil divestitures proceedings and criminal cases which ultimately resulted in Defendants' takeover of Krasnaya Polyana.  A key component to Russian corporate raiding is undue influence in the Russian courts.  Defendants have taken advantage of this to Plaintiff's detriment.

4.   Defendants further raided Krasnaya Polyana by using multiple offshore companies and straw men to disguise the true participants and beneficiaries of the conspiracy.  Defendants implemented a complex scheme in order to hide not only from Plaintiff, but also from the Department of Economy and Finance of the Government of the Russian Federation under current President V. Putin.  The company's shares and assets were being transferred illegally to Defendants.

5.   Defendants worked in concert in order to steal the company.

6.   Upon information and belief, Defendants also used U.S. banks in order to further the conspiracy, subsequently investing some of the apparent proceeds of the crime in the United States.

7.   This type of illicit scheme is a common *modus operandi* in Russia.  It is carried out through well-known techniques and is internationally known as "Reiderstvo."  These techniques include fraud, bribery, forgery, corruption, intimidation, and ultimately expropriation of the targeted company.  Reiderstvo often involves private and public-sector white-collar criminals conspiring with state organizations, including law enforcement agencies, as well as high level sitting

politicians and their family members.  See Dr. Louis Shelley and Judy Deane, *The Rise of Reiderstvo: Implications for Russia and the West* (2016).

8.  While nicknamed as a Russian phenomenon, Reiderstvo commonly includes activities outside of Russia, i.e., the use of shell companies in various jurisdictions (including the United States) to hide the beneficial owners, the use of foreign correspondent banks to move funds in more efficient foreign currency- such as Euros and dollars- and investment of the proceeds.

9.  Reiderstvo dates back to the late Soviet era when organized crime groups exacted 'protection money' from bazaar (marketplace) traders (this process is referred to in Russian as krysha, which means roof). Not only did this provide safeguards against business rivals and competing criminal groups, but a krysha could also be used to attack a competitor's business. Following the collapse of the Soviet Union and subsequent privatizations, raider tactics shifted from small-scale protection and confiscation of minor assets to large-scale theft and seizure of state property. For instance, 'black' or 'bandit' raiding explicitly involved illegal activity and the use of force or intimidation whereby organized criminal groups would send armed men to the premises of a business to physically remove assets including cash, computers, and machinery.

10. By the late 1990s, raiding had evolved from the use of force to more sophisticated methods of coercion, including the manipulation of legal and political institutions. Although the use of force could still be present, it was commonly applied in conjunction with a variety of legal and administrative tools and was often used to facilitate or expedite a judicial ruling. Additionally, criminal figures no longer held a monopoly on force; private entrepreneurs and government officials actively participated in Reiderstvo with the assistance of a vast network of judges, law enforcement, lawyers, accountants, journalists, and others.

11. One of the more profound changes that precipitated the evolution of Reiderstvo was the

active assistance of regional and federal agencies. Such connections (through informal networks of influence or bribery) grant access to the security services, customs, courts, and regulatory agencies, which can be manipulated to acquire, for instance, corporate documents or favorable judgments. For example, raiders across the former Soviet Union commonly employ their connections to tax officials to open investigations into target companies, which can be used to initiate a state or private takeover. Indeed, the use of the state apparatus plays such a significant role in corporate raiding that the consensus among academics is that it is nearly impossible to conduct a raid without government assistance.

12. The tactic of corporate or minority shareholder attacks is an attempt to seize a business from within, typically through the manipulation of shareholder rights. In this case, a raider buys out a minority shareholder (possibly through bribery or intimidation) to acquire a small stake in a target company.  As a shareholder, a raider gains access to company registers that can then be manipulated or used to investigate any weakness in the company's legal status (questionable privatization deals, license discrepancies, etc.).

13. As demonstrated herein, Defendants' actions fit the pattern from the very launch of the attack; from the manipulations of local law enforcement, to the laundering of assets through offshore companies, to the use of U.S. dollars, U.S. correspondent banks and U.S. investments.

14. A compromised and corrupt Russian judiciary facilitates the Reiderstvo phenomenon.  It leaves the victims no meaningful forum in which to seek damages for the expropriation of their assets.

15. Time is of the essence in this litigation, and Plaintiff thus bring claims against Defendants for fraud, unlawful conversion, violations of the Federal RICO statutes, intentional infliction of emotional distress, Abuse of Process, Provision of Material Support to Terrorists, and violations

of New York's General Business Law.

16. All conditions precedent to the filing of this action have been performed or waived.

**THE PARTIES**

17. Plaintiff is *sui juris* before this Court, an individual over the age of 18, a Russian businessman and politician, and at all material times herein, was a majority shareholder and owner of Krasnaya Polyana.

18. Defendant HERMAN GREF is a Russian politician and businessman. At all relevant times herein, HERMAN GREF is and was the CEO and chairman of the executive board of Sberbank, the largest state-owned Russian bank. Herman met with other Defendants during and in furtherance of the conspiracy by engaging in a restructuring process through phony negotiation of the restructuring; a manipulation of the appraisal of the company, baseless criminal proceedings, and shielding other's participation in the endeavor. Herman is a close ally of Russian President Putin as well as a member of his 'inner circle.' He was the Minister of Economics and Trade of Russia from May 2000 to September 2007.

19. Third-party OLEG GREF is the Vice President of NEO Center Consulting Group. In that capacity, Oleg deals with issues of strategic development, business development and also promotion of the group in the Russian and international markets. Oleg is a citizen of the Russian Federation and engaged in multiple communications with Defendants during and in furtherance of the conspiracy.

20. Defendant KIRILL ANDROSOV is a member of the Alterra Board of Directors. Previously, Kirill was Deputy Chief of Staff in the Office of Prime Minister Vladimir Putin. He has also worked as the Russian Federation Minister for Economic Development and Trade, where he began his career as Director for State Tariffs Regulation and Infrastructural Reform and later

served as Deputy Economic Development and Trade Minister.  Kirill is a member of the Board of Directors of OJSC "Rosneft", JSC "Zarubezhneft", PetroEnergoBank.  In May of 2008, he took the post of Deputy Head of the government apparatus. He supervises the functioning of the apparatus, planning the activities of the apparatus, ensuring the activities of the Prime Minister of the Russian Federation. Since 2012, he has been a professor at the Higher School of Economics. He is a member of OAO Russian Machines, Altera Investment Fund, Ruspetro plc, Rusnano, LLC, a member of the Public Chamber of the Russian Federation, the Public Council of the Federal Tax Service of Russia and the Public Council of the Ministry of Energy of the Russian Federation. In different year,  he was a member of the Boards of Directors of RAO UES of Russia, OAO Rosneft, OAO Zarubezhneft, First Channel, VTB OJSC, Svyazinvest OJSC, Russian Railways, and OAO GAO VVC.  Many international experts consider Kirill Androsov and his Altera Investment Fund, the wallet for Defendant Gref's ill-gotten gains, and is Defendant Gref's most trusted advisor and friend since the two have been together for decades.  Kirill met with other Defendants during and in furtherance of the conspiracy as described herein.

21. Third-party SberBank is a Russian banking institution with offices and branches worldwide.

22. At all relevant times, Sberbank maintained offices in New York City through a directly or indirectly controlled subsidiary, which was and is critical to Sberbank's combined corporate structure and operations. Sberbank operates in the United States and New York through its subsidiary Sberbank CIB USA Inc. ("Sberbank CIB"), which is located at 152 W. 57th Street, 46 Floor, New York, New York 10019.

23. Sberbank advertises itself as an international "Group" covering 20 countries with more than 11 million customers outside of Russia and identifies Sberbank CIB as "the Group's corporate

and investment banking business," listing its New York office as a means of contacting the Sberbank Group. Sberbank also offers alternative depositary receipts which trade on U.S. over-the-counter markets.

24. According to public reports, Sberbank spent hundreds of thousands of dollars on lobbying the U.S. Government for the stated purpose of "assessing possible ways to address sanctions relief."

25. Sberbank played a key role in the conspiracy, along with the other Defendants named herein.

26. Sberbank purposely avails itself of the courts of this Circuit to resolve its disputes, having done so as recently as 2017-2018.

27. Third-Party MIKHAIL GUTSERIYEV is a Russian businessman.  Upon information and belief, he is a member of the Union of Writers of the Russian Federation.  Mikhail is the major shareholder of the SAFMAR Group, which includes PJSC "RussNeft", JSC Neftisa, JSC "Russian Coal", PJSC Mospromstroy, A101 Group, JSC NPF Safmar, JSC Doveriye, NPF Mospromstroy-Fund, JSC "LC "Europlan", "VSK" insurance company and many others.  Mikhail owns controlling stakes in the largest Russian retail companies – PJSC M.video and JSC Eldorado. Mikhail is a member of the Management Board of the Russian Union of Industrialists and Entrepreneurs.  Mikhail met with other Defendants during and in furtherance of the conspiracy.

28. Third-party ALTERRA CAPITAL HOLDINGS LTD. (hereinafter referred to as "Alterra") is a Bermuda corporation that provides various specialty insurance and reinsurance products and services to corporations, public entities, and insurance companies.  The company operates in five segments: Insurance, Reinsurance, U.S. Specialty, Alterra at Lloyd's, and Life and Annuity Reinsurance and has operations in the United States, Europe, and Latin America.  Alterra was

formed on May 12, 2010, as the product of a merger between Alterra, a direct wholly owned subsidiary of Max Capital Group Ltd., and Harbor Point.  Alterra was a key player in the furtherance of the conspiracy as described herein.

29. Third-party MIKAIL SHISHKHANOV is a Russian businessman.  Mikail is the majority shareholder (59, 4%) of Binbank Bank (Public Joint-Stock Company) and the co-owner of the Binbank non-state pension capital fund "SAFMAR" (100% affiliated with Binbank), European pension fund, private pension fund "Doverie", private pension fund "Obrazovanie i nauka" and private pension fund "Regionfond").  Mikhail met with other Defendants during and in furtherance of the conspiracy as described herein.

30. Third-party STANISLAV KUZNETSOV is, at all material times herein, the Deputy Chairman of the Executive Board of Sberbank.  He has been awarded the Certificate of Honor of the President of the Russian Federation and the Government of the Russian Federation.  Kuznetsov met with other Defendants during and in furtherance of the conspiracy as described herein.

31. Third-party DMITRY KOZAK is a Russian politician who, at all material times herein, served as the Deputy Prime Minister of Russia from 2008–2020.  He served previously as the Regional Development Minister in the Russian cabinet headed by Viktor Zubkov from 2007 to 2008.  From 2004 to 2007 he served as Presidential Plenipotentiary Representative in the Southern Federal District (North Caucasus and Southern European Russia).  Upon information and belief, Dmitry is a close ally of Vladimir Putin, having worked with him in the St Petersburg city administration during the 1990s and later becoming one of the key figures in Putin's presidential team. During the 2004 Russian presidential election he worked as the head of Putin's election campaign team.  Dmitry met with other Defendants during and in furtherance of the conspiracy as described herein.

32. Third party SEMBOL is  Turkish-based construction company which has successfully carried out projects in countries such as Turkey, Kazakhstan, Russia, Ukraine, Croatia, UAE and Libya for construction of 5-star hotels, recreation zones, shopping and entertainment malls, sport complexes, facilities, which became cultural and educational urban symbols, multi-story buildings of business-centers and media centers, congress-halls, conference centers and other multifunctional projects.  Sembol was a key player in the conspiracy as described herein.

33. Third-party RUSSNEFT OIL COMPANY is a is a Russian oil company and one of the largest producers of oil products in the country.  Russneft was a key player in the conspiracy as described herein.

34. Third-party BINBANK is one of Russia's largest commercial banks organized as a public joint-stock company under the laws of the Russian Federation.  Binbank was a key player in the conspiracy as described herein.

35. Third-party NEFTIS OIL COMPANY is a dynamically developing Russian oil company that is part of Industrial-Financial Group SAFMAR.  Neftis was a key player in the conspiracy as described herein.

36. Third-party RIXOS is one of the world's fastest growing, all-inclusive resort companies with a strong presence in Turkey, UAE, Egypt, Russia and Europe.

37. Third-party M. VIDEO is the largest Russian consumer electronic retail chain by revenue and the first and the only publicly traded company in its market sector, listed in Moscow Exchange.

38. Third-party ELDORADO was an electric goods retail chain, which merged with M. Video in or around March of 2018.

39. Third-party TECHNOSILA operates a chain of electronics retail stores. Technosila provides electronics and household appliances including television, audio and video, computers,

tablets, phones, beauty and health, and car electronics. Technosila serves customers throughout Russia.

40. Third-party SAFMAR is a Russian multisectoral conglomerate.  The Group includes oil producing, oil processing, coal and potash companies, financial assets, retail chains, construction and development holdings, companies engaged in commercial property management, logistics centers, hotels, media resources among which are radio stations and TV channels.  Upon information and belief, Safmar owns all interest in M. Video and Eldorado.

## JURISDICTION AND VENUE

41. Jurisdiction is proper in this District as this case involves violations of Federal Law and thus involves federal questions and violations against a foreign citizen.

42. This Court has jurisdiction under 28 U.S.C. §1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000.00.

43. Jurisdiction over Sberbank is proper in this court on the grounds that Sberbank trades on the New York Stock Exchange, conducts business within the United States and has purposefully availed itself of this Court's jurisdiction in previous litigation.

44. Jurisdiction over Alterra is proper on the grounds that Alterra furthered the conspiracy at issue by conducting transactions in U.S. Dollars using U.S. banks and institutions.

45. Jurisdiction over the remaining Defendants is proper on the grounds that they are all co-conspirators who committed acts in furtherance of a conspiracy which they knew included acts in the United States, such as using U.S. banks for the transfer of the money and/or U.S. dollar payments for the assets of the company.

46. Pursuant to 28 U.S.C. § 1332(a), "[a] case falls within the federal district court's original

diversity jurisdiction only if diversity of citizenship among the parties is complete, i.e., only if there is no plaintiff and no defendant who are citizens of the same State." *Wisconsin Dept. of Corr. v. Schacht*, 524 U.S. 381, 388, 118 S.Ct. 2047, 141 L.Ed.2d 364 (1998) (internal quotation marks and citation omitted).

47. Additionally, Rule 4(k)(2), Federal Rules of Civil Procedure, provides federal courts with personal jurisdiction over a foreign defendant "in federal question cases and if the foreign defendant has sufficient contacts with the United States to satisfy due process requirements." See *Eskofot A/S vs. EI Du Pont De Nemours & Company*, 872 F. Supp. 81 - Dist. Court, SD New York 1995.

48. Defendants are subject to this Court's personal jurisdiction under N.Y. C.P.L.R. §302(a) which provides that: "…a court may exercise personal jurisdiction over any non-domiciliary who, either "in person or through an agent": (i) "transacts any business within the state or contracts anywhere to supply goods or services in the state"; (ii) "commits a tortious act within the state"; (iii) "commits a tortious act without the state causing injury to person or property within the state ... if he [a] regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or [b] expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce"; or (iv) "owns, uses or possesses any real property situated within the state." N.Y. C.P.L.R. §302(a)(1)-(4).

49. "[C]ourts have explained that section 302 is a `single act statute' and proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted." *Chloe v. Queen Bee of Beverly Hills,*

*LLC*, 616 F.3d 158, 170 (2d Cir.2010) (internal quotation marks omitted); see also *Baron Philippe de Rothschild, S.A. v. Paramount Distillers, Inc.*, 923 F.Supp. 433, 436 (S.D.N.Y.1996) ("Personal jurisdiction pursuant to section 302(a)(1) may be satisfied with proof that just one transaction occurred in New York as long as defendants' activities were purposeful and substantially related to plaintiffs' claim.").

50. Foreign defendants can be subject to personal jurisdiction where another party "engaged in purposeful activities in the state ... with the consent and knowledge of the defendants, who both benefitted from those activities and exercised extensive control over [the party] in the transaction underlying th[e] suit." *Retail Software Servs., Inc. v. Lashlee*, 854 F.2d 18, 22 (2d Cir.1988); see also *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467, 527 N.Y.S.2d 195, 522 N.E.2d 40 (1988).

51. Venue is proper in this district for all Defendants pursuant to 28 U.S.C. §1391(c)(3), which authorizes an action against an alien in any district.  Venue is additionally proper in this court for all Defendants pursuant to 28 U.S.C. §1391(b)(2) because substantial actions in furtherance of the conspiracy giving rise to Plaintiff's claims occurred in this District.

52. Jurisdiction and venue are also proper in this District as many of the predicate acts, including multiple threats and acts of intimidation, as described herein, occurred in this District.

53. Jurisdiction and venue are thus proper.

### FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

54. In 2006, Plaintiff and his brother Magomed Gadjievich Bilalov purchased a ski resort "Gornaya Carousel," located in Krasnaya Polyana, Sochi Region, Russia – an ambitious project aimed at construction of new expressway, lift and other real estate development.

55. In 2006, Plaintiff's brother, Magomed Bilalov, became the owner of 84.85% shares of JSC

"Krasnaya Polyana."

56. The aforementioned shares were joint shares, however, Plaintiff authorized his brother and his wife to manage the project because Plaintiff was heavily involved in political aspects at that point of Plaintiff's career.

57. In 2007, after the decision to award 2014 Winter Olympic Games to the City of Sochi was announced in Guatemala, it became apparent that "Krasnaya Polyana" had increased interest of investors, and a decision was announced by the Government of Russian Federation to include "Krasnaya Polyana" as the holder of the property, which was part of the prospective Olympic projects, which were planned to be included in the construction of the ski jumping complex for 15,000 seats, and included "Gornaya Carousel", which were projected to construct a mountain media village and hotels for 2,658 rooms.

58. The building and financing of the infrastructure, including roads, networks, and other projects, were to become the fiscal responsibility of the Russian government.

59. In 2008, under direction of Government of the Russian Federation, which was made through the initiative of the SberBank of the Russian Federation, SberBank's Chairman Herman Gref and his vice-chair Stanislav Kuznetsov, SberBank Capital, a 100% subsidiary of SberBank, became the investor of "Krasnaya Polyana."

60. As per the terms of this agreement, SberBank and SberBank Capital took on the financial responsibility to issue a credit line in amount of 40 billion rubles for construction of the ski jumping complex and other objects and infrastructure.

61. However, the aforementioned obligations were never executed and as a result of which "Krasnaya Polyana" was forced to obtain additional high interest loans from the VneshEconomBank ("VEB") collateralizing its shares.

62. At the same time, Mr. Kuznetsov, Mr. Gref's vice-chair, became the Chairman of the Board of "Krasnaya Polyana"

63. As it turned out, the goal of the group which included SberBank, SberBank Capital, Herman Oskarovich Gref, his son, Oskar Olegovich Gref (as a beneficiary), Kuznetsov Stanislav Konstantinovich, Kozak Dmitry Nikolaevich, a Turkish construction company Sembol, as a company which had corrupt ties to SberBank Capital, Herman Oskarovich Gref and Kuznetsov Stanislav Konstantinovich), Rixon, Gutseriev Mikhail Safarbekovich, an individual who fraudulently obtained 41,429% of shares of "Krasnaya Polyana", which belonged to Plaintiff and his brother, Shishkhanov Mikhail Osmanovich (as a beneficiary) was to defraud Plaintiff and his brother of their company ownership.

64. In 2008, despite guarantees of SberBank and SberBank Capital of investment of 40 billion rubles to "Krasnaya Polyana," only 2.7 billion rubles were invested, as a result of which SberBank Capital, which was a 100% subsidiary company of SberBank, gained control of 25.01% of shares of "Krasnaya Polyana."

65. From their entry into the project, in 2008, Defendants, specifically SberBank Chairman Herman Gref, his vice chair Stanislav Kuznetsov, and the Deputy Prime Minister of the Russian Federation Dmitriy Kozak, as well as other officials, jointly began to execute planned actions aimed to misappropriate shares of "Krasnaya Polyana," which were jointly owned by Plaintiff and his brother.

66. In 2008, under the State program for financing and construction of the Olympic objects, the government committed to build a road from the existing route A148 to the border of the "Krasnaya Polyana" location, where the ski-ramp was located.

67. However, as a result of negligent actions of Dmitry Kozak and Herman Gref, financing of

said road was never completed, which consequently led to a substantial cost increase for construction of the ski-ramp.

68. This negligence and subsequent increase of the cost of construction created the necessity of additional financial involvement of SberBank, which is exactly what Defendant Herman Gref and his accomplices planned for to implement their unlawful actions to take over control of the "Krasnaya Polyana" shares, which belonged to Plaintiff and his brother.

69. As of 2010, Plaintiff and his brother were shareholders of 60% of the "Krasnaya Polyana", SberBank and its affiliate, SberBank Capital, under personal control of Herman Gref owned 25%, Krasnodar Region owned 11%, Independent fund InvestAD (UAE) owned 4% and "Krasnaya Polyana" remained the largest developer and builders in preparation of the 2014 Winter Olympic Games in the City of Sochi, while Mr. Kuznetsov continued to hold the Chairman of the Board position.

70. Prior to 2012, construction of the site was successfully performed by the company "Transcomstroy", which was controlled by Plaintiff's brother; and as a result of successful performance, in the beginning of 2012, Plaintiff's brother received a State award from the President of the Russian Federation V.V. Putin for organization of construction of Olympic facilities and successful test competitions.

71. However, in the middle of 2012, under the pressure of the SberBank Chairman Herman Gref and without any sufficient reason and grounds, the subcontractor "Transcomstroy" which was controlled by Plaintiff, and which executed construction of the object at the price not exceeding $1,800.00 USD for 1 sq. m, has been replaced with the Turkish construction company "Sembol" (a partner of Rixos), which invoiced the same amount of work for more than $3,000 USD for 1 sq. m. and didn't guarantee deadline compliance.

72. After "Sembol" was contracted, the construction budget was increased by $1 billion, after which the company started to lose money.

73. It is a public information that "Sembol" is closely associated with and financed by DenizBank, and both have close ties to Turkish government.

74. When Herman Gref introduced "Sembol" as general contractors, he insisted on investing additional capital in the amount of $50 million for all partners to assure that the company's worth will be exceeding $800 million after which Sberbank and Herman Gref became managing partners.

75. There was an undisputed conspiracy between SberBank, Chairman of SberBank Herman Gref, SberBank Capital and Stanislav Kuznetsov, because the aforementioned persons imposed the company Sembol and its terms to "Krasnaya Polyana", and because the terms of Sembol were knowingly worse than the terms of Transcomstroy.

76. This situation led to a conflict between Plaintiff's brother and Herman Gref, as a result of which Herman Gref and his accomplices were able to remove Plaintiff's brother from management of "Krasnaya Polyana" and started to threaten Plaintiff and his family with bodily harm and even death.

77. Thus, since the middle of 2012, the project implementation and the management of construction performed by "Krasnaya Polyana" was under personal control of Herman Gref and his entrusted persons, including Defendants named herein.

78. Plaintiff and his brother were no longer involved in the company's management or managerial decision-making.

79. The actions of Chairman of SberBank Herman Gref, Dmitriy Kozak, Stanislav Kuznetsov and other third parties, led to additional financial investment whereas a number of Plaintiff's shares in "Krasnaya Polyana" had been purposefully diluted to 41.429 %.

80. These actions were made under false pretenses of investment to be made by the Turkish construction company "Sembol" which, however, didn't comply with its financial obligations and in turn, needed to be funded with the help of the state capital issued by SberBank, which confirms the existence of unlawful and possible corruptive ties.

81. The unlawful actions of Defendants and the Turkish construction company Sembol increased the cost of construction, and therefore reduced the value of shares of "Krasnaya Polyana."

82. On or about February 2, 2013, an agreement was reached during a meeting which was held with  participation of SberBank Chairman Herman Gref, Vice Prime Minister Dmitriy Kozak and Plaintiff's brother, whereas it was agreed, that after completion of the Olympic Games, an actual division of assets would be made, namely 1/3 of the assets (the upper part) which included elite buildings, had to be allocated and transferred to Plaintiff and his brother.  The other 2/3 (the lower part), had to be allocated and transferred to SberBank.

83. As a result of the aforementioned meeting, corresponding minutes were signed by Herman Gref; however, neither Herman Gref, nor Dmitriy Kozak performed under the reached agreement.

84. While continuing to exert and trying to influence Plaintiff and his brother, Herman Gref held another meeting with participation of Dmitriy Kozak and Plaintiff, whereas he demanded to transfer all shares of "Krasnaya Polyana" to him or his affiliates.

85. During this meeting, Herman Gref stated, that if the shares of "Krasnaya Polyana" would not be transferred in the shortest possible timeframe to the parties indicated by Herman Gref or Dmitriy Kozak, Plaintiff and his family personally would face serious problems, including bodily harm or death.

86. From then until this day, Plaintiff has reasons to be afraid for his life and health, because

threats to life and health which were made during the meeting by Herman Gref and Dmitriy Kozak were brought to life; Plaintiff was poisoned with mercury (as confirmed by appropriate analysis and medical documentation) as Plaintiff had to go through a long medical treatment under the supervision of Professor Kelling in the Clinic of Baden-Baden, Hermany.

87. In February of 2013, after Plaintiff and his brother refused to transfer shares owned in "Krasnaya Polyana" to affiliates indicated by Herman Gref, Dmitriy Kozak and Alexander Tkachev and in order to misappropriate shares of "Krasnaya Polyana", the aforementioned Defendants presented a libelous report to the President of the Russian Federation, Vladimir Putin, during a live TV broadcast, where it was indicated that Plaintiff's brother solely managed the construction site and was responsible for failure to meet construction deadlines as well as for increased cost of construction; which was false, because since 2012, the construction was performed by Herman Gref's institutions and by the Turkish construction company Sembol, which was personally selected by Herman Gref.

88. This falsified report of Herman Gref and Dmitriy Kozak against Plaintiff and his brother was an intentional and well-planned slander and was aimed to defraud Plaintiff's assets (shares in "Krasnaya Polyana") and resulted in baseless and unlawful initiation of criminal prosecution of Plaintiff.

89. As of March 2013, Plaintiff's brother was an actual shareholder of 41.429% (1426 ordinary shares) of "Krasnaya Polyana", which was the largest developer of sports facilities in the capital of the 2014 Olympic Games in the City of Sochi.

90. "Krasnaya Polyana" was engaged in construction of the ski resort "Gornaya Carousel", which was one of the key centers of the ski infrastructure of the Winter Olympics. The complex included the Olympic ski-ramps K-125 and K-59 with a total capacity of 15 thousand spectators.

91. The second project of "Krasnaya Polyana" was the Olympic Media Village, which included the construction of commercial entertainment and sports centers, water park, tennis courts and other objects of service infrastructure.

92. In accordance with financial analysis prepared by "SberBank," the total value of 41.429 % of shares or 1426 ordinary shares (shares of the JSC "Krasnaya Polyana") totaled $328 million USD (800 million x 41/100).

93. In March of 2013, Plaintiff's brother had a meeting with Mikhail Gutzeriev.  In the meeting, he threatened Plaintiff and his family with the threat of violence, continuation of baseless and unlawful criminal prosecution and to deprive all of their possessions if they would not transfer the 41.429% (1426 shares of  "Krasnaya Polyana") for the price of $20 million USD, which was at least 40 times less than the actual value.

94. During the meeting, Mikhail Gutseriev called Herman Gref directly, and through the loudspeaker Herman Gref gave instructions: "take everything from Bilalov's family at the lowest possible price, preferably for free."

95. Mikhail Gutzeriev guaranteed that if Plaintiff's brother would sign the documents, any prosecution would be terminated, and he would be "left alone."

96. Mikhail Gutzeriev also guaranteed that he would share with Plaintiff's brother, half of the acquired assets, including political and financial dividends equally, i.e., 50% to Mikhail Gutzeriev and its institutions and relatives, including Mikhail Osmanovich Shishkhanov, and 50% to Plaintiff.

97. In March of 2013, as a result of threats and actions taken against Plaintiff, being scared for his life and safety, Plaintiff's brother and Plaintiff were forced to sell 41.429% (1426 shares of "Krasnaya Polyana") for the price of $20 million USD, which was 40 times less than the actual

value.

98. On March 14, 2013, under physical and emotional pressure, Plaintiff transferred 601 shares of "Krasnaya Polyana."

99. Plaintiff never gave any instruction to transfer nor personally transferred any other shares, however, as Plaintiff found out from mass media, the aforementioned deals were completed, illegally and without Plaintiff's consent or participation.

100. Presently, all illegal actions against Plaintiff and his family continue, criminal cases are being unlawfully initiated and investigated, informational personal attacks continue, and Plaintiff is still receiving threats of a physical and financial nature.

101. Mikhail Gutzeriev never fulfilled promised conditions after receiving 41.429% of shares of "Krasnaya Polyana", even further, he gave permission to Herman Gref to institute additional dilution of shares, where institutions of  SberBank purchased additional issued shares of "Krasnaya Polyana" as well as part of Mikhail Gutzeriev's shares and allowing  SberBank to become the owner of 92% of "Krasnaya Polyana."

102. As a result of these transactions, as reported by mass media, Mikhail Gutseriev received a number of financial preferential benefits from SberBank and its institutions, including unlimited lines of credit for the purchase of real estate, shopping malls, warehouses, etc.

103. As a result of these transactions, by the end of 2013, Gutseriev's family net worth reached $4.9 billion USD, and in subsequent years, namely 2015-2016, reached $15 billion USD.

104. In particular, while convincing Plaintiff and his brother to trust him, Mikhail Gutseriev cited his own situation as an example, namely initiation of the criminal case against him in 2007 on the basis of failure to pay taxes by "Rusneft" in an especially large amount (a company which is controlled by Gutseriev M.S.).

105.     In 2007, Gutseriev sold his company to a "businessman from the government" Oleg Deripaska at the price indicated by him, and after he "resolved all of his issues," Gutseriev returned to Moscow and repurchased "Rusneft" from Deripaska; however, at that time, the company had serious financial problems and Gutseriev needed financial support of the SberBan" and Herman Gref,  in order to resolve financial problems and avoid bankruptcy.

106.     Thus, Mikhail Gutseriev, who was in a desperate need of money for refinancing his shares of the company "Rusneft" and for repayment of other financial liabilities, offered Herman Gref his assistance in acquiring "Krasnaya Polyana" shares at knowingly lowered price in exchange for financial support from SberBank issued to him and his family.

107.     After Plaintiff signed a consent to sell a part of shares (being threatened and under pressure) and when other transactions to which I did not give my consent were completed, Mikhail Gutseriev got control of 41.429%  of "Krasnaya Polyana" shares, which belonged to Plaintiff and his brother, and while colluding with the Chief of SberBank Herman Gref, he approved an additional emission and further purchase of shares by the institutions of "SberBank" at a substantially lowered price.

108.     As compensation, Gutseriev received a possibility to hedge the risks of falling oil prices by more than $700 million USD from SberBank and its affiliates and Herman Gref personally.

109.     As a result of illegal collusion with Herman Gref, Mikhail Gutseriev and his institutions received hundreds of millions of USD under the patronage of Herman Gref, and together with his institutions, he (Mikhail Gutseriev) purchased: MDM Bank, a number of development projects in New Moscow, Non-government pension fund "Raiffeisen", oil and construction companies, banks, pension funds, hotels and business centers, retailers "Eldorado"

and "Tekhnosila", the Sberbank Ukraine, which is a subsidiary of the Russian SberBank and remitted $3 billion in debt of "Rusneft"; all of the above confirms the existence of close and informal ties between Mikhail Gutseriev and Herman Gref.

110.     Even further, as a result of Defendants' unlawful actions, namely illegal deprivation of Plaintiff's assets, by forcing Plaintiff to sign an agreement, so that Plaintiff's brother would sell shares of "Krasnaya Polyana", and by organizing the execution of other documents, which led to the transfer of their stake in "Krasnaya Polyana" to the institutions of SberBank, Mikhail Gutseriev agreed to commit these illegal actions against Plaintiff in exchange to receiving from Herman Gref, the Chairman of SberBank, an unlimited access to unprecedented credit lines for purchase of the large-scale real estate, including shopping malls, at a deliberately low rate, which was implemented by using public funds for personal purposes on the terms which were obviously unfavorable to the State and it is an undisputed proof of corruption committed by a group of people with participation of D.N. Kozak, S.K. Kuznetsov, and the Chairman of SberBank Herman Gref.

111.     Thus, the organized group consisted of the JSC SberBank, the institutions controlled by SberBank, Herman Gref, Mikhail Gutseriev, Mikhail Shishkhanov and third parties related to them, exercised their intention to deprive my spouse's and my assets (41.429% of shares in "Krasnaya Polyana") through physical and moral threats, illegal initiation of criminal cases and attempt of physical elimination of Plaintiff and members of his family.

112.     Mikhail Gutseriev also failed to fulfill his financial obligations to Plaintiff, including payment of half of profits which he received as a result of the aforementioned transaction.

113.     In 2013, the Russian Interior Ministry unlawfully and unjustifiably opened a criminal case against Plaintiff and his brother. They were charged in absentia under Part 1 of Article

201 of Russia's Criminal Code (abuse of office in a commercial organization).

114.     Upon information and belief, in 2016, the charges against Plaintiff and his brother had been dropped.  However, the Interior Ministry denied this, saying that both brothers had been put on 'the wanted list.' At the same time, no court orders were issued in absentia to arrest Plaintiff or his brother.

115.     The former CEO of the company 'Krasnaya Polyana,' Stanislav Khatskevich, was arrested only to be released a while later.  His criminal case never went to court.

116.     Despite numerous assurances by Gutseriev, Kozak and Herman Gref, baseless and unlawful criminal persecution and investigation of Plaintiff continued, and even further, Plaintiff started to receive death threats against himself and his family which forced Plaintiff to initiate actions to protect his rights and the rights of his family members.

117.     Since 2012, Defendants have exerted unprecedented pressure on Plaintiff and contributed to the initiation of unfounded criminal cases against Plaintiff, attempts to poison Plaintiff with mercury and threatened his life, health, and safety.

118.     In or around May of 2016, Plaintiff and his family, in fear for their lives, fled Russia and moved to New York.

119.     In late Spring of 2018, Plaintiff felt that sufficient time has passed, and he was now able to back channel members of the "inner circle" in an effort to recover some of his assets, without litigation.

120.     Knowing that Defendant Sberbank was going to attend annual conferences in San Francisco, California, Plaintiff reached out to Defendant Kirill Androsov, a close friend and associate of Herman Gref.

121.     Plaintiff's initial contacts with Androsov showed promise as he was told that Gref

wanted to amicably resolve the conflict, however, some time was needed.  However, Plaintiff was told that if Plaintiff was to proceed with litigation, Gref would not be able to settle the case, as the matter would be taking a "political tone."

122.    For almost a year, Plaintiff spoke with Androsov and had his representative speak with Oleg Gref, Herman Gref's brother, all in a perceived contemplation of an amicable settlement.

123.    What was not known to Plaintiff at the time was that Gref and his associates needed time to build and manufacture a case against Plaintiff and his family and use their standard intimidation tactics to prevent Plaintiff from exercising his rights to recover his assets.

124.    In late April of 2019, Plaintiff was informed that a representative would be coming in May for the May/June San Francisco Annual Conference.

125.    At the end of May 2019, Plaintiff went to San Francisco, to attend what he assumed was to be a settlement meeting with a Sberbnak representative.  In the lobby of the W hotel, he met with a Russian individual who introduced himself as Alexander Igorevich.  Following initial introductions, they proceeded to have lunch at the hotel restaurant. During lunch, Alexander Igorevich once again confirmed that he works with internal security of Sberbank, and that he is an active FSB major, representing the interests of both the Russian Federation and the State Owned Sberbank.

126.    In no uncertain terms, Alexander Igorevich informed Plaintiff that Sberbank had no intention of settling the matter and that if Plaintiff proceeds with an action against Sberbank or any member of the inner circle, such action would be perceived and presented back home as an act of treason, and the attempted poisoning would be nothing compared to what may happen to both Plaintiff and his family.  Alexander Igorevich further indicated that they will use their reach in the United States to have Plaintiff arrested and they will use their reach in Russia to ensure that

Plaintiff's family would have problems. The meeting lasted several minutes, as Alexander Igorevich simply concluded by telling Plaintiff to forget what he lost and start anew in the land of the free.

127.     Plaintiff returned to New York following the trip to San Francisco.   When he returned to New York, he contacted Androsov and told him what had happened and that he would not surrender and that he will fight for his rights.   Androsov called Plaintiff "a fool" and that Plaintiff should be ready for "a new wave of problems."

128.     In July of 2019, as Plaintiff was exiting his apartment in New York, he was approached by two men who spoke to him in Russian.   They both told him that they know where he lives, and they can get him anywhere.   They wished him a pleasant day and got into a car which was parked opposite the building.

129.     Two weeks later, one of the two men approached Plaintiff on his way home and showed him pictures of his wife entering and exiting their Miami apartment, and just told Plaintiff to "think of his family."

130.     In late August of 2019, Plaintiff once again contacted Androsov to see if things could be settled and to try and leave family out of the situation.   Androsov indicated that the situation is not within his control, but he would relay the message.   Within several days, almost immediately after the Labor Day weekend in September of 2019, when Plaintiff returned home to New York, he was greeted by the same two men from his prior encounter who told him that Alexey Nikolaevich wanted to meet on Friday at the Plaza Hotel bar.

131.     That Friday, Plaintiff met an individual identified as FSB major Alexey Nikolaevich.   The meeting was very brief.   Alexey Nikolaevich was drinking his beer, and rudely told the Plaintiff that "trouble was coming," and that "U.S. authorities will arrest him soon," and

"he will be extradited."   Plaintiff was further told that "everything was already arranged," that Plaintiff "will join his cousin in Lefortovo," and while there, "many interesting things may happen including suicide, just like Vladimir Evdokimov" (former executive of RosKosmos, who allegedly committed suicide by stabbing himself numerous times while in solitary confinement).

132.     Fearing for his life, Plaintiff left New York that same day and went to Miami, as that was the only place he did not receive threats.

133.     In or around October of 2019, while visiting the City of Miami, Plaintiff was wrongfully arrested based on the false information provided by Defendants to Interpol and to the United States Department of Homeland Security ("DHS").  The arrest took place just like Alexey Nikolaevich said he would be and there was an attempt to have him deported (extradited), however, following a brief detention, Plaintiff was released.

134.     Plaintiff filed an appeal with Interpol.

135.     Interpol blocked his file and removed the diffusion following a review of all relevant facts surrounding Plaintiff's situation.

136.     Based on the evidence to be presented by the Plaintiff, his situation clearly demonstrates that the Plaintiff is an unfortunate collateral victim of a politically and improperly motivated persecutory campaign. This campaign appears to be designed to destroy him and his cousin Ziyavudin Magomedov.

137.     Defendants are perceived to be closely allied with Dmitry Medvedev; a man who in January 2020 was relieved as Prime Minister of the Russian Federation.

138.     This persecution campaign has the additional goal of misappropriating Plaintiff's assets.

139.     Plaintiff is not alone in the view that the criminal allegations against him are a

politically motivated fabrication.

140.     In his first correspondence with Interpol, which subsequently blocked access to his file and effectively removed the diffusion placed by Russia, Plaintiff highlighted the immediate reactions of well-informed observers, and the international press covering his case and the case of his cousin of Ziyavudin Magomedov; which point to the political nature of the arrests.

141.     It was established by Plaintiff that he was poisoned and the poisoning was linked to the persecution against him and the unlawful taking of his assets, the political aspects of his case and the case of his cousin both of whom were close allies of Medvedev, and both of whom were not in good graces with Vladimir Putin's Inner Circle.

142.     Based on recent events, it has been shown that poisoning is a popular and established method of removing undesired elements from Russian political and business society.

143.     The recent poisonings of Alexei Navalny, Alexander Litvinenko, Sergei Skripal, and Julia Skripal are just some examples of the Kremlin's inner circle removing any possible opposition.

144.     The view that the Magomedov, and subsequently Bilalov matters which are closely limked, are not just political attacks but a well-orchestrated case of de-privatization which has not gone away and is certainly not limited to the press.

145.     As was also published by the United States Congress in its official records on March 28, 2019, the United States House Permanent Select Committee of Intelligence heard testimony from the U.S. Ambassador to Russia, Michael McFaul.

146.     Mr. McFaul raised the case of Ziyavudin Magomedov, as being a clear example of Putin's high-profile politically motivated nationalizations (or de-privatizations as McFaul puts it), of successful private enterprises.

147.     In his testimony McFaul stated the following: "*Putin and his proxies have considerably reduced the size of Russia's private sector and increased the role of the state in the economy*" […] "*Not surprisingly, increased state ownership in the economy, a major redistribution of property rights guided by political motivation rather than profit maximization, and a growing system of patronage and corruption more generally have not fostered economic growth.*" […] "*High profile nationalizations (or de-privatizations)*" such as the seizure of the oil company Bashneft in 2014, or the arrest of billionaire Ziyavudin Magomedov, underscore the fragility of private property rights a quarter of a century after the end of communism.*"

148.     Ambassador McFaul further indicated in his testimony that one of the principal goals in the persecution of legitimate businessmen, such as Ziyavudin Magomedov, is to reduce the size of Russia's private sector and increase the role of the State in the economy.  This is executed by using corrupt law enforcement officials, and a willing and highly dependent Criminal Court system which McFaul describes as follows: "*Overall, the Russian court system has a reputation for being corrupt and easily manipulated for political ends. The selective application of the law – for example, why did Khodorkovsky go to jail, but oligarchs did not? – creates incentives to develop personal ties with Putin as the only rational strategy for preserving control over one's wealth. Russia's arbitration or economic courts used to be considered more independent than other courts, but their merger into the general system of courts in 2014 has decreased private access to the rule of law even further*."

149.     A blatant example of corrupt law enforcement officials having a direct role in the matter is Deputy Chief Prosecutor Viktor Grin, who personally took part in drawing up and presenting charges in the cases of Khodorkovsky and Lebedev (case of Yukos), Browder and Magnitsky (Hermitage Capital Case), and Ziyavudin Magomedov.

150.     The European Court of Human Rights has already acknowledged that in the case of the Yukos Executives, the representatives of the Russian law enforcement agencies violated sections 6 and 7 of the European Convention on Human Rights.

151.     Viktor Grin was included in the United States Magnitsky sanction list and is present in a slew of other politically motivated de-privatization cases that have been sanctioned by the European Union, Canada, Latvia, Estonia, and other countries.

152.     Another representative of corrupt law enforcement, who also played a key role in the persecution, is investigator Nikolai Budilo, who was an active participant in the cases of William Browder and Sergey Magnitsky (Hermitage Capital Case), Mukhrat Ablyazov Case, and many other corrupt political persecutions. Nikolai Budilo has been added to the United States' Magnitsky sanction List.

153.     Direct Beneficiaries of the illegal actions of Grin and Budilo and other corrupt investigators and prosecutors, perpetrated against legitimate business-people such as Ziyavudin Magomedov and his cousin the Plaintiff, are members of Putin's "Inner Circle" and are also included on major U.S. and European Sanction lists.

154.     The "Inner Circle" consists of CEO and chairman of the executive board of Sberbank (U.S. Sanctioned Bank), Herman Gref, Transneft (the president is FSB Major-General Nikolay Tokarev); Rostec (the CEO is FSB Lieutenant-General Sergey Chemezov); one of the largest state banks VTB (the president is Andrey Kostin); the secretary of the Russian Security Council (FSB Army General Nikolai Patrushev); and Patrushev's son Dmitry Patrushev (a Minister of Agriculture of the Russian Federation).

155.     Ambassador McFaul further testified that "*Russia's prosecution against legitimate businesspeople like the plaintiff and Ziyavudin Magomedov, is happening with an alarming*

*frequency. This is done to enrich Putin's KGB comrades and cronies, which he defines as the 'Inner Circle.' Putin put his people in charge, Putin loyalists now run Russia's largest oil and gas companies, Rosneft and Gazprom; Russia's largest military industrial conglomerate, Rostec; Russia's major energy transportation company, Transneft; Russia's immense rail transport monopoly, Russian Railways; and Russia's largest banks.*"

156.    Most of the members of the "Inner Circle" are listed on multiple international sanction lists for their corruption, their kleptographic conversion of assets, and human rights violations.  They are specifically involved in the case of Ziyavudin Magomedov, his brother, and Plaintiff.

157.    Each Defendant crony herein was a direct beneficiary of the de-privatization present in this case.

158.    Specifically, Ambassador McFaul testified that: "*the Putin regime has occasionally jailed additional oligarchs in schemes that parallel the Khodorkovsky arrest.*"  […] "*Putin continued to redistribute property rights, away from the 1990s-era "oligarchs" considered too independent and towards Putin's loyalists from the KGB and his St. Petersburg friends.*"

159.    As a result of the de-privatization, above-mentioned members of Putin's "Inner Circle" were able to successfully steal Plaintiff's assets, specifically the resort which is the subject of the instant litigation as well as ninety percent of the Magomedov empire; an empire built with decades of hard work.

160.    Before their illegal and internationally criticized detention, Ziyavudin Magomedov was amongst Russia's most successful businessmen (top 100 wealthiest people in Russia).  He is now left with almost nothing.

161.    Using intimidation and extortion, the investigators were able to coerce favorable

transfers of assets to the "Inner Circle;" while Plaintiff escaped with his life, fictitious criminal cases were being fabricated with the pretense of illegally taking his assets and Ziyavudin Magomedov remained incarcerated in deplorable conditions in Russia's most terrifying prison, Lefortovo.  It was in Lefortovo where he executed documents asserting the conversion of his assets, under duress in a Lefortovo prison cell.

162.     Unfortunately, Putin's inner circle used Plaintiff's support for Medvedev and used Plaintiff's ethnicity to portray him as an enemy and a traitor paving the way for the de-privatization of his assets.

163.     Subsequently Defendant Gref and his associates illegally used their law enforcement and intelligence contacts to eliminate the Plaintiff and when that proved fruitless to incriminate him and have him arrested and extradited, however, that too proved fruitless.

164.     This undue influence was used to prevent Plaintiff from exercising his rights and he was afraid for his life due to the treats he received from credible and reliable individuals which represented agencies that acted on their threats in the past.

165.     Following his departure to the Hermany and then to the U.S., Plaintiff's concern was only to protect his life and the lives of his family members, he was recently poisoned and had to seek treatment in Hermany to remove the toxic mercury form his system. Moreover, criminal charges were being fabricated against him and against members of his family.

166.     In December 2019, Plaintiff, through his lawyers, sent a demand letter to Defendant Sberbank outlining his legal position.  No response was ever received. However, following the letter, Plaintiff's family in Russia began to receive threats. Understanding that there is no other way to protect his interest but for litigation, Plaintiff brings the instant action.

167.     As a result of Defendants' wrongful conduct, Plaintiff has been emotionally and

financially damaged.

## COUNT I: FRAUD

### (All Defendants)

168.     Plaintiff reasserts and incorporates by reference the allegations in all preceding paragraphs above.

169.     "In order to sustain an action for actual fraud the plaintiff must prove: (1) that the defendant made a representation, (2) as to a material fact, (3) which was false, (4) and known to be false by the defendant, (5) that the representation was made for the purpose of inducing the other party to rely upon it, (6) that the other party rightfully did so rely, (7) in ignorance of its falsity (8) to his injury (24 N.Y.Jur., Fraud and Deceit, s 14; 37 C.J.S. Fraud s 3)." *Brown v. Lockwood*, 76 AD2d 721, 730 [2d Dept 1980].

170.     "In order to recover damages for fraud, a plaintiff is required to prove, by clear and convincing evidence, a misrepresentation, which was false and known by the defendant to be false, made for the purpose of inducing the plaintiff to rely upon it, justifiable reliance and injury (see *Lama Holding Co. v. Smith Barney*, 88 N.Y.2d 413, 421, 646 N.Y.S.2d 76, 668 N.E.2d 1370 [1996]; *Gizzi v. Hall*, 300 A.D.2d 879, 880, 754 N.Y.S.2d 373 [2002]; *McGovern v. Best Bldg. & Remodeling*, 245 A.D.2d 925, 926, 666 N.Y.S.2d 854 [1997] ). As to the element of reliance, "[w]here a party has the means to discover the true nature of the transaction by the exercise of ordinary intelligence, and fails to make use of those means, he [or she] cannot claim justifiable reliance on [the] defendant's misrepresentations" (*Stuart Silver Assoc. v. Baco Dev. Corp.*, 245 A.D.2d 96, 98–99, 665 N.Y.S.2d 415 [1997]; see *Cohen v. Colistra*, 233 A.D.2d 542, 542–543, 649 N.Y.S.2d 540 [1996]; *Pinney v. Beckwith*, 202 A.D.2d 767, 768, 608 N.Y.S.2d 738 [1994] )."

*Tanzman v. La Pietra*, 8 AD3d 706, 707 [3d Dept 2004].

171.     Defendants made representations to Plaintiff related to his ownership interest in the company.

172.     Defendants knew at the time that these representations were false.

173.     Defendants use intimidation and threats to seize control of Plaintiff's assets.

174.     Defendants use intimidation and threats to seize control of Plaintiff's shares in the company.

175.     Plaintiff justifiably relied upon the representations as described herein.

176.     As a result of Defendants' wrongful conduct and fraudulent misrepresentation, Plaintiff has been financially damaged.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court enter judgment against Defendants in an amount of $1,000,000,000.00:

(1) for their willful fraudulent conduct;

(2) in an amount of damages to be determined at trial;

(3) attorneys' fees and costs incurred in bringing this suit;

(4) pre- and post- judgment interest; and

(5) awarding Plaintiff any other relief deemed just and proper.

## COUNT II: CONSPIRACY TO COMMIT FRAUD

### (All Defendants)

177.     Plaintiff reasserts and incorporates by reference the allegations in all preceding paragraphs above.

178.     "To adequately plead claims for conspiracy to commit fraud under New York law,

in addition to pleading the underlying fraud, the [plaintiff] must allege the following with the required specificity as to each defendant: `(1) an agreement among two or more parties, (2) a common objective, (3) acts in furtherance of the objective, and (4) knowledge.'" *Winnick,* 406 F.Supp.2d at 259 (quoting *Filler v. Hanvit Bank*, No. 01 Civ. 9510, 2003 WL 22110773, at *2 (S.D.N.Y. Sept. 12, 2003)).

179.     Defendants worked in concert to perpetrate the conspiracy.

180.     Defendants agreed to the acts as described herein for the common purpose of depriving Plaintiff of his life, liberty and happiness.

181.     Defendants made representations to Plaintiff related to his ownership interest in the company.

182.     Defendants knew at the time that these representations were false.

183.     Defendants use intimidation and threats to seize control of Plaintiff's assets.

184.     Defendants use intimidation and threats to seize control of Plaintiff's shares in the company.

185.     Plaintiff justifiably relied upon the representations as described herein.

186.     As a result of Defendants' wrongful conduct and fraudulent misrepresentation, Plaintiff has been financially damaged.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court enter judgment against Defendants in an amount of $1,000,000,000.00:

(1) for their willful fraudulent conduct;

(2) in any other amount of damages to be determined at trial;

(3) attorneys' fees and costs incurred in bringing this suit;

(4) pre- and post- judgment interest; and

(5) awarding Plaintiff any other relief deemed just and proper.

## COUNT III: VIOLATION OF GENERAL BUSINESS LAW §349

### (Defendant Sberbank)

187.     Plaintiff reasserts and incorporates by reference the allegations in all preceding paragraphs above.

188.     New York law proscribes "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in th[e] state." GBL § 349(a). To state a claim, a plaintiff must allege (1) that the defendant's acts were consumer oriented, (2) that the acts or practices are "deceptive or misleading in a material way," and (3) that the plaintiff has been injured as a result. *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 25, 623 N.Y.S.2d 529, 647 N.E.2d 741 (1995); *accord Spagnola v. Chubb Corp.,* 574 F.3d 64, 74 (2d Cir.2009); *City of New York v. Smokes-Spirits.Com, Inc.*, 12 N.Y.3d 616, 621, 883 N.Y.S.2d 772, 911 N.E.2d 834 (2009); *Goshen v. Mut. Life Ins. Co. of N.Y.*, 98 N.Y.2d 314, 324, 746 N.Y.S.2d 858, 774 N.E.2d 1190 (2002).

189.     Sberbank conducts everyday business in the State of New York, offering a variety of financial and investment products.

190.     Sberbank's business practices are consumer-oriented.

191.     Sberbank's business practices, as described herein, were deceptive, as they were in furtherance of the conspiracy to seize Plaintiff's assets.

192.     Sberbank's business practices, as described herein, were deceptive, as they were in furtherance of the conspiracy to seize Plaintiff's interest in the company.

193.     As a direct result of Sberbank's willful violations, Plaintiff has been damaged.

**WHEREFORE**, Plaintiff requests that this Honorable Court enter judgment against Sberbank:

(1) for their willful violation of New York's General Business Law;

(2) in an amount of damages to be determined at trial;

(3) attorneys' fees and costs incurred in bringing this suit;

(4) pre- and post- judgment interest; and

(5) awarding Plaintiff any other relief deemed just and proper.

## COUNT IV: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### (All Defendants)

194.     Plaintiff reasserts and incorporates by reference the allegations in all preceding paragraphs above.

195.     A claim for intentional infliction of emotional distress under New York law requires a plaintiff to establish: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." *Howell v. N.Y. Post Co*., 81 N.Y.2d 115, 121, 596 N.Y.S.2d 350, 612 N.E.2d 699 (1993).  "[T]he rigor of the outrageousness standard is well established." *Lan Sang v. Ming Hai*, 951 F.Supp.2d 504, 530 (S.D.N.Y.2013) (internal quotation marks omitted). Specifically, the "[c]onduct must have been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency," and recovery is only available "where severe mental pain or anguish is inflicted through a deliberate and malicious campaign of harassment or intimidation." *Id*. (internal quotation marks omitted).

196.     Defendants' pattern and practice of corruption, threats and intimidation of Plaintiff

is outrageous.

197.     Defendants' conduct in attempting to poison Plaintiff goes beyond all possible bounds of decency.

198.     Defendants' conduct in threatening Plaintiff and his family goes beyond all possible bounds of decency.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court enter judgment against Defendants in an amount of $1,000,000,000.00:

(1) for their willful and intentional infliction of emotional distress upon Plaintiff;

(2) in any other amount of damages to be determined at trial;

(3) attorneys' fees and costs incurred in bringing this suit;

(4) pre- and post- judgment interest; and

(5) awarding Plaintiff any other relief deemed just and proper.


## COUNT V: VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT OF 1970 ("RICO") - (18 U.S.C.A. §§ 1961 *et seq.*)

### (All Defendants)

199.     Plaintiff reasserts and incorporates by reference the allegations in all preceding paragraphs above.

200.     To state a claim under 18 U.S.C.A. §§1961 *et seq.*, a plaintiff must allege (1) that the defendant received money from a pattern of racketeering activity, (2) invested that money in an enterprise, (3) the enterprise affected interstate commerce, and (4) an injury resulting from the investment of racketeering income distinct from an injury caused by the predicate acts themselves. See *Johnson v. GEICO Casualty Co.,* 516 F. Supp. 2d 351 (D. Del. 2007).

201.     Defendants have engaged in a "pattern of racketeering activity" as defined under 18 U.S.C. § 1962(c).

202.     18 U.S.C. §1962(c) states: *It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.*

203.     Defendants have engaged in at least two related acts of racketeering activity that amount to or have posed a threat of continued criminal activity.  See 18 U.S.C. § 1341.

204.     18 U.S.C. §1341 states in relevant part: *Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both.*

205.     Defendants' acts consist of (1) a scheme or artifice to defraud; (2) use of the mail communications in furtherance of the scheme; and (3) intent to deprive Plaintiff of money, liberty,

or property.

206.      "A scheme to defraud is any plan or course of action by which someone intends to deprive another of money or property by means of false or fraudulent pretenses, representations, or promises." *United States v. Faulkenberry*, 614 F.3d 573, 581 (6th Cir. 2010).

207.      Upon information and belief, Defendants and its agents, associates, and/or representatives communicated with one another in furtherance of their scheme to defraud via mail, e-mail and telephonic communications.

208.      As a direct result of Defendants' wrongful conduct and purposeful actions under RICO, Plaintiff has been financially damaged.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court enter an order:

(1) Finding that Defendants are in violation of The Racketeer Influenced and

Corrupt Organizations Act of 1970;

(2) Finding that Defendants have engaged in a pattern of racketeering activity in

furtherance of a scheme to defraud Plaintiff;

(3) Of Judgment against Defendants in the amount of damages to be determined

at       trial; and

(4) Awarding Plaintiff any other relief deemed just and proper.

## COUNT VI:  UNLAWFUL CONVERSION

### (All Defendants)

209.      Plaintiff reasserts and incorporates by reference the allegations in all preceding paragraphs above.

210.      Defendants have, through the use of threats made by agents in Russia and here in

the United States, and other fraudulent and corrupt practices, forced the conversion of Plaintiff's assets and interests in the company over to themselves.

211.     Defendants have engaged in the before mentioned acts for their own financial benefit.

212.     " Conversion is any unauthorized exercise of dominion or control over property by one who is not the owner of the property which interferes with and is in defiance of a superior possessory right of another in the property.   When the original possession is lawful, conversion does not occur until the defendant refuses to return property after demand or until he sooner disposes of the property" See *Moses vs. Martin*, 360 F. Supp. 2d 533 - Dist. Court, SD New York 2005.

213.     "To maintain a claim for conversion, a plaintiff must show: (1) the property subject to conversion is `a specific identifiable thing;' (2) plaintiff had `ownership, possession or control' over the property before its conversion; and (3) defendant `exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights.   However, an action for conversion cannot be validly maintained "where damages are merely being sought for breach of contract. Rather, a plaintiff must show acts that were unlawful or wrongful as opposed to mere violations of contractual rights."   See *Calcutti vs. SBU, Inc.,* 223 F.Supp.2d 517, 523 (S.D.N.Y.2002).

214.     Plaintiff has been economically damaged as a result.

     **WHEREFORE**, Plaintiff requests that this Honorable Court enter an order:

(1) Declaring that the company was unlawfully converted to the Defendants;

(2) Declaring that Defendants utilized unlawful and wrongful acts in converting the
    company and Plaintiff's assets to themselves solely for their own financial benefit;

(3)  Awarding Plaintiff damages in an amount to be determined at trial; and

(4)  Awarding Plaintiff any other such relief as is deemed just and proper.

## COUNT VII:  MALICIOUS ABUSE OF PROCESS

### (All Defendants)

215.     Plaintiff reasserts and incorporates by reference the allegations in all preceding paragraphs above.

216.     Defendants provided false and defamatory information to Interpol and to the United States DHS which led to Plaintiff's arrest in Miami.

217.     Defendants' actions were retaliatory and malicious.

218.     Under New York law, "a malicious abuse-of-process claim lies against a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994).

219.     A "collateral objective" is not the same as a "malicious motive" and must exist "beyond or in addition to [the] criminal prosecution," *Savino*, 331 F.3d at 77, but it is "usually characterized by personal animus," *Jovanovic v. City of New York*, 04-CV-8437, 2010 WL 8500283, at *9 (S.D.N.Y. Sept. 28, 2010) (Crotty, J.), affd, 486 Fed.Appx. 149 (2d Cir. 2012) (citation omitted).

220.     Such an objective may include "infliction of economic harm, extortion, blackmail [or] retribution." *Brandon v. City of New York*, 705 F.Supp.2d at 275.  In other words, "[a]buse of process resembles a form of extortion, by which the defendant invokes legal process to coerce the plaintiff into doing something other than what the process necessitates." *Krebs v. United States*,

98-CV-2590, 1999 WL 185263, at *5 (S.D.N.Y. Mar. 31, 1999) (Mukasey, J.).

221.     Defendants worked in concert with Russian law enforcement agencies, the Courts, using their broad influence in order to have Plaintiff detained.

222.     As a direct and proximate result of Defendants' conduct, Plaintiff has been emotionally and financially damaged.

**WHEREFORE**, Plaintiff requests that this Honorable Court enter judgment against Defendants:

(1) Declaring that Defendants have abused the criminal and immigration process;

(2) Awarding Plaintiff damages in an amount to be determined at trial; and

(3) Awarding Plaintiff any other such relief as is deemed just and proper.

## COUNT VIII: PROVISION OF MATERIAL SUPPORT TO TERRORISTS

### (All Defendants)

223.     Plaintiff reasserts and incorporates by reference the allegations in all preceding paragraphs above.

224.     Defendants' actions in providing banking and other financial services to co-Defendants and co-conspirators and their affiliates and/or executing money transfers that funded the Defendants' terroristic and threatening actions against Plaintiff constituted "acts of international terrorism" as defined in 18 U.S.C. §2331.

225.     As required by 18 U.S.C. § 2331, Defendants' actions in providing banking and other financial services to co-Defendants and co-conspirators and their affiliates and/or executing money transfers that funded the conspiracy constituted a violation of the criminal laws of the United States, including, without limitation, the criminal provisions of 18 U.S.C. § 2339A, which

prohibits the provision of material support to terrorists.

226.     As required by 18 U.S.C. §2331, Defendants' actions in providing banking and other financial services to co-Defendants and co-conspirators and their affiliates and/or executing money transfers that funded the conspiracy were dangerous to human life, because the funds were raised explicitly to purchase lethal equipment for the conspiracy.

227.     As required by 18 U.S.C. §2331, the attempted violent acts committed by Defendants through Defendants' and co-conspirators' material support, specifically the attempted poisoning by mercury of Plaintiff and other significant threats to Plaintiff's life, transcended national boundaries in the means by which they were accomplished and the persons they intended to intimidate or coerce.

228.     Defendants' actions in providing banking and other financial services to co-Defendants and co-conspirators and their affiliates and/or executing money transfers that funded the conspiracy also transcended national boundaries in the means by which they were accomplished and the locales in which Defendants operated.

229.     Defendants knowingly and intentionally provided banking and other financial services to co-Defendants and co-conspirators and their affiliates and/or executed money transfers that funded the conspiracy when they knew or were deliberately indifferent to the fact that Defendants were corrupt and violent individuals and entities dedicated to using threats, intimidation, and terrorism to intimidate and influence the conduct of Plaintiff and to intimidate and coerce the civilian population as a whole.

230.     As a direct and proximate result of Defendants' provision of banking and other financial services to co-Defendants and co-conspirators and their affiliates and/or execution of money transfers that funded the conspiracy, Plaintiff suffered the harms described herein.

231.     Defendants reasonably would have foreseen that persons, such as Plaintiff, would be injured by Defendants' conduct and actions described herein.

232.     Defendants are therefore liable for all of Plaintiff's damages in such sums as may hereinafter be determined, to be trebled pursuant to 18 U.S.C. § 2333(a).

**WHEREFORE**, Plaintiff requests that this Honorable Court enter judgment against Defendants:

(1) Awarding Plaintiff damages in an amount to be determined at trial; and

(2) Awarding Plaintiff any other such relief as is deemed just and proper.

### TOLLING OF THE STATUTE OF LIMITATIONS

233.     Plaintiff hereby incorporates by reference each of the preceding paragraphs as if fully set forth herein.

234.     A four-year statute of limitations applies to civil RICO claims. See *Koch v. Christie's Int'l PLC,* 699 F.3d 141, 148 (2d Cir. 2012).  The timeliness of a civil RICO claim depends on a twin determination of (1) when the plaintiff sustained the alleged injury for which he seeks redress, and (2) when the plaintiff discovered or should have discovered the injury, with the latter date triggering the four-year statute of limitations. See *id*. at 150-51; *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 60 (2d Cir. 1998) ("Thus, even if [an] investor[`s] injury occurred at the time [he] invested, the limitations period does not begin to run until [he] ha[s] actual or inquiry notice of the injury.").

235.     A RICO injury occurs when the "amount of damages becomes clear and definite." *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 768 (2d Cir. 1994); *accord Chevron*

*Corp. v. Donziger*, 833 F.3d 74, 140 (2d Cir. 2016). A RICO claim predicated on an investment injury for which an investor has no contractual or legal remedies generally accrues at the time of investment. See *In re Merrill Lynch Ltd. P'ships Litig*., 154 F.3d at 59.

236.     Plaintiff was arrested in Miami in October 2019 based on false information provided by Defendants to Interpol and to the United States Department of Homeland Security. Plaintiff filed an appeal with Interpol and Interpol blocked the file and removed the diffusion on account of the fact that the case in Russia was more likely than not politically motivated.

237.     Furthermore, the running of any statute of limitations has been equitably tolled by reason of Defendants' fraudulent concealment and conduct.  Through their affirmative misrepresentations and omissions, Defendants actively concealed from Plaintiff the true nature and intent of their conduct, including the takeover of Plaintiff's shares, ownership and interest in the company.

238.     Plaintiff was threatened and poisoned by Defendants.  Because of the corrupt nature of the Russian courts, Plaintiff was unable to even consider bringing suit in Russia previously.

239.     "Under New York law, the doctrines of equitable tolling or equitable estoppel may be invoked to defeat a statute of limitations defense when the plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action." *Abbas v. Dixon*, 480 F.3d 636, 642 (2d Cir.2007) (internal quotation marks omitted); see also *Stuart v. Stuart*, No. 12-CV-5588, 2013 WL 6477492, at *4 (S.D.N.Y. Dec. 10, 2013) (same).

240.     Equitable tolling applies where a defendant's fraudulent conduct results in a plaintiff's lack of knowledge of a cause of action. See *Pearl v. City of Long Beach*, 296 F.3d 76, 82 (2d Cir.2002); *DeSole v. Knoedler Gallery, L.L.C.*, 974 F.Supp.2d 274, 318 (S.D.N.Y.2013).

241.     A plaintiff must establish that "the defendant wrongfully concealed material facts,"

which "prevented plaintiff's discovery of the nature of the claim," and that "plaintiff exercised due diligence in pursuing the discovery of the claim during the period plaintiff seeks to have tolled." *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 157 (2d Cir.2012) (internal quotation marks omitted). Equitable estoppel, on the other hand, permits the tolling of the statute of limitations in extraordinary circumstances where the plaintiff knew of the existence of his cause of action, but the defendant's misconduct caused the plaintiff to delay in bringing suit.  See *Conklin v. Jeffrey A. Maidenbaum, Esq.*, No. 12-CV-3606, 2013 WL 4083279, at *5 (S.D.N.Y. Aug. 13, 2013) ("Equitable estoppel applies only where the plaintiff can show that egregious wrongdoing by a defendant prevented the plaintiff from bringing suit on a claim of which the plaintiff was aware." (internal quotation marks omitted)).

242.    Furthermore, Defendants are estopped from relying on any statute of limitations because of their concealment of the truth, quality, and nature of their wrongful conduct and because of their continuation of the wrongful conduct against Plaintiff in the United States.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all triable issues herein.

Dated: New York, New York                                        Respectfully submitted,
      October 30, 2020

_____

Irina Shpigel, Esq.