Irina Shpigel
Shpigel and Associates, P.C.
*Attorneys for Plaintiff*
250 Greenwich Street, 46th Floor
New York, New York 10007
E-mail: ishpigel@iselaw.com
T 212-390-1913
F 646-355-0242

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AKHMED GADZHIEVICH BILALOV, an individual,<br><br>Plaintiff,<br><br>- against-<br><br><br><br>HERMAN GREF, SBERBANK CIB USA, INC., SBERBANK OF RUSSIA PJSC, and DOES 1-100 inclusive<br><br>Defendants. | Civil Action No.  20-Civ-09153<br><br><br>**SECOND AMENDED COMPLAINT** |

Plaintiff, AKHMED GADZHIEVICH BILALOV (hereinafter referred to as "Plaintiff"), by and through undersigned counsel, alleges upon information and belief the following against Defendants HERMAN GREF and SBERBANK CIB USA, INC.; (hereinafter referred to as "Sberbank").

### PRELIMINARY STATEMENT

1.      Between at least February 2013 and October 2019, the Defendants orchestrated and led a conspiracy throughout Russia and the United States, aimed to defraud Plaintiff of his

ownership interest of Krasnaya Polyana AO, using classic Reiderstvo tactics including sophisticated methods of coercion, fraud, money laundering., mercury poisoning, and through use of politicians and legal institutions.

2.   This action arises out of a textbook case of Russian corporate raiding against Plaintiff and his company "Krasnaya Polyana, AO," located in Sochi, Russian Federation (the "Krasnaya Polyana").

3.      Defendants became interested in acquiring Plaintiff's Company because of the income potential provided in the years leading up to and in the wake of the 2014 Olympics.

4.      Initially, Defendants offered Plaintiff realistic restructuring options, but ultimately it became clear that they purposefully maneuvered Plaintiff into a position where he was essentially trapped.  Defendants then triggered a series of phony civil divestitures proceedings and criminal cases, which ultimately resulted in Defendants' takeover of Krasnaya Polyana.  A key component to Russian corporate raiding is the undue influence over Russian courts, which Defendants have taken advantage of to Plaintiff's detriment.

5.      Defendants transferred the shares and assets of Krasnaya Polyana through the use of multiple offshore companies and straw men to disguise the conspiracy's true participants and beneficiaries.  Defendants sought to hide their identity from both Plaintiff and the Department of Economy and Finance of the Government of the Russian Federation under current President V. Putin.  Defendants worked in concert in order to steal the company.

6.   Upon information and belief, Defendants also used U.S. banks to further the conspiracy, subsequently investing some of the apparent proceeds of the crime in the United States.

7.   This type of illicit scheme is a common *modus operandi* in Russia.  It is carried out through well-known techniques and is internationally known as "Reiderstvo."  These techniques include

fraud, bribery, forgery, corruption, intimidation, and ultimately expropriation of the targeted company. Reiderstvo often involves private and public-sector white-collar criminals conspiring with state organizations, including law enforcement agencies, as well as high level sitting politicians and their family members. *See* Dr. Louis Shelley and Judy Deane, *The Rise of Reiderstvo: Implications for Russia and the West* (2016).

8. While nicknamed as a Russian phenomenon, Reiderstvo commonly includes activities outside of Russia, i.e., the use of shell companies in various jurisdictions (including the United States) to hide the beneficial owners, the use of foreign correspondent banks to move funds in more efficient foreign currency- such as Euros and dollars- and investment of the proceeds. *Id*.

9. Raiderstvo is a tactic that was formerly used by organized crime groups during the late Soviet era. The term refers to a practice whereby organized crime groups extracted 'protection money' from the bazaar (marketplace) traders. *See* Firestone, T. 2008. *'Criminal Corporate Raiding in Russia'*, The International Lawyer, 42, 4. This practice was formerly known as Krysha, which means roof, and a Krysha could also attack competitors. *Id*. Black' or 'bandit' raiding involved illegal activity and the use of force or intimidation whereby organized criminal groups sent armed men to a business's premises to remove assets including cash, computers, and machinery physically. Firestone, T. 2008. *'Criminal Corporate Raiding in Russia'*, The International Lawyer, 42, 4.

10. After the Soviet Union collapsed, raiders' tactics shifted to large-scale theft and seizure of state property and sophisticated methods of coercion, through the use of politicians and legal institutions. *Id*.

11. Government officials and private entrepreneurs actively participate in Reiderstvo with journalists, lawyers, accountants, judges, and law enforcement. *Id*. Use of force is still present but

is used together with bribery and other legal and administrative tools. *Id*. The use of bribery and informal networks of influence often "grant access to the security services, customs, courts, and regulatory agencies, which can be manipulated to acquire, for instance, corporate documents or favorable judgments" Rochlitz, M. 2014. *'Corporate Raiding and the Role of the State in Russia'*, Post-Soviet Affairs, 30, 2-3.

12. "Indeed, the use of the state apparatus plays such a significant role in corporate raiding that the consensus among academics is that it is nearly impossible to conduct a raid without government assistance." Rochlitz, M. 2014. *'Corporate Raiding and the Role of the State in Russia'*, Post-Soviet Affairs, 30, 2-3.

13. For example, a tactic of corporate or minority shareholder attack that is often used by raiders is achieved through the manipulation of shareholder rights. *Id*. A raider buys out a minority shareholder, often through manipulation or bribery, to acquire a stake in the company. *Id*. As a shareholder, the raider obtains access to corporate records and begins to investigate any weaknesses in the company's legal status that would later allow the raider to seize control of the company. *Id*.

14. As demonstrated herein, Defendants' actions fit the pattern from the very launch of the attack, from the manipulations of local law enforcement to the laundering of assets through offshore companies, to the use of U.S. dollars, U.S. correspondent banks, and U.S. investments.

15. A compromised and corrupt Russian judiciary facilitates the Reiderstvo phenomenon. It leaves the victims no meaningful forum in which to seek damages for the expropriation of their assets.

16. As more fully discussed below, this action is necessitated as a result of Defendants classic Reiderstvo scheme to divest Plaintiff of his shares and rightful ownership of "Krasnaya Polyana,

AO".

17. This civil action is based upon violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), which was specifically intended by Congress to eradicate organized crime on all fronts (including in foreign and interstate commerce) and to deprive violators of their ill-gotten gains.  It is also based upon violations of standards of common law, including fraud, unjust enrichment, malicious abuse of process and conversion (federal and state common law), and conspiracy to commit such torts.

## THE PARTIES

18. Plaintiff Akhmed Gadzhievich Bilalov is an individual over the age of 18, and resident of Florida.  He is a former Russian businessman and politician, and at all material times herein, was a majority shareholder and owner of Krasnaya Polyana, AO.

19. Sberbank of Russia PJSC (hereinafter "SberBank") is a Russian banking institution with offices and branches in New York. It conducts significant business operations in the State of New York and within the Southern District of New York, are subject to the personal jurisdiction of the courts in the Southern District of New York, and/or have agents within the Southern District of New York.

20. At all relevant times, Sberbank of Russia maintained offices in New York City through a directly or indirectly controlled subsidiary, which was and is critical to Sberbank's combined corporate structure and operations.

21. Sberbank of Russia operates in the United States and New York through its subsidiary SberBank CIB USA Inc. ("SberBank CIB), which is located at 152 W. 57th Street, 46th Floor, New York, New York 100019.

22. Sberbank also offers alternative depository receipts which trade on U.S. over-the-counter

markets. In an April 2018 interview with the *Financial Times,* Herman Gref, the Chairman of

Sberabk's executive board, boasted that at least 25 percent of Sberbank's shareholders are located

in the United States, claiming that its American ownership was so substantial that "[w]e don't need

lobbyists. Our American shareholders do that for us." This makes Americans the single largest

group of Sberbank shareholders other than the Government of the Russian Federation, which owns

51% of the bank.

23. Sberbank purposely avails itself of the courts of this Circuit to resolve its disputes, having

done so as recently as 2018.

24. In recent years, according to public reports, Sberbank spent hundreds of thousands of

dollars on lobbying the U.S. Government for the stated purpose of "assessing possible ways to

address sanctions relief."

25.      Defendant SberBank CIB USA, INC. (hereinafter SberBank CIB)  is a company

organized in 1997 under the laws of the State of Delaware with its principal place of business and

headquarters located in New York, New York. Defendant SberBank CIB is a registered broker-

dealer pursuant to Section 15(b) of the Securities and Exchange Act of 1934. The company is also

registered as an Introducing Broker with the Commodity Futures Trading Commission and is a

member of the National Futures Association. Defendant Gref used Defendant SberBank CIB USA,

Inc., to launder the instrumentalities and proceeds of the wrong described below through U.S.

banks.

26. Sberbank CIB and SberBank of Russia both played a crucial role in the conspiracy, along

with the other Defendants named herein.

27. Sberbank CIB was created in 2012 as part of the integration of Sberbank and Troika Dialog.

28. Defendant Herman Gref is a Russian politician and businessman.  At all relevant times

herein, Herman Gref is and was the CEO and chairman of the executive board of Sberbank. Defendant Gref was a key participant in the scheme that undertook direction actions meant to strip Plaintiff Bilalov, of his assets and created conditions for other co-defendants to likewise take such action.

29. Upon information and belief Does 1-100 are individuals and entities whose names and addresses of residences are unknown.

30. The DEFENDANTS are and were, during all relevant times, responsible for the acts and omissions of their employees, for acts undertaken within the general area of their authority and for the benefit of the  DEFENDANTS. As alleged herein, the DEFENDANTS were central figures in the overall conspiracy that actively embarked on and extensively participated in the fraudulent scheme. By means of corporate policies that put the DEFENDANTS' resources and strategy at the heart of the conspiracy, the  DEFENDANTS were and are aggressor entities that acted to harm the economic interests of the Plaintiffs.

31. The DEFENDANTS, during relevant times, adopted a policy that purports to exercise control of the activities of their employees, as well as those of their direct and indirect subsidiaries. Under this policy, the DEFENDANTS have undertaken responsibility for the acts of the employees of the  DEFENDANTS, wherever taken, including acts related to money-laundering activities within the United States.

## JURISDICTION AND VENUE

32. Jurisdiction is proper in this District as this case involves violations of Federal Law and thus involves federal questions and violations against a foreign citizen.

33.  This Court has jurisdiction under 28 U.S.C. §1332 because the parties are citizens of

different states and the amount in controversy exceeds $75,000.00.

34. Jurisdiction over Sberbank of Russia PJSC is proper in this court on the grounds that Plaintiff's claim arise from Sberbank of Russia's conduct in New York. Sberbank of Russia trades on the New York Stock Exchange, conducts business within the United States and has purposefully availed itself of this Court's jurisdiction in previous litigation.

35. Jurisdiction over the remaining Defendants is proper on the grounds that they are all co-conspirators who committed acts in furtherance of a conspiracy which they knew included acts in the United States, such as using U.S. banks for the transfer of the money and/or U.S. dollar payments for the assets of the company.

36. Pursuant to 28 U.S.C. § 1332(a), "[a] case falls within the federal district court's original diversity jurisdiction only if diversity of citizenship among the parties is complete, i.e., only if there is no plaintiff and no defendant who are citizens of the same State." *Wisconsin Dept. of Corr. v. Schacht*, 524 U.S. 381, 388, 118 S.Ct. 2047, 141 L.Ed.2d 364 (1998) (internal quotation marks and citation omitted).

37. Additionally, Rule 4(k)(2), Federal Rules of Civil Procedure, provides federal courts with personal jurisdiction over a foreign defendant "in federal question cases and if the foreign defendant has sufficient contacts with the United States to satisfy due process requirements." See *Eskofot A/S vs. EI Du Pont De Nemours & Company*, 872 F. Supp. 81 - Dist. Court, SD New York 1995.

38. Defendants are subject to this Court's personal jurisdiction under N.Y. C.P.L.R. §302(a) which provides that: "…a court may exercise personal jurisdiction over any non-domiciliary who, either "in person or through an agent": (i) "transacts any business within the state or contracts anywhere to supply goods or services in the state"; (ii) "commits a tortious act within the state";

(iii) "commits a tortious act without the state causing injury to person or property within the state ... if he [a] regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or [b] expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce"; or (iv) "owns, uses or possesses any real property situated within the state." N.Y. C.P.L.R. §302(a)(1)-(4).

39. "[C]ourts have explained that section 302 is a `single act statute' and proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted." *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 170 (2d Cir.2010) (internal quotation marks omitted); see also *Baron Philippe de Rothschild, S.A. v. Paramount Distillers, Inc*., 923 F.Supp. 433, 436 (S.D.N.Y.1996) ("Personal jurisdiction pursuant to section 302(a)(1) may be satisfied with proof that just one transaction occurred in New York as long as defendants' activities were purposeful and substantially related to plaintiffs' claim.").

40. Foreign defendants can be subject to personal jurisdiction where another party "engaged in purposeful activities in the state ... with the consent and knowledge of the defendants, who both benefitted from those activities and exercised extensive control over [the party] in the transaction underlying th[e] suit." *Retail Software Servs., Inc. v. Lashlee*, 854 F.2d 18, 22 (2d Cir.1988); see also *Kreutter v. McFadden Oil Corp*., 71 N.Y.2d 460, 467, 527 N.Y.S.2d 195, 522 N.E.2d 40 (1988).

41. Venue is proper in this Court pursuant to 18 U.S.C. § 1965(a) because DEFENDANTS reside, are found, have an agent, or transact affairs in this district. Venue is also proper in this Court

pursuant to 18 U.S.C. § 1965(b) because, to the extent, any DEFENDANT may reside outside of this district, the ends of justice require such DEFENDANT or DEFENDANTS to be brought before the Court. Venue properly lies in this Court pursuant to 28 U.S.C. §1391(c)(3), which authorizes an action against an alien in any district. Venue is additionally proper in this court for all Defendants pursuant to 28 U.S.C. §1391(b)(2) because substantial actions in furtherance of the conspiracy giving rise to Plaintiff's claims occurred in this District, or, alternatively, pursuant to 28 U.S.C. § 1391(a)(2). Further, certain of the conspiratorial acts alleged herein took place within this judicial district.

42. Jurisdiction and venue are also proper in this District as many of the predicate acts, including multiple threats and acts of intimidation, as described herein, occurred in this District.

43. Jurisdiction and venue are thus proper.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

44. In 2006, Plaintiff and his brother Magomed Gadjievich Bilalov purchased a ski resort, "Gornaya Carousel," located in Krasnaya Polyana, Sochi Region, Russia – an ambitious project aimed at the construction of new expressway, lift, and other real estate development.

45. In 2006, Plaintiff's brother, Magomed Bilalov, became the owner of 84.85% shares of JSC "Krasnaya Polyana."

46. The shares mentioned above were jointly owned by Plaintiff. Plaintiff authorized his brother and his wife to manage the project because Plaintiff was involved in politics.

47. In 2007, the Olympic Committee awarded the 2014 Winter Olympic Games to the City of Sochi. The "Krasnaya Polyana" region of Sochi suddenly aroused the interest of investors. As a result, the Government of the Russian Federation announced that "Krasnaya Polyana" would be included as part of the prospective Olympic projects for the construction of the ski jumping

complex with a planned 15,000 seats. The project also included "Gornaya Carousel," where a mountain media village and hotels for 2,658 rooms were to be constructed. The building and financing of the infrastructure, including roads, networks, and other projects, were to become the Russian government's fiscal responsibility.

48. At this time Herman Gref, was Russia's Minister of Economics. After the Olympic Committee awarded the 2014 Olympic Games to the City of Sochi, Herman Gref was removed as the Minister of Economics in the fall of 2007. In November 2007, Herman Gref was named as the Chairman of SberBank.

49. In 2008, under SberBank's initiative and pursuant to the direction of the Government of the Russian Federation, SberBank's Chairman Herman Gref and his vice-chair Stanislav Kuznetsov, SberBank Capital, a 100% subsidiary of SberBank, became the investor of "Krasnaya Polyana."

50. As per the terms of this agreement, SberBank and SberBank Capital took on the financial responsibility to issue a credit line in amount of 40 billion rubles for construction of the ski jumping complex and other objects and infrastructure.

51. However, the aforementioned obligations were never executed. SberBank only provided a bridge loan of 1 billion rubles at an interest rate of 10%-15%. SberBank, renegotiated the 40 billion financing commitment and instead offered to directly buy 25% of the company. As a result of berBank's failure to fund the project, "Krasnaya Polyana" was forced to obtain additional high interest loans from the VneshEconomBank ("VEB") collateralizing its shares.

52. At the same time, Mr. Kuznetsov, Mr. Gref's vice-chair, became the Chairman of the Board of "Krasnaya Polyana"

53. As more fully described below, SberBank and German Gref set a plan in motion to obtain

control of the company from Plaintiff and his brother by undue influence, fraud, and threat of bodily harm with the help of both private and state players which include SberBank, SberBank Capital, Herman Oskarovich Gref, his son, Oskar Olegovich Gref (as a beneficiary), Kuznetsov Stanislav Konstantinovich, Kozak Dmitry Nikolaevich, a Turkish construction company Sembol, as a company which had corrupt ties to SberBank Capital, Herman Oskarovich Gref and Kuznetsov Stanislav Konstantinovich), Rixon, Gutseriev Mikhail Safarbekovich, an individual who fraudulently obtained 41,429% of shares of "Krasnaya Polyana".

54. In 2008, despite guarantees of SberBank and SberBank Capital of investment of 40 billion rubles to "Krasnaya Polyana," only 2.7 billion rubles were invested, as a result of which SberBank Capital, which was a 100% subsidiary company of SberBank, gained control of 25.01% of shares of "Krasnaya Polyana."

55. From their entry into the project, in 2008, Defendants, specifically SberBank Chairman Herman Gref, his vice chair Stanislav Kuznetsov, and the Deputy Prime Minister of the Russian Federation Dmitriy Kozak, as well as other officials, jointly began to execute planned actions aimed to misappropriate shares of "Krasnaya Polyana," which were jointly owned by Plaintiff and his brother.

56. In 2008, under the State program for financing and construction of the Olympic objects, the government committed to build a road from the existing route A148 to the border of the "Krasnaya Polyana" location, where the ski-ramp was located.

57. However, as a result of negligent actions of Dmitry Kozak and Herman Gref, financing of said road was never completed, which consequently led to a substantial cost increase for construction of the ski-ramp.

58. This negligence and subsequent increase of the cost of construction created the necessity

of additional financial involvement of SberBank, which is exactly what Defendant Herman Gref and his accomplices planned for to implement their unlawful actions to take over control of the "Krasnaya Polyana" shares, which belonged to Plaintiff and his brother.

59. As of 2010, Plaintiff and his brother were shareholders of 60% of the "Krasnaya Polyana", SberBank and its affiliate, SberBank Capital, under personal control of Herman Gref owned 25%, Krasnodar Region owned 11%, Independent fund InvestAD (UAE) owned 4% and "Krasnaya Polyana" remained the largest developer and builders in preparation of the 2014 Winter Olympic Games in the City of Sochi, while Mr. Kuznetsov continued to hold the Chairman of the Board position.

60. Prior to 2012, construction of the site was successfully performed by the company "Transcomstroy", which was controlled by Plaintiff's brother; and as a result of successful performance, in the beginning of 2012, Plaintiff's brother received a State award from the President of the Russian Federation V.V. Putin for organization of construction of Olympic facilities and successful test competitions.

61. However, in the middle of 2012, under the pressure of the SberBank Chairman Herman Gref and without any sufficient reason and grounds, the subcontractor "Transcomstroy" which was controlled by Plaintiff, and which executed construction of the object at the price not exceeding $1,800.00 USD for 1 sq. m, has been replaced with the Turkish construction company "Sembol" (a partner of Rixos), which invoiced the same amount of work for more than $3,000 USD for 1 sq. m. and didn't guarantee deadline compliance.

62. After "Sembol" was contracted, the construction budget was increased by $1 billion USD, after which the company started to lose money.

63. It is a public information that "Sembol" is closely associated with and financed by

DenizBank, and both have close ties to Turkish government.

64. When Herman Gref introduced "Sembol" as general contractors, he insisted on investing additional capital in the amount of $50 million USD for all partners to assure that the company's worth will be exceeding $800 million USD after which Sberbank and Herman Gref became managing partners.

65. There was an undisputed conspiracy between SberBank, Chairman of SberBank Herman Gref, SberBank Capital and Stanislav Kuznetsov, because the aforementioned persons imposed the company Sembol and its terms to "Krasnaya Polyana", and because the terms of Sembol were knowingly worse than the terms of Transcomstroy.

66. This situation led to a conflict between Plaintiff's brother and Herman Gref, as a result of which Herman Gref and his accomplices were able to remove Plaintiff's brother from management of "Krasnaya Polyana" and started to threaten Plaintiff and his family with bodily harm and even death.

67. Thus, since the middle of 2012, the project implementation and the management of construction performed by "Krasnaya Polyana" was under personal control of Herman Gref and his entrusted persons, including Defendants named herein.

68. Plaintiff and his brother were no longer involved in the company's management or managerial decision-making.

69. The actions of Chairman of SberBank Herman Gref, Dmitriy Kozak, Stanislav Kuznetsov and other third parties, led to additional financial investment whereas a number of Plaintiff's shares in "Krasnaya Polyana" had been purposefully diluted to 41.429 %.

70. These actions were made under false pretenses of investment to be made by the Turkish construction company "Sembol" which, however, didn't comply with its financial obligations and

in turn, needed to be funded with the help of the state capital issued by SberBank, which confirms the existence of unlawful and possible corruptive ties.

71. The unlawful actions of Defendants and the Turkish construction company Sembol increased the cost of construction, and therefore reduced the value of shares of "Krasnaya Polyana."

72. On or about February 2, 2013, an agreement was reached during a meeting which was held with participation of SberBank Chairman Herman Gref, Vice Prime Minister Dmitriy Kozak and Plaintiff's brother, whereas it was agreed, that after completion of the Olympic Games, an actual division of assets would be made, namely 1/3 of the assets (the upper part) which included elite buildings, had to be allocated and transferred to Plaintiff and his brother.  The other 2/3 (the lower part), had to be allocated and transferred to SberBank.

73. As a result of the aforementioned meeting, corresponding minutes were signed by Herman Gref; however, neither Herman Gref, nor Dmitriy Kozak performed under the reached agreement.

74. While continuing to exert and trying to influence Plaintiff and his brother, Herman Gref held another meeting with participation of Dmitriy Kozak and Plaintiff, whereas he demanded to transfer all shares of "Krasnaya Polyana" to him or his affiliates.

75. During this meeting, Herman Gref stated, that if the shares of "Krasnaya Polyana" would not be transferred in the shortest possible timeframe to the parties indicated by Herman Gref or Dmitriy Kozak, Plaintiff and his family personally would face serious problems, including bodily harm or death.

76. From then until this day, Plaintiff has reasons to be afraid for his life and health, because threats to life and health which were made during the meeting by Herman Gref and Dmitriy Kozak were brought to life; Plaintiff was poisoned with mercury (as confirmed by appropriate analysis

and medical documentation) as Plaintiff had to go through a long medical treatment under the supervision of Professor Kelling in the Clinic of Baden-Baden, Germany.

77. In February of 2013, after Plaintiff and his brother refused to transfer shares owned in "Krasnaya Polyana" to affiliates indicated by Herman Gref, Dmitriy Kozak and Alexander Tkachev and in order to misappropriate shares of "Krasnaya Polyana", the aforementioned Defendants presented a libelous report to the President of the Russian Federation, Vladimir Putin, during a live TV broadcast, where Gref falsely indicated that Plaintiff's brother solely managed the construction site and was responsible for failure to meet construction deadlines as well as for increased cost of construction; which was false, because since 2012, the construction was performed by Herman Gref's institutions and by the Turkish construction company Sembol, which was personally selected by Herman Gref.

78. This falsified report of Herman Gref and Dmitriy Kozak against Plaintiff and his brother was an intentional and well-planned slander and was relied on by Putin to the detriment of Plaintiff. The purpose of the statement was aimed to obtainPlaintiff's assets (shares in "Krasnaya Polyana") and resulted in baseless and unlawful initiation of criminal prosecution of Plaintiff.

79. As of March 2013, Plaintiff's brother was an actual shareholder of 41.429% (1426 ordinary shares) of "Krasnaya Polyana", which was the largest developer of sports facilities in the capital of the 2014 Olympic Games in the City of Sochi.

80. "Krasnaya Polyana" was engaged in construction of the ski resort "Gornaya Carousel", which was one of the key centers of the ski infrastructure of the Winter Olympics. The complex included the Olympic ski-ramps K-125 and K-59 with a total capacity of 15 thousand spectators.

81. The second project of "Krasnaya Polyana" was the Olympic Media Village, which included the construction of commercial entertainment and sports centers, water park, tennis courts and

other objects of service infrastructure.

82. In accordance with financial analysis prepared by "SberBank," the total value of 41.429 % of shares or 1426 ordinary shares (shares of the JSC "Krasnaya Polyana") totaled $328 million USD (800 million x 41/100).

83. In March of 2013, Plaintiff's brother had a meeting with Mikhail Gutzeriev.  In the meeting, he threatened Plaintiff and his family with the threat of violence, continuation of baseless and unlawful criminal prosecution and to deprive all of their possessions if they would not transfer the 41.429% (1426 shares of  "Krasnaya Polyana") for the price of $20 million USD, which was at least 40 times less than the actual value.

84. During the meeting, Mikhail Gutseriev called Herman Gref directly, and through the loudspeaker Herman Gref gave instructions: "take everything from Bilalov's family at the lowest possible price, preferably for free."

85. Mikhail Gutzeriev guaranteed that if Plaintiff's brother would sign the documents, any prosecution would be terminated, and he would be "left alone."

86. Mikhail Gutzeriev also guaranteed that he would share with Plaintiff's brother, half of the acquired assets, including political and financial dividends equally, i.e., 50% to Mikhail Gutzeriev and its institutions and relatives, including Mikhail Osmanovich Shishkhanov, and 50% to Plaintiff.

87. In March of 2013, as a result of threats and actions taken against Plaintiff, being scared for his life and safety, Plaintiff's brother and Plaintiff were forced to sell 41.429% (1426 shares of "Krasnaya Polyana") for the price of $20 million USD, which was 40 times less than the actual value.

88. On March 14, 2013, under physical and emotional pressure, Plaintiff transferred 601 shares

of "Krasnaya Polyana."

89. Plaintiff never gave any instruction to transfer nor personally transferred any other shares, however, as Plaintiff found out from mass media, the aforementioned deals were completed, illegally and without Plaintiff's consent or participation.

90. Presently, all illegal actions against Plaintiff and his family continue, criminal cases are being unlawfully initiated and investigated, informational personal attacks continue, and Plaintiff is still receiving threats of a physical and financial nature.

91. Mikhail Gutzeriev never fulfilled promised conditions after receiving 41.429% of shares of "Krasnaya Polyana", even further, he gave permission to Herman Gref to institute additional dilution of shares, where institutions of SberBank purchased additional issued shares of "Krasnaya Polyana" as well as part of Mikhail Gutzeriev's shares and allowing SberBank to become the owner of 92% of "Krasnaya Polyana."

92. As a result of these transactions, as reported by mass media, Mikhail Gutzeriev received a number of financial preferential benefits from SberBank and its institutions, including unlimited lines of credit for the purchase of real estate, shopping malls, warehouses, etc.

93. As a result of these transactions, by the end of 2013, Gutzeriev's family net worth reached $4.9 billion USD, and in subsequent years, namely 2015-2016, reached $15 billion USD.

94. In particular, while convincing Plaintiff and his brother to trust him, Mikhail Gutzeriev cited his own situation as an example, namely initiation of the criminal case against him in 2007 on the basis of failure to pay taxes by "Rusneft" in an especially large amount (a company which is controlled by Gutzeriev M.S.).

95. In 2007, Gutzeriev sold his company to a "businessman from the government" Oleg Deripaska at the price indicated by him, and after he "resolved all of his issues," Gutzeriev returned

to Moscow and repurchased "Rusneft" from Deripaska; however, at that time, the company had serious financial problems and Gutseriev needed financial support of the SberBan" and Herman Gref, in order to resolve financial problems and avoid bankruptcy.

96. Thus, Mikhail Gutseriev, who was in a desperate need of money for refinancing his shares of the company "Rusneft" and for repayment of other financial liabilities, offered Herman Gref his assistance in acquiring "Krasnaya Polyana" shares at knowingly lowered price in exchange for financial support from SberBank issued to him and his family.

97. After Plaintiff signed a consent to sell a part of shares (being threatened and under pressure) and when other transactions to which Plaintiff did not give his consent were completed, Mikhail Gutseriev got control of 41.429% of "Krasnaya Polyana" shares, which belonged to Plaintiff and his brother, and while colluding with the Chief of SberBank Herman Gref, he approved an additional emission and further purchase of shares by the institutions of "SberBank" at a substantially lowered price.

98. As compensation, Gutseriev received a possibility to hedge the risks of falling oil prices by more than $700 million USD from SberBank and its affiliates and Herman Gref personally.

99. As a result of illegal collusion with Herman Gref, Mikhail Gutseriev and his institutions received hundreds of millions of USD under the patronage of Herman Gref, and together with his institutions, he (Mikhail Gutseriev) purchased: MDM Bank, a number of development projects in New Moscow, Non-government pension fund "Raiffeisen", oil and construction companies, banks, pension funds, hotels and business centers, retailers "Eldorado" and "Tekhnosila", the Sberbank Ukraine, which is a subsidiary of the Russian SberBank and remitted $3 billion in debt of "Rusneft"; all of the above confirms the existence of close and informal ties between Mikhail Gutseriev and Herman Gref.

100.     Even further, as a result of Defendants' unlawful actions, namely illegal deprivation of Plaintiff's assets, by forcing Plaintiff to sign an agreement, so that Plaintiff's brother would sell shares of "Krasnaya Polyana", and by organizing the execution of other documents, which led to the transfer of their stake in "Krasnaya Polyana" to the institutions of SberBank, Mikhail Gutseriev agreed to commit these illegal actions against Plaintiff in exchange to receiving from Herman Gref, the Chairman of SberBank, an unlimited access to unprecedented credit lines for purchase of the large-scale real estate, including shopping malls, at a deliberately low rate, which was implemented by using public funds for personal purposes on the terms which were obviously unfavorable to the State and it is an undisputed proof of corruption committed by a group of people with participation of D.N. Kozak, S.K. Kuznetsov, and the Chairman of SberBank Herman Gref.

101.     Thus, the organized group consisted of the Defendants including SberBank, the institutions controlled by  SberBank, Herman Gref  and third parties related to them, exercised their intention to deprive Plaintiff of his assets (41.429% of shares in "Krasnaya Polyana") through physical and moral threats, illegal initiation of criminal cases and attempt of physical elimination of Plaintiff and members of his family.

Money Laundering Scheme

102.     The DEFENDANTS have been actively involved in money laundering for many years through the Troika Laundromat, and have carried out their scheme through acts within this district and throughout the State of New York. Examples of the methods and means by which the DEFENDANTS have been complicit in the money-laundering scheme, directly and through the acts of their coconspirators, are set forth below.

103.     Troika Dialog which was acquired by Sberbank CIB, was founded by the American Peter Derby in 1991. In March 2009, the company announced a strategic alliance with Standard Bank Group under which Standard Bank will become a 36% shareholder in Troika Dialog.

104.     In March 2011, Sberbank agreed to acquire Troika Dialog for US$1 billion, through the purchase of a 63.6 percent stake held by a shareholder group led by Ruben Vardanyan, and a 36.4 percent stake held by South Africa's Standard Bank.

105.     In 2012 the brokerage firm has been acquired by Russia's biggest bank, Sberbank, for US$1bn and continued operation as a part of its investment banking division.

106.     The so-called Troika Laundromat was a financial network set up by a Russian investment bank to help high profile political and business clients move money out of the country and hide it in the United States and Europe. The scheme exported about $4.8 billion over seven years, with the help of U.S., Russian, and Lithuanian banks. The Troika Laundromat was operated by staff at an independent arm of the Russian investment bank Troika Dialog, which now part of Sberabnk and Sberbank CIB.

107.     The scheme consisted of at least 75 shell companies set up by Troika. Money was moved between them for deals that were entirely made up, including fake invoices, in order to disguise the recipients. In total, $8.8 billion of internal transactions were generated to obscure the source of the money. Clients used the funds to buy real estate or luxury yachts in the US and abroad, while criminal groups worked to launder illicit funds.

108.     The Laundromat wasn't just a money laundering system. It was also a hidden investment vehicle, a slush fund, a tax evasion scheme, and much more. Troika's clients also used it to buy properties in Great Britain, Spain, and the United States; to acquire Real Estate, luxury yachts and artwork; to pay for medical services and World Cup tickets; to cover tuition at

prestigious Western schools for their children, and even to make donations to churches. In addition, the Troika Laundromat enabled organized criminal groups and fraudsters to launder the proceeds of their crimes.

109.     In addition, the Troika Laundromat enabled organized criminal groups and fraudsters to launder the proceeds of their crimes. OCCRP and partners have identified several high-level frauds perpetrated in Russia that used Laundromat companies to hide the origins of their money.

110.     The Troika Laundromat is unique among the Laundromats that have been uncovered in recent years in that it was created by a prestigious financial institution and was managed by Russia's largest bank. The Scheme also had a strong relationship with Citibank Inc., with up to 20 percent of Troika's new investors coming via the American bank. That made New York-based Citibank Troika's biggest "external agent," according to a 2006 interview with Troika co-founder Pavel Teplukhin.

111.     The Defendants named herein have used the Troika scheme to move massive sums of money acquired in the Reidestvo scheme. The International Consortium of Investigative Journalists (ICIJ) indicated that major banks flagged $2 trillion worth of suspicious transactions between 1999-2017. The FinCEN Files investigation, led by 108 media outlets from 88 countries, is based on more than 2,100 leaked suspicious activity reports (SARs) submitted by banks to the U.S. Treasury's financial law enforcement agency.

112.     The investigation found suspicious banking activities by companies owned by Russian tycoons Oleg Deripaska, Arkady Rotenberg, Alisher Usmanov and Alexei Mordashov, as well as Sergei Roldugin. Deripaska moved at least $3 billion in 2002-2016 through a little-known Latvian bank to pay for lobbyists in Washington and private jets as well as real estate in New York.

113.     Rotenberg-linked Advantage Alliance moved 60 million pounds ($77.7 million) in 2012-2016 through London-based Barclays, with many transactions occurring after the Rotenbergs were sanctioned by the U.S. in 2014, A U.S. Senate investigation accused Rotenberg of circumventing sanctions by buying expensive art through Barclays.

114.     An Usmanov-linked offshore holding company paid $6 million in "service" fees to influential Putin adviser Valentin Yumashev through JP Morgan Chase Bank in 2006-2008.

115.     According to FinCen reports almost a million dollars was laundered through South Florida branch of Bank of America, via realtor who used Sberbank laundered assets to help fund Syria's chemical weapons program.

116.     Lastly, Sberbank and CIB Sberbank, the entities which own, operate and manage Troika, have an intimate relationship with one of U.S. largest banks via its CEO, Gref who is a member of the JP Morgan Chase International Council.

117.     United States and European Union had sanctioned most of the parties involved on Plaintiff's plight, including Sbebrank itself. As seen from the instant case as well as thousands of cases coming from Russia, the country is not stable and political corruption is rampant. As such, if an individual is not a member of the Putin Inner circle, the individual may find himself exiled, arrested on fabricated charges, or worse assassinated via poisoning or a sniper.

118.     These KGB era tactics have been employed with impunity over the course of the past decade, and the only two countries where victims can find relative safety and justice are the United States and Great Britain, these counties have been the last beacon of hope for victims of Putin's inner circle, which frequently operates independent of their leader.

119.     Upon information and belief, the Plaintiff assets which were illegally obtained were in whole or in part transferred to and/or though the United States. The money was laundered

through the Troika Laundromat to avoid detection by authorities and to circumvent U.S. sanctions. The movement of financial resources by corrupt business and political leaders to the United States is a means of asset protection by members of the "inner circle" from the Russian corruption, that they created and maintain.

### Defendant's Retaliation of and Persecution of Akhmed Bilalov

120.    In 2013, the Defendants acting through intermediaries, provided money or things of value to the Russian Interior Ministry to open a criminal case against Plaintiff and his brother. The Russian Interior Ministry charge Plaintiff in absentia under Part 1 of Article 201 of Russia's Criminal Code (abuse of office in a commercial organization).

121.    Upon information and belief, in 2016, the charges against Plaintiff and his brother had been dropped. However, the Interior Ministry denied this, saying that both brothers had been put on 'the wanted list.' At the same time, no court orders were issued in absentia to arrest Plaintiff or his brother.

122.    Herman Gref and the Defendants either directly or through coconspiraators and intermediaries continued baseless and unlawful criminal persecution and investigations of Plaaintiff. Hermaan Gref and the Defendants either directly or through coconspirators sent death threats against Plaintiff and his family which forced Plaintiff to initiate actions to protect his rights and the rights of his family members.

123.    On or about April 27th, 2013 Herman Gref and the other Defendants either directly or through coconspirators and intermediaries attempted to poison Plaintiff with Mercury.

124.    In or around May of 2016, Plaintiff and his family, in fear for their lives, fled Russia and moved to New York.

125.    In late Spring of 2018, Plaintiff felt that sufficient time has passed, and he was now

able to back channel members of the "inner circle" in an effort to recover some of his assets.

126.     Plaintiff reached out to Defendant Kirill Androsov by telephone, a close friend and associate of Herman Gref for the purpose of settling his claims against Defendants in connection with the allegations contained in this Complaint.

127.     Plaintiff's initial contacts with Androsov showed promise as he was told that Gref wanted to amicably resolve the conflict, however, some time was needed. However, Plaintiff was told that if Plaintiff was to proceed with litigation, Gref would not be able to settle the case, as the matter would be taking a "political tone."

128.     The Defendants misrepresented to Plaintiff that Defendants are negotiating in good faith. The whole purpose of the negotiations was to lull Plaintiff into a false sense of security and to prevent him from pursuing his claims against the Defendants in the United States.

129.     Unbeknownst to Plaintiff, at the time of the negotiations, the Defendants had already filed false, unfounded, politically motivated charges against Plaintiff.

130.     Plaintiff did not pursue any claims against the Defendants in 2018 in reliance on Defendants misrepresentations that the Defendants will settle Plaintiff's claims in good faith.

131.     On or about March 4th, 2018 the DEFENDANTS, acting through intermediaries, provided money or things of value to foreign officials to obtain an Interpol red notice and/or diffusion against Bilalov. Bilalov was located in the U.S.A at the time. The red notice and/or diffusion was based on false, unfounded, politically motivated accusations. The defendant intended to cause Bilalov to be detained and deported to Russia, where Defendants would be able to use their influence to imprison and/or execute Bilalov, similar to the case of Magnitsky.

132.     For almost a year, Plaintiff spoke with Androsov by telephone and had his representative speak with Oleg Gref, Herman Gref's brother, all in a perceived contemplation of

an amicable settlement.

133.     In late April of 2019, Plaintiff was informed by Andrasov via telephone that Defendants' representative would meet with him in May for the May/June San Francisco Annual Conference.

134.     Defendants' representatives and/or agents traveled from Russia to the United States to meet with Plaintiff in furtherance of engaging in the criminal conspiracy, to manage, establish, carry on or facilitate the promotion, management establishment and carrying on of unlawful activity, mainly intimidation and extortion of Plaintiff.

135.     At the end of May 2019, Plaintiff went to San Francisco, to attend what he believed to be a settlement meeting with Defendants' representative.  In the lobby of the W hotel, he met with a Russian individual who introduced himself as Alexander Igorevich.  Following initial introductions, they proceeded to have lunch at the hotel restaurant. During lunch, Alexander Igorevich once again confirmed that he works with internal security of Sberbank, and that he is an active FSB major, representing the interests of both the Russian Federation and the State Owned Sberbank.

136.     Alexander Igorevich traveled from Russia to the United States to meet with Plaintiff in furtherance of engaging in the criminal conspiracy, to manage, establish, carry on or facilitate the promotion, management establishment and carrying on of unlawful activity, mainly intimidation and extortion of Plaintiff.

137.     In no uncertain terms, Alexander Igorevich informed Plaintiff that the Defendants and Sberbank had no intention of settling the matter and that if Plaintiff proceeds with an action against Sberbank or any member of the inner circle, such action would be perceived and presented back home as an act of treason, and the attempted poisoning would be nothing compared to what

may happen to both Plaintiff and his family.   Alexander Igorevich further indicated that the Defendants will use their reach in the United States to have Plaintiff arrested and they will use their reach in Russia to ensure that Plaintiff's family would have problems. The meeting lasted several minutes, as Alexander Igorevich simply concluded by telling Plaintiff to forget what he lost and start anew in the land of the free.

138.    Plaintiff returned to New York following the trip to San Francisco.   When he returned to New York, he contacted Androsov by telephone  and told him what had happened and that he would not surrender and that he will fight for his rights.  Androsov called Plaintiff "a fool" and that Plaintiff should be ready for "a new wave of problems."

139.    In July of 2019, as Plaintiff was exiting his apartment in New York, he was approached by two men, who were sent by the Defendants.  They both told him that they know where he lives, and they can get him anywhere.  They wished him a pleasant day and got into a car which was parked opposite the building.

140.    Two weeks later, one of the two men, who was sent by the Defendants, approached Plaintiff on his way home and showed him pictures of his wife entering and exiting their Miami apartment, and just told Plaintiff to "think of his family."

141.    In late August of 2019, Plaintiff once again contacted Androsov by telphone to see if things could be settled and to try and leave family out of the situation.  Androsov indicated that the situation is not within his control, but he would relay the message.  Within several days, almost immediately after the Labor Day weekend in September of 2019, when Plaintiff returned home to New York, he was greeted by the same two men from his prior encounter who were sent by the Defendants. The two men told him that Alexey Nikolaevich wanted to meet on Friday at the Plaza Hotel bar.

142.     That Friday, Plaintiff met an individual identified as FSB major Alexey Nikolaevich.  The meeting was very brief.  Alexey Nikolaevich was drinking his beer, and rudely told the Plaintiff that "trouble was coming," and that "U.S. authorities will arrest him soon," and "he will be extradited."   Plaintiff was further told that "everything was already arranged," that Plaintiff "will join his cousin in Lefortovo Prison," and while there, "many interesting things may happen including suicide, just like Vladimir Evdokimov" (former executive of RosKosmos, who allegedly committed suicide by stabbing himself numerous times while in solitary confinement).

143.     Fearing for his life, Plaintiff left New York that same day and went to Miami, where he believed to be safe.

144.     In or around October of 2019, while visiting the City of Miami, Plaintiff was wrongfully arrested based on the false information provided by Defendants to Interpol and to the United States Department of Homeland Security ("DHS").  The arrest took place just like Alexey Nikolaevich said he would be and there was an attempt to have him deported (extradited), however, following a brief detention, Plaintiff was released.

145.     Plaintiff filed an appeal with Interpol.

146.     Interpol blocked his file and removed the diffusion following a review of all relevant facts surrounding Plaintiff's situation.

147.     Based on the evidence to be presented by the Plaintiff, his situation clearly demonstrates that the Plaintiff is an unfortunate collateral victim of a politically and improperly motivated persecutory campaign. This campaign appears to be designed to destroy him and his cousin Ziyavudin Magomedov.

148.     This persecution campaign has the additional goal of misappropriating Plaintiff's assets and laundering the proceeds.

149.     Plaintiff is not alone in the view that the criminal allegations against him are a politically motivated fabrication.

150.     In his first correspondence with Interpol, which subsequently blocked access to his file and effectively removed the diffusion placed by Russia, Plaintiff highlighted the immediate reactions of well-informed observers, and the international press covering his case and the case of his cousin of Ziyavudin Magomedov; which point to the political nature of the arrests.

151.     It was established by Plaintiff that he was poisoned and the poisoning was linked to the persecution against him by the Defendants and the unlawful taking of his assets.

152.     Based on recent events, it has been shown that poisoning is a popular and established method of removing undesired elements from Russian political and business society.

153.     The recent poisonings of Alexei Navalny, Alexander Litvinenko, Sergei Skripal, and Julia Skripal are just some examples of the same methods used in the instant matter.

154.     The Magomedov, and Bilalov matters which are closely linked, are a well-orchestrated case of de-privatization

155.     As was also published by the United States Congress in its official records on March 28, 2019, the United States House Permanent Select Committee of Intelligence heard testimony from the U.S. Ambassador to Russia, Michael McFaul.

156.     Mr. McFaul raised the case of Ziyavudin Magomedov, as being a clear example of Putin's high-profile politically motivated nationalizations (or de-privatizations as McFaul puts it), of successful private enterprises.

157.     In his testimony McFaul stated the following: "*Putin and his proxies have considerably reduced the size of Russia's private sector and increased the role of the state in the economy*" [...] "*Not surprisingly, increased state ownership in the economy, a major*

*redistribution of property rights guided by political motivation rather than profit maximization, and a growing system of patronage and corruption more generally have not fostered economic growth.*" [...] "*High profile nationalizations (or de-privatizations)*" such as the seizure of the oil company Bashneft in 2014, or the arrest of billionaire Ziyavudin Magomedov, underscore the fragility of private property rights a quarter of a century after the end of communism.*"

158.     Ambassador McFaul further indicated in his testimony that one of the principal goals in the persecution of legitimate businessmen, such as Ziyavudin Magomedov, is to reduce the size of Russia's private sector and increase the role of the State in the economy.  This is executed by using corrupt law enforcement officials, and a willing and highly dependent Criminal Court system which McFaul describes as follows: "*Overall, the Russian court system has a reputation for being corrupt and easily manipulated for political ends. The selective application of the law – for example, why did Khodorkovsky go to jail, but oligarchs did not? – creates incentives to develop personal ties with Putin as the only rational strategy for preserving control over one's wealth. Russia's arbitration or economic courts used to be considered more independent than other courts, but their merger into the general system of courts in 2014 has decreased private access to the rule of law even further.*"

159.     A blatant example of corrupt law enforcement officials having a direct role in the matter is Deputy Chief Prosecutor Viktor Grin, who personally took part in drawing up and presenting charges in the cases of Khodorkovsky and Lebedev (case of Yukos), Browder and Magnitsky (Hermitage Capital Case), and Ziyavudin Magomedov.

160.     The European Court of Human Rights has already acknowledged that in the case of the Yukos Executives, the representatives of the Russian law enforcement agencies violated sections 6 and 7 of the European Convention on Human Rights.

161.     Viktor Grin was included in the United States Magnitsky sanction list and is present in a slew of other politically motivated de-privatization cases that have been sanctioned by the European Union, Canada, Latvia, Estonia, and other countries.

162.     Another representative of corrupt law enforcement, who also played a key role in the persecution, is investigator Nikolai Budilo, who was an active participant in the cases of William Browder and Sergey Magnitsky (Hermitage Capital Case), Mukhrat Ablyazov Case, and many other corrupt political persecutions. Nikolai Budilo has been added to the United States' Magnitsky sanction List.

163.     Direct Beneficiaries of the illegal actions of Grin and Budilo and other corrupt investigators and prosecutors, perpetrated against legitimate business-people such as Ziyavudin Magomedov and the Plaintiff, are members of Putin's "Inner Circle" and are also included on major U.S. and European Sanction lists.

164.     The "Inner Circle" consists of CEO and chairman of the executive board of Sberbank (U.S. Sanctioned Bank), Herman Gref, Transneft (the president is FSB Major-General Nikolay Tokarev); Rostec (the CEO is FSB Lieutenant-General Sergey Chemezov); one of the largest state banks VTB (the president is Andrey Kostin); the secretary of the Russian Security Council (FSB Army General Nikolai Patrushev); and Patrushev's son Dmitry Patrushev (a Minister of Agriculture of the Russian Federation).

165.     Ambassador McFaul further testified that "*Russia's prosecution against legitimate businesspeople like the plaintiff and Ziyavudin Magomedov, is happening with an alarming frequency. This is done to enrich Putin's KGB comrades and cronies, which he defines as the 'Inner Circle.' Putin put his people in charge, Putin loyalists now run Russia's largest oil and gas companies, Rosneft and Gazprom; Russia's largest military industrial conglomerate, Rostec;*

*Russia's major energy transportation company, Transneft; Russia's immense rail transport monopoly, Russian Railways; and Russia's largest banks.*"

166.    Most of the members of the "Inner Circle" are listed on multiple international sanction lists for their corruption, their kleptographic conversion of assets, and human rights violations.  They are specifically involved in the case of Ziyavudin Magomedov, his brother, and Plaintiff.

167.    Each Defendant crony herein was a direct beneficiary of the de-privatization present in this case.

168.    Specifically, Ambassador McFaul testified that: "*the Putin regime has occasionally jailed additional oligarchs in schemes that parallel the Khodorkovsky arrest." [...] "Putin continued to redistribute property rights, away from the 1990s-era "oligarchs" considered too independent and towards Putin's loyalists from the KGB and his St. Petersburg friends*."

169.    As a result of the de-privatization, above-mentioned members of Putin's "Inner Circle" were able to successfully steal Plaintiff's assets, specifically the resort which is the subject of the instant litigation as well as ninety percent of the Magomedov empire; an empire built with decades of hard work.

170.    Before their illegal and internationally criticized detention, Ziyavudin Magomedov was amongst Russia's most successful businessmen (top 100 wealthiest people in Russia).  He is now left with almost nothing.

171.    Using intimidation and extortion, the investigators were able to coerce favorable transfers of assets to the "Inner Circle;" while Plaintiff escaped with his life, fictitious criminal cases were being fabricated with the pretense of illegally taking his assets and Ziyavudin Magomedov remained incarcerated in deplorable conditions in Russia's most terrifying prison,

Lefortovo.  It was in Lefortovo prison where he executed documents asserting the conversion of his assets, under duress.

172.    Unfortunately, Putin's inner circle used Plaintiff's support for Medvedev and used Plaintiff's ethnicity to portray him as an enemy and a traitor paving the way for the de-privatization of his assets.

173.    Subsequently Defendant Gref and his associates illegally used their law enforcement and intelligence contacts to eliminate the Plaintiff and when that proved fruitless to incriminate him and have him arrested and extradited, however, that too proved fruitless.

174.    This undue influence was used to prevent Plaintiff from exercising his rights and he was afraid for his life due to the treats he received from credible and reliable individuals which represented agencies that acted on their threats in the past.

175.    Following his departure to Germany and then to the U.S., Plaintiff's concern was only to protect his life and the lives of his family members, he was recently poisoned and had to seek treatment in Germany to remove the toxic mercury form his system. Moreover, criminal charges were being fabricated against him and against members of his family.

176.    In December 2019, Plaintiff, through his lawyers, sent a demand letter to Defendant Sberbank outlining his legal position.  No response was ever received. However, following the letter, Plaintiff's family in Russia began to receive threats. Understanding that there is no other way to protect his interest but for litigation, Plaintiff brings the instant action.

177.    The type of ruthless Corporate and Government corruption that is seen in Russian Reiderstvo practices of which the Defendants regularly practice, is that which imperils the human rights of Plaintiff and the Russian people as a whole.

178.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff has

been financially damaged, deprived of ownership of Krasnaya Polyana AO, falsely accused of criminal activity, suffered loss of employment and employment opportunities due to Defendants actions as specified above. Defendants employed force, threats of force, fear and violence in an attempt to deprive plaintiff of pursuing civil and criminal claims against Defendants.

179.     Defendants through intermediaries, provided money or things of value to foreign officials to obtain an Interpol red notice and/or diffusion against Bilalov. Through their actions Defendants proximately and directly caused Bilalov to be detained. As a direct and proximate result of Defendants wrongful conduct as specified above, Plaintiff Bilalov suffered damages to his reputation and suffered a loss of employment opportunities.

180.     Defendant further suffered physical damages as a direct and proximate result of Defendants' attempt to poison Plaintiff with Mercury.

181.     Defendants obtained collectively more than $1,000,000,000.00 from Plaintiff through fraud and other Reiderstvo activities in Russia and the U.S. from 2013-2019.

## COUNT I

## (AS TO ALL DEFENDANTS) (RICO, 18 U.S.C. § 1962(a))

182.     Plaintiff reasserts and incorporates by reference the allegations in all preceding paragraphs above.

183.     The DEFENDANTS Gref, Sberbank and Sberbank CIB, along with their coconspirators Does 1-100, including associated "inner circle" members and companies, including institutions controlled by SberBank, Herman Gref, and third-parties related to them consisting of currency dealers, money brokers, and other participants in the schemes identified above, were, at all relevant times, an association-in-fact of individuals and corporations engaged in, and the activities of which affected, interstate and foreign commerce, and thus constituted an "enterprise"

within the meaning of 18 U.S.C. § 1961(4) (the "Sberbank Enterprise"). These persons and entities were and are associated in fact for the purpose, among others, of illegally engaging in fraud, bribery, forgery, corruption, extortion, intimidation, and money laundering criminal proceeds of the illegal activity to the economic detriment of Plaintiff. The Sberbank Enterprise is an ongoing organization whose constituent elements function as a continuing unit for the common purpose of acquiring private companies by illegal means, money laundering and carrying out other elements of the SberBank DEFENDANTS' scheme. The SberBank Enterprise has an ascertainable structure and purpose beyond the scope of the DEFENDANTS' predicate acts and the conspiracy to commit such acts. The Enterprise has engaged in and its activities have affected interstate and foreign commerce. The Enterprise continues through the concerted activities of the DEFENDANTS to disguise the nature of the wrongdoing, to conceal the proceeds thereof, and to conceal the DEFENDANTS' participation in the Enterprise in order to avoid and/or minimize their exposure to criminal and civil penalties and damages. The role of each DEFENDANT in the SberBank Enterprise has been set forth above.

184.            In connection with the fraudulent schemes set forth above, and to further their illegal aims, the DEFENDANTS have engaged in numerous acts of "racketeering activity." Each of the DEFENDANTS has aided and abetted each other of the DEFENDANTS and other coconspirators in committing those acts of "racketeering activity" within the meaning of RICO. 18 U.S.C. §§ 1961, et seq.; 18 U.S.C. § 2. The DEFENDANTS have committed multiple predicate acts of racketeering including, but not limited to:

(a.) Money Laundering. (18 U.S.C. §§ 1956(a)(1), 1961(1)(B)). Knowing that the property involved in certain financial transactions represented the proceeds of some form of unlawful activity, the DEFENDANTS conducted or attempted to conduct financial

transactions in interstate and foreign commerce involving the proceeds of specified unlawful activity with the intent to promote the carrying on of specified unlawful activity; or did so knowing that the transactions were designed in whole or in part to conceal or disguise the nature, the location, the source of ownership, or the control of the proceeds of specified unlawful activity, or did so knowing that the transactions were designed in whole or in part to avoid a transaction-reporting requirement under state or federal law. The DEFENDANTS knew that the property and funds they received in the manners outlined in this Complaint represented the proceeds of specified unlawful activity, including without limitation violation of human rights, wire fraud, mail fraud, and violations of the Travel Act. The DEFENDANTS knowingly conducted and attempted to conduct such financial transactions with the intent to promote the carrying on of such unlawful activity. In addition, the DEFENDANTS knowingly conducted and attempted to conduct such financial transactions with the intent to conceal or disguise the nature (proceeds of racketeering activity), the location, the source (through human rights violations, money launderers), the ownership, and/or the control of the proceeds of specified unlawful activity. Finally, the DEFENDANTS knowingly conducted and attempted to conduct such financial transactions to avoid transaction-reporting requirements under state or federal law, including without limitation currency and monetary instrument reports and to by-pass the United States sanctions against Russian persons and corporations involved in corruption and human rights violations: The Sergei Magnitsky Rule of Law Accountability Act of 2012.

(b.) International Money Laundering. (18 U.S.C. §§ 1956(a)(2), 1961(1)(B)). The DEFENDANTS transported, transmitted, and/or transferred monetary instruments or funds to a place in the United States from or through a place outside the United States with the intent to promote the carrying on of specified unlawful activity, or did so knowing that the monetary instruments or funds involved in the transportation, transmission, or transfer represented the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of a specified unlawful activity, or to avoid a transaction-reporting requirement under state or federal law. By such conduct, the DEFENDANTS engaged in financial transactions within the meaning of 18 U.S.C. § 1956(c)(4). Among other things, the DEFENDANTS knew that the funds sent from Russia to the United States represented the proceeds of specified unlawful activity, including without limitation violations of human rights, wire fraud, mail fraud, and violations of the Travel Act. The DEFENDANTS also knew that such specified unlawful activity violated 18 U.S.C. 656, which prohibits the embezzlement, misapplication, and abstraction of assets or securities entrusted to the custody or care of a bank.  The DEFENDANTS also aided and abetted violations of 18 U.S.C. § 1956(a)(1) and § 1956(a)(2).

(c.) Conspiracy to Engage in Money Laundering. 18 U.S.C. §§ 1956(h), 1961(1)). The DEFENDANTS conspired to commit offenses defined in 18 U.S.C. § 1956 – including § 1956(a)(1) and § 1956(a)(2). The DEFENDANTS, by their words and actions, agreed to accept currency, monetary instruments, and funds with the knowledge that

the currency, monetary instruments, and funds represented the proceeds of specified unlawful activity conducted by themselves and their coconspirators. The DEFENDANTS adopted the common purpose of the conspiracy and participated in its consummation. The goal of the money-laundering conspiracy was to deprive Plaintiffs of money and property while assuring that the profits derived from the Reiderstvo scheme were repatriated to the benefit of the DEFENDANTS in a clandestine manner to avoid detection and prosecution.

(d.) Money Laundering (18 U.S.C. §§ 1957, 1961(1)). DEFENDANTS knowingly engaged or attempted to engage in monetary transactions in the United States in criminally derived property having a value greater than $10,000 and derived from specified unlawful activity. 18 U.S.C. § 1957(f)(3) and § 1956(c)(7). DEFENDANTS engaged in monetary transactions, including deposits, withdrawals, transfers, or exchanges, in or affecting interstate or foreign commerce, involving funds or monetary instruments by, through, or to financial institutions. DEFENDANTS knew that the funds or instruments received by them represented the proceeds of specified unlawful activity, including but not limited to violations of various human rights, wire fraud, mail fraud, and violations of the Travel Act. The DEFENDANTS knew that such specified unlawful activity violated 18 U.S.C. 656, which prohibits the embezzlement, misapplication, and abstraction of assets or securities entrusted to the custody or care of a bank.

(e.) Money Laundering of Proceeds of Offenses Against a Foreign Nation Involving a Scheme to Defraud Foreign Banks. (18 U.S.C. § 1956(c)(7)(B)(iii); 18 U.S.C. § 1961(1)(B)). The DEFENDANTS, knowing that the property involved in a financial

transaction represented the proceeds of some form of unlawful activity, conducted or attempted to conduct financial transactions in interstate and foreign commerce involving the proceeds of specified unlawful activity with the intent to promote the carrying on of specified unlawful activity; or, knowing that the transaction was designed in whole or in part to conceal or disguise the nature, the location, the source of ownership, or the control of the proceeds of specified unlawful activity, or knowing that the transaction was designed in whole or in part to avoid a transaction- reporting requirement under state or federal law. DEFENDANTS engaged in and facilitated financial transactions and acts of money laundering that deprived foreign banks and domestic banks of money and property that would have been paid to such banks through the lawful transaction of business. DEFENDANTS knowingly engaged in financial transactions designed to launder the proceeds of fraud, or a scheme or attempt to defraud, foreign and domestic banks.

(f.)     Money Laundering of Proceeds of Violations of Foreign Corrupt Practices Act. (18 U.S.C. § 1956(c)(7)(D); 18 U.S.C. § 1961(1)(B)). In general, the Foreign Corrupt Practices Act (FCPA) makes it unlawful for DEFENDANTS, or any officer, director, employee, or agent thereof, to pay or promise to pay money or anything of value to any foreign official for purposes of influencing any act or decision of the foreign official in his or her official capacity, inducing such official to do or omit to do any act in violation of the lawful duty of such official, or securing any improper advantage, or inducing such foreign official to use his or her influence with a foreign government or instrumentality thereof to affect or influence any act or decision of such government or instrumentality, in order to assist DEFENDANTS in obtaining or retaining business

for or with, or directing business to, any person. "Foreign official" means any officer or employee of a foreign government or any department, agency, or instrumentality thereof, or of a public international organization, or any person acting in an official capacity for or on behalf of such entities.   On or about March 4th, 2018 the DEFENDANTS, acting through intermediaries, provided money or things of value to foreign officials to obtain an Interpol red notice and/or diffusion against Bilalov. Bilalov was located in the U.S.A at the time. The red notice and/or diffusion was based on false, unfounded, politically motivated accusations. The defendant intended to cause Bilalov to be detained and deported to Russia, where Defendants would be able to use their influence to imprison and/or execute Bilalov, similar to the case of Magnitsky. Furthermore, Defendants also from 2013-the present, acting through intermediaries, provided money or things of value to foreign officials to obstruct oversight of DEFENDANTS' money-laundering conduct, preclude discovery of their involvement in money laundering and other criminality, and thereby permit their business to continue. The DEFENDANTS, knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, conducted or attempted to conduct financial transactions in interstate and foreign commerce involving the proceeds of specified unlawful activity with the intent to promote the carrying on of specified unlawful activity; or, knowing that the transaction was designed in whole or in part to conceal or disguise the nature, the location, the source of ownership, or the control of the proceeds of specified unlawful activity, or knowing that the transaction was designed in whole or in part to avoid a transaction-reporting requirement under state or federal law.

(g.) Wire fraud and mail fraud. (18 U.S.C. §§ 1341, 1343, 1961(1)(B)). The DEFENDANTS devised a scheme or artifice to defraud and/or to obtain money by means of false pretenses, representations, or promises, and used the mails and wires for the purpose of executing the scheme, and acted with a specific intent to defraud by devising, participating in, and/or abetting the scheme. The wire and mail communications were made during the course of the conspiracy that covered at least 2012 through 2019. Hundreds of telephone conversations and faxes were made to further the fraudulent scheme on virtually a daily basis during the course of the conspiracy, including without limitation those identified in paragraphs 118, 125-132, 137, 140 and others. These telephone conversations, mailings, and wire transfer of funds furthered the scheme by expediting the secret payments to the DEFENDANTS of funds that constituted the proceeds of criminal activity and were part of a clandestine system for the remittance of such proceeds to the DEFENDANTS. The DEFENDANTS, acting through their employees, agents, and coconspirators, made or caused to be made such telephone calls, mailings, and wire transfers of funds to further the scheme. The DEFENDANTS knew that their coconspirators, in the course of carrying out the DEFENDANTS' directions and orders, would use or cause to be used the interstate and international wires and mails. The motive for committing fraud is plain: the acquisition of Plaintiff's assets through unlawful means, fraud, undue influence and corruption, money laundering their criminal proceeds meant to increase profits and market share for the Defendants.

(h.) Violation of the Travel Act. (18 U.S.C. §§ 1952, 1961(1)(B)). The DEFENDANTS traveled in interstate or foreign commerce, and used facilities in interstate and foreign

commerce, including the mail, with intent to distribute the proceeds of unlawful activity, and to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of unlawful activity, and thereafter performed or attempted to perform unlawful activity. The DEFENDANTS knew that the funds provided to them represented the proceeds of unlawful activity, including human rights violations, Reiderstvo activities, and knew that, by accepting such payments, they aided the efforts of the unlawful corporate raiding to launder their ill-gotten gains. The DEFENDANTS and their representatives and coconspirators traveled across national borders and otherwise used the facilities of foreign commerce to distribute the proceeds of unlawful activity to the benefit of the DEFENDANTS. By this conduct, the DEFENDANTS promoted, managed, established, and facilitated such unlawful activity.

(i.) Hobbs Act Extortion (18 U.S.C. 1951). The Hobbs Act makes it unlawful for DEFENDANTS, or any officer, director, employee, or agent thereof, to obstruct, delay or affect commerce, by extortion or an attempt to do so, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to commit Hobbs Act Extortion. On or about May 2019, while Plaintiff was in San Francisco, the Defendants directed their representatives and coconspirators to threaten Plaintiff through use of force, violence, and fear to forfeit his rights to all claims of his assets and interest in Krasnaya Polyana; and to abandon any potential lawsuits or actions available to Plaintiff. Defendants told Plaintiff that if he continues to pursue his claims against the Defendants, the Defendants will harm the Plaintiff and his family. On or about July 2019- September 2019 on several separation occasions, while

Plaintiff was in New York, the Defendants directed their representatives and coconspirators to make multiple threats to intimidate Plaintiff through use of force, violence, and fear to forfeit his rights to all claims of his assets and interest in Krasnaya Polyana and to abandon any potential lawsuits or actions available to Plaintiff. Defendants, through their coconspirators and agents, threatened Plaintiff with detention in Lefortovo Prison and physical harm, unless Plaintiff abandons his claims regarding Krasnaya Polyana.

185.    The acts described above form a "pattern" of racketeering activity within 18 U.S.C. § 1961(5). The DEFENDANTS and others with whom they have been associated have been related in their common objectives of Reidestvo, illegal corporate raiding and utilizing money laundering to achieve this end. The DEFENDANTS' predicate acts have had the same or similar purposes, results, participants, victims, and methods of commission, and occurred over at least a ten-year period. The predicate acts have been consistently repeated and are capable of further repetition.

186.    The DEFENDANTS' pattern of racketeering activities dates from at least February 1, 2013 through the present and threatens to continue in the future.

187.    The DEFENDANTS used or invested, directly or indirectly, racketeering income, or a part thereof, or the proceeds of such income, to acquire an interest in, establish, and operate, the SberBank Enterprise, which is and was engaged in, or the activities of which affect and have affected, interstate or foreign commerce, in violation of 18 U.S.C. § 1962(a). The DEFENDANTS were principals in the racketeering scheme. The Plaintiff suffered multiple injuries to their economic interests as a result of this use and investment of racketeering income.

188.    Specifically, the DEFENDANTS received the income and proceeds of a pattern of racketeering activity in which they participated as principals, including an international money-

laundering scheme,Hobbs Act Extortion acts of wire fraud and mail fraud, and violations of the Travel Act. Upon their receipt of such ill-gotten gains by wire transfers from money launderers and/or their associates, the DEFENDANTS used and invested such income and proceeds, or a portion thereof, to acquire an interest in, establish, and operate the SberBank Enterprise, which was and is engaged in interstate and foreign commerce.

189.    Specifically, the DEFENDANTS received the income and proceeds of a pattern of racketeering activity in which they participated as principals, including an international money-laundering scheme,Hobbs Act Extortion acts of wire fraud and mail fraud, and violations of the Travel Act. Upon their receipt of such ill-gotten gains by wire transfers from money launderers and/or their associates, the DEFENDANTS used and invested such income and proceeds, or a portion thereof, to acquire an interest in, establish, and operate the SberBank Enterprise, which was and is engaged in interstate and foreign commerce.

190.    In particular, the DEFENDANTS used the proceeds of the scheme: (a) to operate the SberBank Enterprise; (b) to engage in corporae raiding; (c) to acquire, purchase, and subsidize facilities necessary to the SberBank Enterprise, including offshore companies and bank accounts; (d) to compensate employees and agents of the DEFENDANTS engaged in the money-laundering activities; (e) to pay expenses incurred in connection with money- laundering activities such as telephone bills incurred in the wire-fraud scheme and travel costs incurred by such employees; and (f) to establish a money-laundering scheme, infrastructure, and network. In sum, the DEFENDANTS did not reinvest the proceeds of racketeering activity in their general business operations but instead used and invested such proceeds in establishing the infrastructure of, acquire an interest in, and operate the SberBank Enterprise, and it was this use and investment that harmed the Plaintiff.

191.    The Plaintiff was injured in his business and property by reason of the DEFENDANTS' use and investment of racketeering income to acquire, establish, and operate the SberBank Enterprise. Absent this use and investment of racketeering income, the criminals who launder their criminal proceeds through United States banks would find their crimes less profitable and more difficult to commit.

192.    As a direct and proximate result of the violations set forth above, Plaintiff has been injured in his business and property as set forth more fully above in paragraphs 177-181. The DEFENDANTS' violations of 18 U.S.C. § 1962(a) caused these losses. Under the provisions of 18 U.S.C. § 1964(c), the Plaintiff is entitled to bring this action and recover herein treble damages, the costs of bringing the suit, pre-judgment interest, and reasonable attorneys' fees.

COUNT II
(AS TO ALL DEFENDANTS) (RICO, 18 U.S.C. § 1962(b))

166.    Plaintiff reasserts and incorporates by reference the allegations in all preceding paragraphs above.

167.    The DEFENDANTS acquired or maintained, directly or indirectly, through a pattern of racketeering activity, an interest in and control of the SberBank Enterprise, which was and is engaged in, or the activities of which affect and have affected, interstate or foreign commerce in violation of 18 U.S.C. § 1962(b). The Plaintiff has been injured by the DEFENDANTS' acquisition and maintenance of an interest in and control of the enterprise through a pattern of racketeering activity.

168.    The DEFENDANTS, through a pattern of racketeering activity, acquired or maintained, directly or indirectly, an interest in and control of the SberBank Enterprise that engaged in the activities which affect interstate and foreign commerce. Specifically, the DEFENDANTS

maintained control of the SberBank Enterprise by means of racketeering activities, including, for example: (a) interstate and international wire communications in violation of 18 U.S.C. § 1343 (orders and instructions for payment were placed telephonically and Defendants had total control over the enterprise and the payment for their product); (b) money laundering in violation of 18 U.S.C. §§ 1956 and 1957 (Defendants controlled and concealed Reiderstvo – a key aim of the scheme – through money laundering); and (c) violations of the Travel Act, 18 U.S.C., §1952 (cross-border travel and transactions to facilitate money laundering and other illicit activities). Through this pattern of racketeering activities, which also included transmitting false statements to government authorities, the DEFENDANTS were able to acquire and maintain an interest in and control of the SberBank Enterprise. This interest and control furthered, concealed, and protected the operations of the money-laundering enterprise, and thereby permitted the SberBank Enterprise to flourish without detection.

169.    As a direct and proximate result of the DEFENDANTS' acquisition and maintenance of an interest in and control of the SberBank Enterprise, the Plaintiff has suffered the loss of money and property as set forth more fully above in paragraphs 177-181. The DEFENDANTS' violations of 18 U.S.C. § 1962(b) caused these losses. Under the provisions of 18 U.S.C. § 1964(c), the Plaintiff is entitled to bring this action and recover herein treble damages, the costs of bringing the suit, pre-judgment interest, and reasonable attorneys' fees.

COUNT III
(AS TO ALL RJR DEFENDANTS) (RICO, 18 U.S.C. § 1962(c))

170.    Plaintiff reasserts and incorporates by reference the allegations in all preceding paragraphs above.

171.    The  DEFENDANTS, through the commission of two or more acts constituting a pattern

of racketeering activity, directly or indirectly participated in the operation or management of the SberBank Enterprise, the activities of which affect interstate or foreign commerce.

172.    At all relevant times, the  DEFENDANTS participated in the operation or management of an "enterprise," within the meaning of 18 U.S.C. § 1961(4). The  DEFENDANTS, operating together and individually, directed and controlled the SberBank Enterprise. The  DEFENDANTS operated, managed, and exercised control over the enterprise by, among other things: (a) establishing a Reiderstvo scheme; (b) establishing a money-laundering scheme in which the coconspirators facilitated the money-laundering scheme and concealed and remitted to the DEFENDANTS the proceeds of the Reidestvo and money- laundering scheme; (c) investing and using the proceeds of the money-laundering scheme in the enterprise.

173.    As a direct and proximate result of the violations set forth above, the Plaintiff has been injured in his business and property as set forth more fully above in paragraphs 177-181. The DEFENDANTS' violations of 18 U.S.C. § 1962(c) caused these losses. Under the provisions of 18 U.S.C. § 1964(c), the Plaintiff is entitled to bring this action and recover herein treble damages, the costs of bringing the suit, pre-judgment interest, and reasonable attorneys' fees.

COUNT IV
(AS TO ALL DEFENDANTS)
(RICO, 18 U.S.C. § 1962(d))

174.    Plaintiff reasserts and incorporates by reference the allegations in all preceding paragraphs above.

175.    The  DEFENDANTS entered into an agreement with each other and with other co-conspirators to join in the conspiracy to violate 18 U.S.C. §§ 1962(a), 1962(b), and 1962(c). Each DEFENDANT entered into an agreement to join the conspiracy, and undertook acts in the furtherance of the conspiracy and knowingly participated in the conspiracy. The purpose of the

conspiracy was to unlawfully acquire companies and to launder the proceeds of their criminal activity to the economic detriment of the Plaintiff and to the economic benefit of the DEFENDANTS. The conspirators carried out the scheme and each conspirator was put on notice of the general nature of the conspiracy, that the conspiracy extended beyond the individual role of any single member, and that the conspiratorial venture functioned as a continuing unit for a common purpose. The DEFENDANTS adopted the goal of furthering and facilitating the criminal endeavor. Their stake in the money-laundering venture was in making profits and increasing market share through their informed and interested cooperation with their criminal customers, and their active assistance, stimulation, and instigation of the money-laundering activities. The DEFENDANTS engaged in an actionable wrong, committed jointly with their coconspirators, and the acts of each member of the conspiracy are imputed to the others because of their common purpose and intent. The DEFENDANTS, acting with their coconspirators, engaged in common action for a common purpose by common agreement and understanding among the group, and are subject to common responsibility.

176.    The DEFENDANTS, together with each member of the conspiracy, agreed and conspired to violate: (1) 18 U.S.C. § 1962(a) by using, or causing the use of, income they derived from the above-described pattern of racketeering activities in the acquisition, establishment, and/or operation of the enterprise, the activities of which affect interstate or foreign commerce; (2) 18 U.S.C. § 1962(b) by acquiring or maintaining, or causing the acquisition or maintenance of, through a pattern of racketeering activity, an interest or control in the enterprise, the activities of which affect interstate or foreign commerce; (3) 18 U.S.C. § 1962(c) by participating, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, including an agreement that the conspirators, or one of them, would commit or cause the

commission of two or more racketeering acts constituting such a pattern;

177.    The  DEFENDANTS participated in and cooperated with each other and with their coconspirators in the aforementioned conspiracy that enabled each coconspirator to obtain proceeds from the illegal acquisition of Plaintiff's company in violation of internationally recognized human rights.

178.    As a result of the conspiracy, the  DEFENDANTS and their coconspirators facilitated the laundering of large volumes of money that constituted the proceeds of criminal activity.

179.    The membership of the conspiracy in question includes the   DEFENDANTS coconspirators Does 1-100, including associated "inner circle" members and companies, including institutions controlled by SberBank, Herman Gref, and third-parties related to them consisting of currency dealers, money brokers, and other participants in the schemes identified above who all acted in concert with Defendants in illegally acquiring Plaintiff's company through fraud and dureess and then  arranged for payment in a way that is undetectable by governmental authorities, with said payments ultimately being returned to the  DEFENDANTS in the United States.  As coconspirators, the  DEFENDANTS are liable for all of the actions committed by all of the coconspirators within the conspiracy and are liable for all of the damages sustained by the Plaintiff that were caused by any members of the conspiracy, regardless of whether the  DEFENDANTS were themselves directly involved in a particular aspect of the enterprise.

180.    As a direct and proximate result of the violations set forth above, the Plaintiff has been injured in his business and property as set forth more fully above in paragraphs 177-181. The DEFENDANTS' violations of 18 U.S.C. § 1962(d) caused these losses. Under the provisions of 18 U.S.C. § 1964(c), the Plaintiff is  entitled to bring this action and recover herein treble damages, the costs of bringing the suit, pre-judgment interest, and reasonable attorneys' fees.

**COUNT V**
**FRAUD**
**(All Defendants)**

193.    Plaintiff reasserts and incorporates by reference the allegations in all preceding paragraphs above.

194.    "In order to sustain an action for actual fraud the plaintiff must prove: (1) that the defendant made a representation, (2) as to a material fact, (3) which was false, (4) and known to be false by the defendant, (5) that the representation was made for the purpose of inducing the other party to rely upon it, (6) that the other party rightfully did so rely, (7) in ignorance of its falsity (8) to his injury (24 N.Y.Jur., Fraud and Deceit, s 14; 37 C.J.S. Fraud s 3)." *Brown v. Lockwood*, 76 AD2d 721, 730 [2d Dept 1980].

195.    "In order to recover damages for fraud, a plaintiff is required to prove, by clear and convincing evidence, a misrepresentation, which was false and known by the defendant to be false, made for the purpose of inducing the plaintiff to rely upon it, justifiable reliance and injury (see *Lama Holding Co. v. Smith Barney*, 88 N.Y.2d 413, 421, 646 N.Y.S.2d 76, 668 N.E.2d 1370 [1996]; *Gizzi v. Hall*, 300 A.D.2d 879, 880, 754 N.Y.S.2d 373 [2002]; *McGovern v. Best Bldg. & Remodeling*, 245 A.D.2d 925, 926, 666 N.Y.S.2d 854 [1997] ). As to the element of reliance, "[w]here a party has the means to discover the true nature of the transaction by the exercise of ordinary intelligence, and fails to make use of those means, he [or she] cannot claim justifiable reliance on [the] defendant's misrepresentations" (*Stuart Silver Assoc. v. Baco Dev. Corp.*, 245 A.D.2d 96, 98–99, 665 N.Y.S.2d 415 [1997]; see *Cohen v. Colistra*, 233 A.D.2d 542, 542–543, 649 N.Y.S.2d 540 [1996]; *Pinney v. Beckwith*, 202 A.D.2d 767, 768, 608 N.Y.S.2d 738 [1994] )." *Tanzman v. La Pietra*, 8 AD3d 706, 707 [3d Dept 2004].

196.    Defendants made representations to Plaintiff related to his ownership interest in the

company.

197.     Defendants knew at the time that these representations were false.

198.     Defendants use intimidation and threats to seize control of Plaintiff's assets.

199.     Defendants use intimidation and threats to seize control of Plaintiff's shares in the company.

200.     Plaintiff justifiably relied upon the representations as described herein.

201.     As a result of Defendants' wrongful conduct and fraudulent misrepresentation, Plaintiff has been financially damaged.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court enter judgment against Defendants in an amount of $1,000,000,000.00:

(1) for their willful fraudulent conduct;

(2) in an amount of damages to be determined at trial;

(3) attorneys' fees and costs incurred in bringing this suit;

(4) pre- and post- judgment interest; and

(5) awarding Plaintiff any other relief deemed just and proper.

## COUNT VI
## CONSPIRACY TO COMMIT FRAUD
### (All Defendants)

202.     Plaintiff reasserts and incorporates by reference the allegations in all preceding paragraphs above.

203.     "To adequately plead claims for conspiracy to commit fraud under New York law, in addition to pleading the underlying fraud, the [plaintiff] must allege the following with the required specificity as to each defendant: `(1) an agreement among two or more parties, (2) a

common objective, (3) acts in furtherance of the objective, and (4) knowledge.'" *Winnick,* 406 F.Supp.2d at 259 (quoting *Filler v. Hanvit Bank*, No. 01 Civ. 9510, 2003 WL 22110773, at *2 (S.D.N.Y. Sept. 12, 2003)).

204.     Defendants worked in concert to perpetrate the conspiracy.

205.     Defendants agreed to the acts as described herein for the common purpose of depriving Plaintiff of his life, liberty and happiness.

206.     Defendants made representations to Plaintiff related to his ownership interest in the company.

207.     Defendants knew at the time that these representations were false.

208.     Defendants use intimidation and threats to seize control of Plaintiff's assets.

209.     Defendants use intimidation and threats to seize control of Plaintiff's shares in the company.

210.     Plaintiff justifiably relied upon the representations as described herein.

211.     As a result of Defendants' wrongful conduct and fraudulent misrepresentation, Plaintiff has been financially damaged.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court enter judgment against Defendants in an amount of $1,000,000,000.00:

(1) for their willful fraudulent conduct;

(2) in any other amount of damages to be determined at trial;

(3) attorneys' fees and costs incurred in bringing this suit;

(4) pre- and post- judgment interest; and

(5) awarding Plaintiff any other relief deemed just and proper.

## COUNT VII:
## UNLAWFUL CONVERSION
### (All Defendants)

212.     Plaintiff reasserts and incorporates by reference the allegations in all preceding paragraphs above.

213.     Defendants have, through the use of threats made by agents in Russia and here in the United States, and other fraudulent and corrupt practices, forced the conversion of Plaintiff's assets and interests in the company over to themselves.

214.     Defendants have engaged in the before mentioned acts for their own financial benefit.

215.     " Conversion is any unauthorized exercise of dominion or control over property by one who is not the owner of the property which interferes with and is in defiance of a superior possessory right of another in the property.   When the original possession is lawful, conversion does not occur until the defendant refuses to return property after demand or until he sooner disposes of the property" See *Moses vs. Martin*, 360 F. Supp. 2d 533 - Dist. Court, SD New York 2005.

216.      "To maintain a claim for conversion, a plaintiff must show: (1) the property subject to conversion is `a specific identifiable thing;' (2) plaintiff had `ownership, possession or control' over the property before its conversion; and (3) defendant `exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights.   However, an action for conversion cannot be validly maintained "where damages are merely being sought for breach of contract. Rather, a plaintiff must show acts that were unlawful or wrongful as opposed to mere violations of contractual rights."   See *Calcutti vs. SBU, Inc.,* 223 F.Supp.2d 517, 523 (S.D.N.Y.2002).

217.      Plaintiff has been economically damaged as a result.

**WHEREFORE**, Plaintiff requests that this Honorable Court enter an order:

(1) Declaring that the company was unlawfully converted to the Defendants;

(2) Declaring that Defendants utilized unlawful and wrongful acts in converting the company and

Plaintiff's assets to themselves solely for their own financial benefit;

(3) Awarding Plaintiff damages in an amount to be determined at trial; and

(4) Awarding Plaintiff any other such relief as is deemed just and proper.

### COUNT VIII
### MALICIOUS ABUSE OF PROCESS
### (All Defendants)

218.      Plaintiff reasserts and incorporates by reference the allegations in all preceding

paragraphs above.

219.      Defendants provided false and defamatory information to Interpol and to the United

States DHS which led to Plaintiff's arrest in Miami.

220.      Defendants' actions were retaliatory and malicious.

221.      Under New York law, "a malicious abuse-of-process claim lies against a defendant

who (1) employs regularly issued legal process to compel performance or forbearance of some act

(2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral

objective that is outside the legitimate ends of the process." *Cook v. Sheldon*, 41 F.3d 73, 80 (2d

Cir. 1994).

222.      A "collateral objective" is not the same as a "malicious motive" and must exist

"beyond or in addition to [the] criminal prosecution," *Savino*, 331 F.3d at 77, but it is "usually

characterized by personal animus," *Jovanovic v. City of New York*, 04-CV-8437, 2010 WL

8500283, at *9 (S.D.N.Y. Sept. 28, 2010) (Crotty, J.), affd, 486 Fed.Appx. 149 (2d Cir. 2012)

(citation omitted).

223.     Such an objective may include "infliction of economic harm, extortion, blackmail [or] retribution." *Brandon v. City of New York*, 705 F.Supp.2d at 275.  In other words, "[a]buse of process resembles a form of extortion, by which the defendant invokes legal process to coerce the plaintiff into doing something other than what the process necessitates." *Krebs v. United States*, 98-CV-2590, 1999 WL 185263, at *5 (S.D.N.Y. Mar. 31, 1999) (Mukasey, J.).

224.     Defendants worked in concert with Russian law enforcement agencies, the Courts, using their broad influence in order to have Plaintiff detained.

225.     As a direct and proximate result of Defendants' conduct, Plaintiff has been emotionally and financially damaged.

**WHEREFORE**, Plaintiff requests that this Honorable Court enter judgment against Defendants:

(1) Declaring that Defendants have abused the criminal and immigration process;

(2) Awarding Plaintiff damages in an amount to be determined at trial; and

(3) Awarding Plaintiff any other such relief as is deemed just and proper.

<u>**COUNT IX**</u>
<u>**UNJUST ENRICHMENT**</u>
<u>(All Defendants)</u>

220.     Plaintiff reasserts and incorporates by reference the allegations in all preceding paragraphs above.

221      As a result of Defendants' unauthorized dominion over the unlawfully transferred shares of Krasnaya Polyana  as set forth in detail above, they were unjustly enriched to the detriment of Plaintiff.

222      Defendants have unlawfully retained the subject funds and have refused to return them.

223     Defendants had no legal or equitable rights to Plaintiff's funds and corporate shares.

224      It is inequitable and against good conscience to allow Defendants to retain any benefit from the Companies' funds.

**WHEREFORE**, Plaintiff requests that this Honorable Court enter judgment against all Defendants:

(1) Awarding Plaintiff damages in an amount to be determined at trial; and

(2) Awarding Plaintiff any other such relief as is deemed just and proper.

## COUNT X
### (AS TO ALL DEFENDANTS)
### (ALIENS ACTIONS FOR TORT), 28 U.S.C. § 1350

225.     Plaintiff reasserts and incorporates by reference the allegations in all preceding paragraphs above.

226.     Defendants violated the Alien Tort Claims Act, 28 U.S.C. §1350, and customary international law enforceable in this Court as federal common law and the law of nations:

a.  Defendants engaged in and encouraged the practice of Reiderstvo, and offenses committed in furtherance of or ancillary to those crimes such as corporate piracy, bribery of officials, unlawful detention, manufactured and false criminal actions. unlawful detention, extortion and money laundering;

b.  Defendants participated in the criminal enterprise as more fully stated above;

c.  Defendants acted with disregard of a substantial risk of harm to Plaintiff;

d.  Defendants acted in conscious disregard of known dangers to Plaintiff;

e.  Defendants acted with deliberate indifference to a substantial risk of harm to

Plaintiff.

227.       Defendants are liable to plaintiffs for compensatory and punitive damages.


## TOLLING OF THE STATUTE OF LIMITATIONS

1.   Plaintiff hereby incorporates by reference each of the preceding paragraphs as if fully set forth herein.

2.   A four-year statute of limitations applies to civil RICO claims. See *Koch v. Christie's Int'l PLC,* 699 F.3d 141, 148 (2d Cir. 2012).  The timeliness of a civil RICO claim depends on a twin determination of (1) when the plaintiff sustained the alleged injury for which he seeks redress, and (2) when the plaintiff discovered or should have discovered the injury, with the latter date triggering the four-year statute of limitations. See *id*. at 150-51; *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 60 (2d Cir. 1998) ("Thus, even if [an] investor[`s] injury occurred at the time [he] invested, the limitations period does not begin to run until [he] ha[s] actual or inquiry notice of the injury.").

3.   A RICO injury occurs when the "amount of damages becomes clear and definite." *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 768 (2d Cir. 1994); *accord Chevron Corp. v. Donziger*, 833 F.3d 74, 140 (2d Cir. 2016). A RICO claim predicated on an investment injury for which an investor has no contractual or legal remedies generally accrues at the time of investment. See *In re Merrill Lynch Ltd. P'ships Litig*., 154 F.3d at 59.

4.   Plaintiff was arrested in Miami in October 2019 based on false information provided by Defendants to Interpol and to the United States Department of Homeland Security.  Plaintiff filed an appeal with Interpol and Interpol blocked the file and removed the diffusion on account of the fact that the case in Russia was more likely than not politically motivated.

5.   Furthermore, the running of any statute of limitations has been equitably tolled by reason of Defendants' fraudulent concealment and conduct.  Through their affirmative misrepresentations and omissions, Defendants actively concealed from Plaintiff the true nature and intent of their conduct, including the takeover of Plaintiff's shares, ownership and interest in the company.

6.   Plaintiff was threatened and poisoned by Defendants.  Because of the corrupt nature of the Russian courts, Plaintiff was unable to even consider bringing suit in Russia previously.

7.   "Under New York law, the doctrines of equitable tolling or equitable estoppel may be invoked to defeat a statute of limitations defense when the plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action." *Abbas v. Dixon*, 480 F.3d 636, 642 (2d Cir.2007) (internal quotation marks omitted); see also *Stuart v. Stuart*, No. 12-CV-5588, 2013 WL 6477492, at *4 (S.D.N.Y. Dec. 10, 2013) (same).

8.   Equitable tolling applies where a defendant's fraudulent conduct results in a plaintiff's lack of knowledge of a cause of action. See *Pearl v. City of Long Beach*, 296 F.3d 76, 82 (2d Cir.2002); *DeSole v. Knoedler Gallery, L.L.C.*, 974 F.Supp.2d 274, 318 (S.D.N.Y.2013).

9.   A plaintiff must establish that "the defendant wrongfully concealed material facts," which "prevented plaintiff's discovery of the nature of the claim," and that "plaintiff exercised due diligence in pursuing the discovery of the claim during the period plaintiff seeks to have tolled." *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 157 (2d Cir.2012) (internal quotation marks omitted). Equitable estoppel, on the other hand, permits the tolling of the statute of limitations in extraordinary circumstances where the plaintiff knew of the existence of his cause of action, but the defendant's misconduct caused the plaintiff to delay in bringing suit.  See *Conklin v. Jeffrey A. Maidenbaum, Esq.*, No. 12-CV-3606, 2013 WL 4083279, at *5 (S.D.N.Y. Aug. 13, 2013) ("Equitable estoppel applies only where the plaintiff can show that egregious wrongdoing by a

defendant prevented the plaintiff from bringing suit on a claim of which the plaintiff was aware." (internal quotation marks omitted)).

10. Furthermore, Defendants are estopped from relying on any statute of limitations because of their concealment of the truth, quality, and nature of their wrongful conduct and because of their continuation of the wrongful conduct against Plaintiff in the United States.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all triable issues herein.

Dated: New York, New York
      June 4th, 2021                                 Respectfully submitted,

                                            */s/ Irina Shpigel*
                                            Irina Shpigel, Esq.