UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AKHMED GADZHIEVICH BILALOV, an
individual,

                Plaintiff,

       -against-

HERMAN GREF, SBERBANK CIB USA, INC.,
SBERBANK OF RUSSIA PJSC, and DOES 1-100
inclusive,

                Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  9/13/2022

20 Civ. 9153 (AT)

**ORDER**

ANALISA TORRES, District Judge:

        Plaintiff, Akhmed Gadzhievich Bilalov, brings this action against Defendants Herman Gref,

Sberbank CIB USA, Inc. ("Sberbank USA"), Sberbank of Russia PJSC ("Sberbank Russia"), and Does

1-100 based upon violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18

U.S.C. § 1962, common law fraud, unjust enrichment, malicious abuse of process, conversion, and the

Alien Tort Statute (the "ATS"), 28 U.S.C. § 1350. *See generally* Sec. Amend. Compl., ECF No. 51.

Plaintiff's claims arise, primarily, out of an alleged conspiracy to deprive him of his ownership interest

in Krasnaya Polyana (the "Company"), a Russian company he owned with his brother. *See generally*

*id.* Gref and Sberbank Russia (together, the "Russian Defendants") move to dismiss Plaintiff's claims

under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction under the Foreign

Sovereign Immunities Act (the "FSIA"), 28 U.S.C. § 1330, and, in the alternative, under the doctrine

of *forum non conveniens* in favor of adjudication in Russia, Federal Rule of Civil Procedure 12(b)(2)

for lack of personal jurisdiction, or Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.

*See* Russian Defs. Mem., ECF No. 59; Russian Defs. Supp. Mem., ECF No. 73.  Sberbank USA moves

to dismiss Plaintiff's claims under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.

US Def. Mem., ECF No. 62.  For the reasons stated below, Defendants' motions are GRANTED.

BACKGROUND[1]

In 2006, Plaintiff and his brother purchased the Company, a ski resort located in the Sochi Region of Russia, and became joint owners of 84.85% of the Company's shares. Sec. Amend. Compl. at 10 ¶¶ 44–46.[2]  In 2007, the Olympic Committee awarded the 2014 Winter Olympic Games (the "Olympics") to the City of Sochi, and the Company was identified as an entity for involvement in a prospective Olympic construction project, which substantially increased the Company's value. *Id*. at 10 ¶ 47.

In November 2007, Gref was named the Chairman of Sberbank Russia, and, in 2008, "under Sberbank[ Russia's] initiative and pursuant to the direction of the Government of the Russian Federation," Gref and others became investors in the Company. *Id*. at 11 ¶¶ 48–49.  After becoming investors, the Russian Defendants progressively obtained more control over the Company and acquired more shares through allegedly improper actions that forced the Company to take on more debt. *Id*. at 11–13 ¶¶ 49–58.  As of 2010, Plaintiff and his brother owned 60% of the Company. *Id*. at 13 ¶ 59.  In 2012, after the Russian Defendants switched subcontractors for construction projects related to the Olympics and facilitated a failed investment, a conflict arose between Plaintiff's brother and Gref, which resulted in Plaintiff's brother being removed from the management of the Company and Gref taking control. *Id*. at 13–15 ¶¶ 60–71.  These actions also led to Plaintiff's shares being diluted to 41.429%. *Id*. at 14 ¶ 69.

On February 2, 2013, at a meeting that included Gref, the Vice Prime Minister of Russia, Dmitry Kozak, and Plaintiff's brother, an agreement was reached whereby, after the conclusion of the Olympics, one third of the Company's assets would be transferred to Plaintiff and his brother, and the

---

[1] The facts in this section are taken from the second amended complaint and "are presumed to be true for purposes of considering a motion to dismiss for failure to state a claim." *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 398 (2d Cir. 2015).

[2] Because the second amended complaint contains duplicate paragraph citations, the Court shall cite to both a page and paragraph number for clarity.

other two thirds would be transferred to Sberbank Russia. *Id*. at 15 ¶ 72. But, in a later meeting that same month involving Gref, Kozak, and Plaintiff, Gref demanded that Plaintiff transfer all shares of the Company to Gref and his affiliates. *Id*. at 15 ¶ 74. Gref also stated that, if the shares were not transferred quickly, "Plaintiff and his family personally would face serious problems, including bodily harm or death." *Id*. at 15 ¶ 75. Gref and others also presented a report to the President of the Russian Federation, Vladimir Putin, on live television, in which Gref falsely indicated that Plaintiff's brother was responsible for the failure to meet construction deadlines and increased construction costs. *Id*. at 16 ¶ 77.

In March 2013, Plaintiff's brother met with an associate of Gref's, Mikhail Gutseriev, who threatened Plaintiff and his family at Gref's direction with "violence, continuation of baseless and unlawful criminal prosecution[,] and [the deprivation of] all of their possessions" if Plaintiff and his brother did not transfer their remaining shares to him for $20 million, which was far less than their actual value of $328 million. *See id*. at 17 ¶¶ 82–84; *id*. at 19–20 ¶¶ 96–101. Although Gutseriev made certain promises to Plaintiff's brother regarding the sharing of acquired assets, these promises were not kept. *See id*. at 17 ¶ 86; *id*. at 18 ¶ 91. Plaintiff and his brother transferred the shares, although Plaintiff asserts he consented to transfer only a portion of his shares. *Id*. at 17–18 ¶¶ 87–89.

At some point, Sberbank USA acquired a company known as Troika Dialog ("Troika"), which was then acquired by Sberbank Russia in March 2011 and is owned, operated, and managed by Sberbank Russia and Sberbank USA. *See id*. at 21 ¶¶ 103–106; *id*. ¶ 116. Troika operates a financial network known as the Troika Laundromat through which it sets up shell companies and moves money between them to disguise the recipients. *Id*. at 21–23 ¶¶ 103–18. Defendants have used the Troika scheme to move money they acquired through their "Reiderstvo" activities.[3] *Id.* at 22 ¶ 111. Plaintiff

---

[3] Plaintiff asserts that the alleged scheme perpetrated by Gref, Sberbank Russia, and others is an example of "Reiderstvo," which he contends is a common "Russian corporate raiding" practice in which "private and public-sector white-collar criminals conspire[e] with state organizations" to steal companies. Sec. Amend. Compl. at 1–5 ¶¶ 1–16. Plaintiff also

alleges, "[u]pon information and belief," that assets rightfully belonging to him were transferred in the United States through the Troika Laundromat to "avoid detection by authorities and to circumvent U.S. sanctions." *Id.* at 23–24 ¶ 119.

Plaintiff claims that, in 2013, Defendants bribed the Russian Interior Ministry to open a criminal investigation against Plaintiff and his brother. *Id.* at 24 ¶ 120. Although it is unclear if the charges have been dropped, no court orders have been issued to arrest Plaintiff or his brother. *Id.* at 24 ¶ 121. Plaintiff also alleges that, on April 27, 2013, Defendants "either directly or through coconspirators and intermediaries" poisoned Plaintiff with mercury. *See id.* at 15–15 ¶ 76; *id.* at 24 ¶ 123.

In May 2016, Plaintiff and his family fled Russia and moved to New York. *Id.* at 24 ¶ 124. Then, in the Spring of 2018, Plaintiff decided to "back channel members of the 'inner circle' in an effort to recover some of his assets." *Id.* at 24–25 ¶ 125.[4] Plaintiff reached out to Kirill Androsov, a close friend and associate of Gref, to attempt to settle his claims against Defendants arising out of their takeover of the Company. *Id.* at 25 ¶ 126. Although Androsov initially indicated that Gref was interested in resolving the conflict, Defendants, in actuality, had no interest in negotiating and instead filed false charges against Plaintiff. *Id.* at 25 ¶¶ 127–29. On March 4, 2018, Defendants, "acting through intermediaries," bribed foreign officials to obtain an International Criminal Police Organization ("Interpol") "[R]ed [N]otice" or "diffusion" against Plaintiff, with the intention of causing his deportation to Russia, where he could be imprisoned and/or executed. *Id.* at 25 ¶ 131.

In April 2019, Androsov informed Plaintiff that a representative of Defendants would meet with him in May in San Francisco. *Id.* at 26 ¶ 133. Plaintiff went to San Francisco and met with Defendants' representative, Alexander Igorevich, who had traveled from Russia. *Id.* at 26 ¶ 135. Igorevich told

---

asserts that Reiderstvo "commonly includes . . . the use of shell companies in various jurisdictions . . . to hide the beneficial owners." *Id.* at 3 ¶ 8.

[4] According to Plaintiff, the "inner circle" includes Gref and other leaders of financial institutions, as well as Russian officials. Sec. Amend. Compl. at 31 ¶ 163.

Plaintiff that he worked for Sberbank Russia and represented the interests of both the Russian Federation and Sberbank Russia. *Id*. During their conversation, Igorevich said that Defendants had no intention of resolving their conflict with Plaintiff and threatened that, if Plaintiff proceeded with an action against Defendants, it would be perceived as "an act of treason" and the "poisoning would be nothing compared to what may happen to both Plaintiff and his family." *Id*. at 26 ¶ 137. Igorevich also indicated that Defendants will have Plaintiff arrested. *Id*.

After this meeting, Plaintiff returned to New York. *Id*. at 27 ¶ 138. He called Androsov and, when Plaintiff indicated he would fight for his property, Androsov told him to "be ready for a new wave of problems." *Id*. (quotation marks omitted). In July 2019, Plaintiff was approached by two men outside of his apartment who were sent by Defendants. *Id*. at 27 ¶ 139. The men told him "that they know where he lives, and they can get him anywhere." *Id*. Two weeks later, one of the two men approached Plaintiff on Plaintiff's way home and showed him pictures of Plaintiff's wife entering and exiting their apartment in Miami. *Id*. at 27 ¶ 140. The man told Plaintiff to "think of his family." *Id*.

In August 2019, Plaintiff contacted Androsov again to try to resolve his conflict with Defendants. *Id*. at 27 ¶ 141. A few days later, Plaintiff was greeted by the two men who told him that Alexey Nikolaevich, a Russian army official, wanted to meet him later that week. *Id*. at 27–28 ¶¶ 141–42. That Friday, Plaintiff met with Nikolaevich at a hotel bar. *Id*. at 28 ¶ 142. Nikolaevich told Plaintiff that "trouble was coming," and that he would soon be arrested and extradited to Russia, where he would be imprisoned in Lefortovo Prison, a place where "many interesting things may happen[,] including suicide." *Id*. Fearing for his life, Plaintiff went to Miami. *Id*. at 28 ¶ 143.

In October 2019, when he was in Miami, Plaintiff was detained based on the information Defendants provided to Interpol and the U.S. Department of Homeland Security, which led to the

issuance of a Red Notice and/or a diffusion.[5]  *Id*. at 28 ¶ 144.  Although there was an attempt to have

Plaintiff deported/extradited, Plaintiff was released after a "brief detention."  *Id*.  Plaintiff then appealed

with Interpol, which blocked his file and removed the Red Notice and/or diffusion following a review

of Plaintiff's situation.  *Id*. at 28 ¶¶ 145–46.

On November 2, 2020, Plaintiff filed this action, ECF No. 1, and amended his complaint twice,

once on February 5, 2021, ECF No. 11, and again on July 2, 2021, Sec. Amend. Compl.  On September

6, 2021, Defendants moved to dismiss Plaintiff's second amended complaint.  Russian Defs. Mot.; US

Def. Mot.

## DISCUSSION

I.    Legal Standards[6]

A.  Rule 12(b)(1)

Courts must dismiss a case for lack of subject matter jurisdiction under Federal Rule of Civil

Procedure 12(b)(1) when they "lack[] the statutory or constitutional power to adjudicate it."  *Makarova*

*v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  In the context of a jurisdictional challenge under

the FSIA, courts "look at the substance of the allegations to determine whether one of the exceptions

to the FSIA's general exclusion of jurisdiction over foreign sovereigns applies."  *Robinson v. Gov't of*

*Malaysia*, 269 F.3d 133, 140 (2d Cir. 2001) (quotation marks and citation omitted).  "The defendant

must first present[ ] a prima facie case that it is a foreign sovereign," and the "plaintiff then has the

burden of going forward with evidence showing that, under exceptions set forth in the FSIA, immunity

---

[5] The Court takes judicial notice of the fact that an Interpol Red Notice is "a request to law enforcement worldwide to locate and provisionally arrest a person pending extradition, surrender, or similar legal action," INTERPOL, RED NOTICES, https://www.interpol.int/en/How-we-work/Notices/Red-Notices (last visited July 28, 2022), and a diffusion is a "less formal" version of a Red Notice or other form of notice, INTERPOL, ABOUT NOTICES, https://www.interpol.int/en/How-we-work/Notices/About-Notices (last visited July 28, 2022).  *See* Fed. R. Evid. 201(b)(2) (allowing courts to take judicial notice of facts that are "not subject to reasonable dispute because [they] . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned").

[6] Because the Court dismisses Plaintiff's claims under Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6), the Court does not address the legal standard for addressing motions brought based on *forum non conveniens* or Federal Rule of Civil Procedure 12(b)(2).

should not be granted." *Blue Ridge Invs., LLC v. Republic of Arg.*, 902 F. Supp. 2d 367, 371 (S.D.N.Y. 2012), *aff'd sub nom*, 735 F.3d 72 (2d Cir. 2013) (quotation marks and citation omitted).  But, "the ultimate burden of persuasion remains with the alleged foreign sovereign." *Robinson*, 269 F.3d at 141 (citation omitted).

Although a court does not "decide a case on the merits in order to decide if it has jurisdiction," it "may examine the defendant's activities to determine whether they confer subject matter jurisdiction on the federal courts." *Id*. at 141–42.  And, "[i]f the defendant challenges only the legal sufficiency of the plaintiff's jurisdictional allegations, the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff." *Id*. at 140 (quotation marks and citations omitted).

### B.  Rule 12(b)(6)

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.  A plaintiff is not required to provide "detailed factual allegations," but he must assert "more than labels and conclusions." *Twombly*, 550 U.S. at 555.  Although courts must "draw all reasonable inferences in [the] [plaintiff's] favor[ and] assume all well-pleaded factual allegations to be true," they are not "bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (quotation marks and citations omitted).

II.    Application

A.  The FSIA

Under the FSIA, "a foreign state is presumptively immune from the jurisdiction of United States courts." *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993).  Thus, "unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state." *Id*.  This immunity extends to an "agency or instrumentality of a foreign state," which includes any "separate legal person, corporate or otherwise," "a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof," and "which is neither a citizen of a State of the United States . . . nor created under the laws of any third country."  28 U.S.C. § 1603(a)–(b).

The Russian Defendants argue that Sberbank Russia is an instrumentality of a foreign state, the Russian Federation, because it is "a corporate entity organized under the laws of Russia that is legally separate from, but majority-owned by, the Russian Federation."  Russian Defs. Supp. Mem. at 3; Sec. Amend. Compl. at 5–6 ¶ 22 (stating that the Russian Federation owns 51% of Sberbank Russia); ECF No. 53.  Plaintiff does not dispute that Sberbank Russia should be considered an instrumentality of the Russian Federation, *see generally* Pl. Supp. Opp., ECF No. 79, and the Court finds that the Russian Defendants have presented a *prima facie* case that Sberbank Russia is a foreign state under the FSIA, *see Figueroa v. Ministry for Foreign Affs. of Swed.*, 222 F. Supp. 3d 304, 307 (S.D.N.Y. 2016).

The Court then must determine whether Plaintiff has put forward evidence showing that, under exceptions to the FSIA, immunity should not be granted.  *See id*.  Plaintiff contends that both the commercial activity exception, 28 U.S.C. § 1605(a)(2), and the expropriation exception, 28 U.S.C. § 1605(a)(3), apply to Sberbank Russia's behavior as it relates to his claims.  *See generally* Pl. Supp. Opp.

Under the commercial activity exception, foreign states are not immune from suit where

> the action is based upon a commercial activity carried on in the United States by the
> foreign state; or upon an act performed in the United States in connection with a
> commercial activity of the foreign state elsewhere; or upon an act outside the territory
> of the United States in connection with a commercial activity of the foreign state
> elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2).  And, under the expropriation exception, a foreign sovereign is not immune

from suit in any case

> in which rights in property taken in violation of international law are in issue and that
> property or any property exchanged for such property is present in the United States in
> connection with a commercial activity carried on in the United States by the foreign
> state; or that property or any property exchanged for such property is owned or operated
> by an agency or instrumentality of the foreign state and that agency or instrumentality
> is engaged in a commercial activity in the United States.

28 U.S.C. § 1605(a)(3).  The Court shall address each of these in turn.

1.   RICO, Fraud, Conversion, Unjust Enrichment, and ATS Claims

a.   Commercial Activity Exception

"As a threshold step in assessing [a plaintiff's] reliance on the 'commercial activity' exception,

[the court] must identify the act of the foreign sovereign State that serves as the basis for [the plaintiff's]

claims."  *Garb v. Republic of Pol.*, 440 F.3d 579, 586 (2d Cir. 2006).  To show that a claim is based

upon activity in the United States, a plaintiff must show that "the particular conduct that constitutes the

gravamen of the suit" took place in the United States.  *OBB Personenverkehr AG v. Sachs*, 577 U.S.

27, 35 (2015) (quotation marks omitted).  "[A] court should identify that particular conduct by looking

to the basis or foundation for a claim."  *Id*. at 33 (quotation marks and citation omitted); *see also*

*Atlantica Holdings v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 813 F.3d 98, 107 (2d Cir. 2016)

(identifying the plaintiff's "core claim").  The Second Circuit has clarified that courts should "look not

to the analysis of each individual claim, but to the overall question where a lawsuit's *foundation* is

geographically based."  *Atlantica Holdings*, 813 F.3d at 108 (emphasis in original).  Here, it is clear

that, with one potential exception that shall be discussed later, the gravamen of Plaintiff's claims is the

alleged taking of his shares of the Company in 2013, which occurred in Russia.  *See, e.g.*, Sec. Amend. Compl. at 17–20 ¶¶ 82–101.

Plaintiff argues that the first form of the commercial activity exception, which applies when "the action is based upon a commercial activity carried on in the United States by the foreign state," 28 U.S.C. § 1605(a)(2), applies to his claims because Defendants (1) filed false charges against Plaintiff while he was in the United States, (2) threatened him in the United States in an attempt to prevent him from pursuing claims against them, and (3) transferred money associated with the shares they got from him into banks in the United States.  Pl. Supp. Opp. at 4–5.  The Court disagrees.  First, Plaintiff has not shown that the Russian Defendants undertook any actions in the United States in connection with the filing of the false charges.  *See* Sec. Amend. Compl. at 25 ¶ 131.  Thus, this conduct does not support a finding that they carried out commercial activity in the United States.  Second, any threats made to Plaintiff to prevent him from recovering his property and any transferring of money into the United States do not constitute the gravamen of his lawsuit, *see Atlantica Holdings*, 813 F.3d at 108; *Sachs*, 577 U.S. at 34; rather, they consist of subsequent actions that may have reinforced an injury that occurred abroad, c*f. Garb*, 440 F.3d at 582, 586–87 (finding that the commercial activity exception does not apply when the "subsequent commercial treatment" of taken property occurred in the United States but the actual taking occurred outside the United States).  Therefore, assuming, *arguendo*, that these activities are commercial, they either were not "carried out in the United States" or do not form the basis of Plaintiff's action.

Next, Plaintiff contends that the second form of the commercial activity exception, which applies when "the action is based . . . upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere," 28 U.S.C. § 1605(a)(2), applies to his claims because the taking of his property was a commercial activity and the Russian Defendants "used intimidation and threats to dissuade . . . Plaintiff from pursuing claims against them relating to the

divestiture of [the Company] and to further misappropriate Plaintiff's assets and launder the proceed[s] and ill-gotten [gains] obtained from the divestiture," Pl. Supp. Opp. at 5–6.  For the same reasons discussed with respect to the first form of the commercial activity exception, this argument fails, as Plaintiff's claims are not based upon any acts performed in the United States.  Rather, they are based on the taking of his property, which occurred in Russia.

Finally, Plaintiff argues that the third form of the commercial activity exception, which applies when "the action is based . . . upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States," 28 U.S.C. § 1605(a)(2), applies to his claims because the taking of Plaintiff's property caused "funds to be paid into the United States in furtherance of the illegal money laundering scheme," Pl. Supp. Opp. at 6.  Again, the Court disagrees.

When assessing whether an action has a direct effect in the United States, courts look for effects that "follow as an immediate consequence of the defendant's activity."  *Atlantica Holdings*, 813 F.3d at 108 (quotation marks, citations, and alterations omitted).  For causes of action based on tort, the direct effect of the tort is typically the plaintiff's injury, although the Second Circuit has left "open the possibility that even a foreign tort may have had sufficient contacts with the United States to establish the requisite direct effect in this country."  *Id*. at 109 (quotation marks and citation omitted).  As was stated above, the act on which Plaintiff's claims are based is the taking of his shares in the Company. Thus, any effect in the United States must follow as an immediate consequence of that taking.  *Id*. at 108.  Plaintiff does not argue, and indeed cannot argue, that the injury from Defendants' act occurred in the United States—the property that was taken was located in Russia and he was in Russia when the property was taken.  *See Guirlando v. T.C. Ziraat Bankasi A.S.*, 602 F.3d 69, 78 (2d Cir. 2010) (explaining that the direct effects test is not satisfied when the injured party moves to the United States). Moreover, although the alleged money laundering is, in some sense, connected to the taking of

Plaintiff's property, this connection is "simply too attenuated, and not substantive enough" to constitute a direct effect. *Garb*, 440 F.3d at 587 (quotation marks omitted). As the Second Circuit has held, "subsequent commercial transactions involving [stolen] property do not give rise to subject matter jurisdiction over claims arising from the original [theft]." *Id*. Therefore, Plaintiff has not shown that the third form of the commercial activity exception applies.

b.   Expropriation Exception

"[I]n order to establish jurisdiction pursuant to the FSIA expropriation exception, a plaintiff must show that: (1) rights in property are in issue; (2) that the property was taken; (3) that the taking was in violation of international law; and (4) that one of the two nexus requirements is satisfied." *Zappia Middle E. Const. Co. Ltd. v. Emirate of Abu Dhabi*, 215 F.3d 247, 251 (2d Cir. 2000) (quotation marks omitted). The legislative history of the FSIA makes clear that the phrase "taken in violation of international law," 28 U.S.C. § 1605(a)(3), "refers to the nationalization or expropriation of property without payment of the prompt adequate and effective compensation required by international law, including takings which are arbitrary or discriminatory in nature," *Zappia*, 215 F.3d at 251 (quotation marks and citation omitted). Thus, for the purposes of the FSIA, the term "taken" "refers to acts of a sovereign, not a private enterprise, that deprive a plaintiff of property without adequate compensation." *Id*.

Assuming, *arguendo*, that Plaintiff has alleged that Sberbank Russia acted as an "alter ego" of the Russian Federation when it took Plaintiff's property, *see id*. (explaining that "government instrumentalities are presumed to be distinct and independent from their sovereign and normally are treated as such"), the Court still finds that the expropriation exception does not apply. As the Supreme Court has held, the phrase "'rights in property taken in violation of international law,' as used in the FSIA's expropriation exception . . . incorporates the domestic takings rule," which "assumes that what a country does to property belonging to its own citizens within its own borders is not the subject of

international law." *Fed. Republic of Ger. v. Philipp*, 141 S. Ct. 703, 709, 715 (2021) (quoting 28 U.S.C. § 1605(a)(3)).  Therefore, because Plaintiff is a citizen of Russia and his property was allegedly taken in Russia by the Russian government, the expropriation exception does not apply.

Accordingly, the Court GRANTS the Russian Defendants' motion to dismiss as it relates to claims against Sberbank Russia arising from the alleged theft of Plaintiff's shares in the Company, which include Plaintiff's claims under RICO and the ATS, and his common law claims for fraud, conspiracy to commit fraud, unjust enrichment, and conversion.

### 2.   Abuse of Process

In contrast to Plaintiff's claims discussed above, Plaintiff's claim for abuse of process does not focus on the alleged theft of his shares in the Company.  *See*, *e.g.*, Russian Defs. Supp. Mem. at 4. Rather, it concerns Plaintiff's detention in Florida that allegedly resulted from Defendants' bribing of foreign officials and otherwise improperly instituting criminal processes against him in order to retaliate against him and have him wrongfully deported/extradited back to Russia.  *See*, *e.g.*, Sec. Amend. Compl. at 25 ¶¶ 131; *id*. at 28 ¶ 144; *id*. at 54–55 ¶¶ 218–225.  Because a lawsuit can have more than one focus, *see Rodriguez v. Pan Am. Health Org.*, 29 F.4th 706, 714 (D.C. Cir. 2022); *Sachs*, 577 U.S. at 36 n.2 (noting that it was considering "only a case in which the gravamen of each claim is found in the same place"), the Court shall address whether the commercial activity exception applies to Plaintiff's abuse-of-process claim.

Plaintiff's abuse-of-process claim alleges that Defendants bribed "foreign officials" to obtain an "Interpol [R]ed [N]otice and/or diffusion" against Plaintiff in an effort to have him arrested and sent back to Russia where he could be "imprison[ed] and/or execute[d]."  *See* Sec. Amend. Compl. at 25 ¶ 131. These acts plainly did not occur in the United States, and, therefore, the first and second forms of the commercial activity exception do not apply.  *See* 28 U.S.C. § 1605(a)(2).  Thus, the Court shall turn to the third form of the commercial activity exception, which applies when an action is based

"upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." *Id*.

Here, Plaintiff alleges that Defendants' actions had a direct effect in the United States, the place where Plaintiff was detained in order to facilitate his removal and where Plaintiff sustained "damage[] to his reputation and suffered a loss of employment opportunities." Sec. Amend. Compl. at 34 ¶ 179. The Second Circuit has stated that bribery, the act which purportedly forms the basis of this claim,[7] is considered a commercial activity because "commercial activity has 'been held to include criminal acts if those actions are ones in which private parties could engage and if they are committed in the course of business or trade.'" *United States v. Turkiye Halk Bankasi A.S.*, 16 F.4th 336, 349 n.55 (2d Cir. 2021) (quoting RESTATEMENT (FOURTH), THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 454 rn. 3).  This holds true regardless of whether a private party would commit bribery for the specific purpose of causing arrest and deportation/extradition. *See id*. at 348–49 (noting that the FSIA provides that "[t]he commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose") (quoting 28 U.S.C. § 1603(d)).

Accordingly, the Court finds that it has jurisdiction over Sberbank Russia for Plaintiff's abuse-of-process claim.[8]

## B.  RICO

Section 1964(c) of the RICO statute provides a private right of action for certain types of RICO violations. *See* 18 U.S.C. § 1964(c).  "To establish a RICO claim, a plaintiff must show: (1) a violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury was

---

[7] The Court shall address whether the bribery alleged actually supports Plaintiff's abuse-of-process claim below.  *See Robinson*, 269 F.3d at 141 ("[J]urisdiction is not defeated by the possibility that the averments might fail to state a cause of action." (citation omitted)).

[8] Because the Court shall dismiss the claims against Gref for other reasons, the Court shall not address whether he is entitled to some form of official immunity.  *Cf. Samantar v. Yousuf*, 560 U.S. 305, 322 (2010).

caused by the violation of Section 1962." *DeFalco v. Bernas*, 244 F.3d 286, 305 (2d Cir. 2001) (quotation marks and citation omitted).  By the terms of the civil RICO statute, the only losses cognizable under RICO are "economic losses of one kind or another." *Bascuñán v. Elsaca*, 874 F.3d 806, 817 (2d Cir. 2017).  And, these losses must derive from a "*domestic* injury to [the plaintiff's] business or property" in order for them to be cognizable. *RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 346 (2016) (emphasis in original).  Moreover, any injury to business or property must be "proximately caus[ed]" by the alleged racketeering activities, meaning that the racketeering activities are "a substantial factor in the sequence of responsible causation," and "the injury is reasonably foreseeable or anticipated as a natural consequence" of those activities. *Hollander v. Flash Dancers Topless Club*, 173 F. App'x 15, 17 (2d Cir. 2006) (quotation marks and citation omitted).

1.  Statute of Limitations

Claims brought under RICO are subject to a four-year statute of limitations and accrue at the time the plaintiff discovers or reasonably should have discovered the RICO injury.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 148–50 (2d Cir. 2012).  Plaintiff acknowledges that he had notice of his RICO injury more than four years before he filed his claims but argues that his claims are still timely under the "separate accrual" rule.  Pl. Opp. at 15–16, ECF No. 67.  He contends that the alleged Hobbs Act Extortion, which occurred in August 2019, triggers the separate accrual rule because it concerns the Russian Defendants using threats and intimidation to force Plaintiff into abandoning his allegations against them that are related to their taking of his interest in the Company.  *Id*.  The Court disagrees.

First, contrary to Plaintiff's contentions, "the alleged occurrence of RICO predicate acts subsequent to [a plaintiff's] discovery of his injuries does not affect the accrual of his RICO claims." *Zahl v. Kosovsky*, No. 08 Civ. 8308, 2011 WL 779784, at *13 (S.D.N.Y. Mar. 3, 2011), *aff'd*, 471 F. App'x 34 (2d Cir. 2012).  Rather, under the separate accrual rule, the RICO limitations period runs

anew each time "a new and independent RICO violation occurs" that creates a "new and independent" injury for the plaintiff.  *See id*. at *12.  Plaintiff does not allege that the Hobbs Act Extortion was the source of a new and independent injury; he asserts that Defendants acted to conceal an old injury and used threats and intimidation to pressure him into giving up rights to reclaim property that Defendants purportedly took in 2013.  *See* Pl. Opp. at 15–16.  Therefore, the alleged extortion does not trigger the separate accrual rule.  *See also In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 59–60 (2d Cir. 1998); *Tech. Opportunity Grp., Ltd. v. BCN Telecom, Inc.*, No. 16 Civ. 9576, 2019 WL 4688628, at *7–8 (S.D.N.Y. Sept. 25, 2019); *Simmons v. Reich*, No. 19 Civ. 3316, 2020 WL 7024345, at *11 (E.D.N.Y. Nov. 30, 2020), *aff'd*, No. 20 Civ. 4114, 2021 WL 5023354 (2d Cir. Oct. 29, 2021).[9]  Thus, Plaintiff's RICO claims are time-barred.

### 2.   Domestic Injury

Moreover, even if Plaintiff's RICO claims were timely, they must be dismissed because Plaintiff has failed to allege a domestic injury to his business or property.  *See RJR Nabisco*, 579 U.S. at 346; Russian Defs Mem. at 21–22; US Def. Mem. at 18.

First, Plaintiff contends that his RICO injuries should be considered domestic because Defendants committed certain acts in the United States with respect to his stolen shares—namely the alleged money laundering.  *See* Pl. Opp. at 18.  The Second Circuit has made clear that "a defendant's use of the U.S. financial system to conceal or effectuate his tort does not, on its own, turn an otherwise foreign injury into a domestic one." *Bascuñán*, 874 F.3d at 819.  Thus, Plaintiff's RICO claims are not considered domestic even if Defendants engaged in concealment-related activities in the United States.

---

[9] In the second amended complaint, Plaintiff argues that his claims are timely under the doctrines of equitable tolling and equitable estoppel, *see* Sec. Amend. Compl. at 2–3 ¶¶ 5–10, but in his memorandum of law in opposition to Defendants' motions, Plaintiff does not rebut Defendants' contention that those doctrines do not apply, *see* US Def. Mem. at 11–13; Pl. Opp.  The Court, therefore, finds that Plaintiff has abandoned this argument.  *See Felske v. Hirschmann*, No. 10 Civ. 8899, 2012 WL 716632, at *3 (S.D.N.Y. Mar. 1, 2012) ("A plaintiff effectively concedes a defendant's arguments by his failure to respond to them."); *Kelsey v. Rutledge*, No. 21 Civ 4298, 2022 WL 2110436, at *4 n.5 (S.D.N.Y. June 10, 2022).

Next, Plaintiff argues that he has alleged two injuries that took place in the United States: (1) his detention in Miami and the subsequent press coverage of the incident that led directly to his suffering a loss of employment opportunities and reputational harm in the United States, and (2) Defendants' use of threats of force in the United States to discourage Plaintiff from pursuing his claims against them.  Pl. Opp. at 20–21.  Neither of these domestic injuries constitute an injury to business or property for the purposes of Plaintiff's RICO claims.  *See Hollander v. Flash Dancers Topless Club*, 340 F. Supp. 2d 453, 458 (S.D.N.Y. 2004), *order amended on denial of reconsideration* (Oct. 28, 2004), *aff'd*, 173 F. App'x 15 (2d Cir. 2006) (explaining that an injury to business or property is "not physical, emotional[,] or reputational harm or any economic aspect of such harm").  Moreover, these allegations are "simply too remotely related to the predicate acts" Plaintiff alleges, namely money laundering, wire fraud and mail fraud, violations of the travel act, and Hobbs Act Extortion, for the Court to find that they were proximately caused by that racketeering activity.  *Burdick v. Am. Exp. Co.*, 865 F.2d 527, 529 (2d Cir. 1989); *see also Hollander*, 173 F. App'x at 17 (stating that a RICO complaint fails when "the alleged injuries were proximately caused not by the alleged racketeering violations, but by the public exposure of those activities").

And, assuming, *arguendo*, that the taking or loss of a legal claim can be considered an injury to property, Plaintiff does not allege that he lost the ability to bring this action.  *See* Pl. Opp. at 21, 25. Plaintiff cites no authority for the proposition that the threatened taking of a property interest is a cognizable injury under RICO, and the Court finds that such an injury is personal, not economic.

Accordingly, Defendants' motions to dismiss Plaintiff's RICO claims are GRANTED.

### C.  Common Law Fraud, Conspiracy to Commit Fraud, Conversion, and Unjust Enrichment

Defendants argue that Plaintiff's claims for common law fraud, conspiracy to commit fraud, conversion, and unjust enrichment, are all untimely.  *See* US Def. Mem. at 9–10.  Plaintiff makes no

arguments in support of the timeliness of these claims, *see* Pl. Opp., and, therefore, the Court finds that he has conceded their untimeliness, *see Felske v. Hirschmann*, No. 10 Civ. 8899, 2012 WL 716632, at *3 (S.D.N.Y. Mar. 1, 2012). But, assuming, *arguendo*, that Plaintiff has not conceded the untimeliness of these claims, the Court shall proceed with its analysis.

For state law claims, "a federal court sitting in New York must apply the New York choice-of-law rules and statutes of limitations." *Stuart v. Am. Cyanamid Co.,* 158 F.3d 622, 626 (2d Cir. 1998). New York's "borrowing" statute provides that, "when a nonresident plaintiff sues upon a cause of action that arose outside of New York, the court must apply the shorter limitations period, including all relevant tolling provisions, of either: (1) New York; or (2) the state where the cause of action accrued." *Id*. at 627 (discussing N.Y. C.P.L.R. § 202). Here, Plaintiff is a resident of Florida, *see* Sec. Amend. Compl. at 5 ¶ 18, and his claims for fraud, conspiracy to commit fraud, unjust enrichment, and conversion arose in Russia, *see id*. at 50–55 ¶¶ 193–217, 220–24. Thus, New York's borrowing statute applies. *See* N.Y. C.P.L.R. § 202.

Under New York's statute of limitations, claims for fraud and conspiracy to commit fraud must be brought within six years from the date of the fraud or two years from the date that the plaintiff discovered or could have reasonably discovered the fraud. *See* N.Y. C.P.L.R. § 213(8).[10] At the latest, Plaintiff's claims based on fraud accrued in 2013, and, therefore, must have been brought by 2019. *See* Sec. Amend. Compl. at 14 ¶¶ 65–66, 69; *id*. at 17 ¶ 87. Thus, Plaintiff's claims, brought in 2020, are untimely. *See* ECF No. 4.

Moreover, Plaintiff's claims for conversion and unjust enrichment must be brought within three years from the occurrence of the conversion or the unjust act. *See* N.Y. C.P.L.R. § 214(3); *Bill Diodato*

---

[10] Neither party addresses what the statute of limitations period is in the "state where the cause of action accrued." *See Stuart*, 158 F.3d at 627; *see generally* Russian Defs. Mem; US Def. Mem.; Pl. Opp. But, because Plaintiff's claims are untimely under New York's statute of limitations, the Court need not decide what other statute of limitations may apply. *See* N.Y. C.P.L.R. § 202 (requiring application of the shorter limitations period).

*Photography LLC v. Avon Prod., Inc.*, No. 12 Civ. 847, 2012 WL 3240428, at *11 (S.D.N.Y. Aug. 7, 2012) (conversion); *Cohen v. Dunne*, No. 15 Civ. 3155, 2017 WL 4516820, at *3 (S.D.N.Y. Sept. 27, 2017) (unjust enrichment).   Plaintiff's claims for conversion and unjust enrichment arise from Defendants' alleged wrongful taking of his shares in the Company in 2013, *see* Amend. Compl. ¶¶ 212–17, and are therefore time-barred.

Accordingly, Defendants' motions to dismiss Plaintiff's claims for fraud, conspiracy to commit fraud, conversion, and unjust enrichment are GRANTED.

### D.  ATS

Under the ATS, district courts "have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."  28 U.S.C. § 1350.  To plead a claim under the ATS, a plaintiff must satisfy "numerous jurisdictional predicates," which include that (1) "[t]he complaint pleads a violation of the law of nations," and (2) "[t]he presumption against the extraterritorial application of the ATS . . . does not bar the claim."  *Licci by Licci v. Lebanese Canadian Bank, SAL*, 834 F.3d 201, 212 (2d Cir. 2016) (citations omitted).  As to the first predicate, "[b]ecause the [ATS] requires that plaintiffs plead a violation of the law of nations at the jurisdictional threshold, th[e] statute requires a . . . searching review of the merits to establish jurisdiction."  *Kadic v. Karadžić*, 70 F.3d 232, 238 (2d Cir. 1995) (quotation marks and citation omitted); *see also Licci*, 834 F.3d at 213.

Defendants first argue that Plaintiff's ATS claims fail because Plaintiff has not pleaded a violation of the law of nations.  Russian Defs. Mem. at 28–30.  The Court agrees with Defendants that many of Plaintiff's allegations do not constitute such violations.  In his second amended complaint, Plaintiff contends that Defendants violated the law of nations by "engag[ing] in and encourag[ing] the

practice of Reiderstvo,[11] and offenses committed in furtherance of or ancillary to those crimes such as corporate piracy, bribery of officials, unlawful detention, manufactured and false criminal actions[,] . . . extortion[,] and money laundering."   Sec. Amend. Compl. at 56 ¶ 226.   These alleged wrongs primarily sound in fraud, conversion, and misrepresentation, which are not violations of international law.   *See Arndt v. UBS AG*, 342 F. Supp. 2d 132, 141 (E.D.N.Y. 2004); *Hamid v. Price Waterhouse*, 51 F.3d 1411, 1418 (9th Cir. 1995).   Plaintiff's allegations related to bribery, money laundering, and abuse of process leading to a brief detention, also do not constitute violations of international law.   *See Hamid*, 51 F.3d at 1414, 1418 (dismissing claims based, in part, on bribery); *Nahl v. Jaoude*, 968 F.3d 173, 183 (2d Cir. 2020) (dismissing claims based on money-laundering); *Sosa v. Alvarez-Machain*, 542 U.S. 692, 737 (2004) ("Any credible invocation of a principle against arbitrary detention . . . requires a factual basis beyond relatively brief detention in excess of positive authority.").   And, there is no private cause of action for extortion, *see Eliahu v. Jewish Agency for Israel*, 919 F.3d 709, 713 (2d Cir. 2019) ("With respect to the extortion claim, [p]laintiffs have not identified a private cause of action under either federal or state law, and the Court is not aware of one."), so Plaintiff cannot bring extortion claims under the ATS, *see Nestlé USA, Inc. v. Doe*, 141 S. Ct. 1931, 1937 (2021) (explaining that the ATS is a jurisdictional statute that does not create causes of action).

But, Plaintiff does allege one wrong, the claimed poisoning, which could conceivably constitute a violation of international law.   *See* Sec. Amend. Compl. at 15–16 ¶ 76; *id.* at 24 ¶ 123; *id.* at 29 ¶¶ 151–54.   The Second Circuit has found that extrajudicial killing constitutes a violation of international law when it is perpetrated by a state actor.   *See Kadic*, 70 F.3d at 243–44; *Flores v. S. Peru Copper Corp.*, 414 F.3d 233, 249–50 (2d Cir. 2003).   As the Russian Defendants have argued, Gref can be considered a state actor.   *See* Russian Defs. Supp. Mem.   Thus, the poisoning, an attempted

---

[11] *See supra* note 3.

extrajudicial killing allegedly perpetrated by a state actor, may constitute a violation of international law.

Assuming, *arguendo*, that the poisoning is a violation of international law, the Court must next address whether the presumption against extraterritoriality bars Plaintiff's cause of action based on the poisoning. As the Supreme Court has held, the presumption against extraterritoriality applies to claims brought under the ATS, *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 124–25 (2013), and, therefore, a plaintiff must allege that "the conduct relevant to the statute's focus occurred in the United States," *Nestlé*, 141 S. Ct. at 1936. Although the Supreme Court left unsettled what it considers to be the "focus" of the ATS, it is clear that the ATS does not apply when "all the relevant conduct took place outside the United States." *Kiobel*, 569 U.S. at 124–25; *see also Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 266 (2010) ("[T]he presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever *some* domestic activity is involved in the case." (emphasis in original)).

Plaintiff alleges that the poisoning took place in Russia in 2013. *See* Sec. Amend. Compl. at 15–16 ¶ 76; *id*. at 24 ¶ 123; *id*. at 29 ¶¶ 151–54. Although he claims that this poisoning was part of a larger scheme intended to deprive him of his property, and that certain acts taken to perpetuate this scheme took place in the United States, *see id*. at 24–25 ¶¶ 124–46, these acts, which occurred years after the poisoning, concern only the underlying deprivation of Plaintiff's property. Because Plaintiff does not allege that any acts relevant to the poisoning occurred in the United States, his claim represents an impermissible extraterritorial application of the ATS. *See Balintulo v. Daimler AG*, 727 F.3d 174, 192 (2d Cir. 2013) (dismissing a claim when none of the allegations "tie[d] the relevant human rights violations to actions taken within the United States").

Accordingly, Defendants' motions to dismiss Plaintiff's claims under the ATS are GRANTED.

E.   Abuse of Process

Defendants move to dismiss Plaintiff's abuse-of-process claim as (1) time-barred under New York's statute of limitations, and (2) insufficiently pleaded. US Def. Mem. at 10–11, 29–30.[12]

First, the Court finds that Plaintiff's abuse-of-process claim is not barred under New York's statute of limitations. Plaintiff is a Florida resident and his abuse-of-process claim arose in Florida, the state where he was detained in 2019. Therefore, New York's borrowing statute applies. *See Stuart*, 158 F.3d at 626; N.Y. C.P.L.R. § 202. New York applies a one-year statute of limitations to abuse-of-process claims, *see Gomez v. City of N.Y.*, No. 14 Civ. 05932, 2016 WL 5115499, at *6 (S.D.N.Y. Sept. 16, 2016), which is shorter than the four-year statute of limitations that applies in Florida, *Callaway Land & Cattle Co., Inc. v. Banyon Lakes C. Corp.*, 831 So. 2d 204, 208 (Fla. Dist. Ct. App. 2002). Thus, under New York's borrowing statute, New York's statute of limitations governs. *See* N.Y. C.P.L.R. § 202.

Although Defendants correctly note that, under normal circumstances, Plaintiff's abuse-of-process claim would be time barred because he was detained in October 2019 and he filed his claim in November 2020, *see* Sec. Amend. Compl. at 28 ¶ 144; ECF No. 1; *see also Gomez*, 2016 WL 5115499, at *6, Plaintiff's claim was not filed under normal circumstances. In recognition of the difficulties posed by the COVID-19 pandemic, then-Governor Andrew Cuomo issued a series of executive orders tolling the statute of limitations period for the filing "of any legal action . . . as prescribed by the procedural laws of the state" from March 20, 2020, until November 3, 2020. *See* N.Y. Executive Order No. 202.8; N.Y. Executive Order 202.67. Therefore, Plaintiff's claim, which was filed on November

---

[12] The Court notes that the Russian Defendants also argue that Plaintiff's claims should be dismissed because the Court lacks personal jurisdiction over them and under the doctrine of *forum non conveniens*. Because the Court dismisses Plaintiff's claim on an alternative ground, it need not reach these arguments.

2, 2022, is timely. *See Citi Connect, LLC v. Loc. Union No. 3, Int'l Bhd. of Elec. Workers, AFL-CIO*, No. 20 Civ. 5147, 2020 WL 5940143, at *4 (S.D.N.Y. Oct. 7, 2020).

Next, the Court shall address whether Plaintiff has adequately pleaded his abuse-of-process claim. Before reaching the merits of Plaintiff's claim, the Court must determine what law applies. Because the cause of action at issue is a state law claim over which the Court has jurisdiction based on either diversity or the FSIA, the Court must apply the choice of law rules of the forum state—New York. *See Alonso v. Saudi Arabian Airlines Corp*., No. 98 Civ. 7781, 1999 WL 244102, at *4 (S.D.N.Y. Apr. 23, 1999) (the FSIA); *Kinsey v. N.Y. Times Co*., 991 F.3d 171, 176–77 (2d Cir. 2021) (diversity).

Under New York choice-of-law rules, courts must first determine "whether there is an actual conflict between the rules of the relevant jurisdictions." *Kinsey*, 991 F.3d at 176 (quotation marks omitted). The relevant jurisdictions here are New York, where the suit was initiated, and Florida, the state where Plaintiff resides and where he was subject to detention as a result of Defendants' actions. With respect to abuse-of-process claims, Florida law requires that a plaintiff plead "an act which constituted misuse of the process after it was issued," *S&I Invs. v. Payless Flea Mkt., Inc.*, 36 So. 3d 909, 917 (Fla. Dist. Ct. App. 2010), but New York law does not impose such a requirement, *see Manhattan Enter. Grp. LLC v. Higgins,* 816 F. App'x 512, 514 (2d Cir. 2020). Because Florida law imposes an additional requirement on the pleading of abuse-of-process claims, the laws of these jurisdictions conflict, and the Court must advance to the next step of the choice-of-law analysis and decide which jurisdiction's substantive law controls. *See Kinsey*, 991 F.3d at 176.

In tort cases, New York courts "appl[y] the law of the state with the most significant interest in the litigation." *Id*. (footnote omitted). Because Plaintiff was detained in Florida and his alleged injuries occurred in Florida, the Court finds that Florida has the "the paramount interest" with respect to Plaintiff's cause of action. *Tripodi v. Loc. Union No. 38, Sheet Metal Workers' Int'l Ass'n, AFL-CIO*,

120 F. Supp. 2d 318, 321 (S.D.N.Y. 2000).  Therefore, the Court shall analyze Plaintiff's claims using Florida law.

Florida law requires that a plaintiff pleading an abuse-of-process cause of action show: "(1) that the defendant made an illegal, improper, or perverted use of process; (2) that the defendant had ulterior motives or purposes in exercising such illegal, improper, or perverted use of process; and (3) that, as a result of such action on the part of the defendant, the plaintiff suffered damage."  *S&I Invs.*, 36 So. 3d at 917.

Here, Plaintiff's allegations do not state a claim for abuse of process under Florida law.  Plaintiff alleges that Defendants engaged in improper actions to induce the issuance of the Interpol Red Notice and/or diffusion, *see* Sec. Amend. Compl. at 25 ¶ 131, but he does not claim that they undertook "an act which constituted misuse of the process after it was issued," *S&I Invs.*, 36 So. 3d at 917. Additionally, Plaintiff's allegations that Defendants were motivated to seek this Red Notice and/or diffusion in order to have Plaintiff temporarily detained and then deported/extradited back to Russia so that they could imprison, torture, and execute him, *see* Sec. Amend. Compl. at 25 ¶ 131, consist solely of a "concurrent" or "ulterior" motivation for using these processes in the way in which they were intended to be used, *see S&I Invs.*, 36 So. 3d at 917 (explaining that an abuse-of-process claim cannot lie when a defendant used the process "to accomplish the result for which it was created, *regardless of an incidental or concurrent motive of spite or ulterior purpose*" (citation omitted) (emphasis in original)).  Red Notices and diffusions are used to temporarily detain people pending arrest or deportation.  Because Plaintiff does not claim that Defendants used the process "to accomplish an immediate purpose other than that for which it was designed," Plaintiff's claim fails. *Johnson v. New Destiny Christian Ctr. Church, Inc*., 826 F. App'x 766, 773 (11th Cir. 2020) (citation omitted).

Accordingly, Defendants' motions to dismiss Plaintiff's abuse-of-process claim are GRANTED.

III.     Leave to Amend

In his opposition to Defendants' motions to dismiss, Plaintiff requests that, should the Court grant Defendants' motions to dismiss, it provide him with "leave to amend the [second amended complaint] to address any pleading deficiencies." Pl. Opp. at 29. Plaintiff does not indicate how he would amend his complaint to address these deficiencies. *Id*. at 29–30.

Although "[l]eave to amend should be freely granted, . . . the district court has the discretion to deny leave if there is a good reason for it, such as futility, bad faith, undue delay, or undue prejudice to the opposing party." *Jin v. Metro. Life Ins. Co.*, 310 F.3d 84, 101 (2d Cir. 2002). And, "[a] counseled plaintiff is not necessarily entitled to . . . repleading [his claims] whenever he has indicated a desire to amend his complaint." *Porat v. Lincoln Towers Cmty. Ass'n*, 464 F.3d 274, 276 (2d Cir. 2006) (per curiam). Courts may refuse leave to amend a complaint when a plaintiff "has already had ample opportunity to amend [his] complaint, and it is unlikely that the deficiencies were unforeseen." *Gray Gables Corp. v. Arthur*, No. 21 Civ. 1551, 2022 WL 905393, at *4 (2d Cir. Mar. 29, 2022) (quotation marks, citations, and alterations omitted).

Here, the Court denies Plaintiff's request for leave to amend his claims under RICO and the ATS, and his claims for fraud, unjust enrichment, and conversion. Plaintiff has amended his complaint twice and had notice of the deficiencies of these claims at least since Defendants filed their pre-motion letters on their motions to dismiss in July 2021. *See* ECF Nos. 54–55. Moreover, after briefing on Defendants' motions was complete, Plaintiff requested leave to file a third amended complaint to add an additional defendant and did not seek leave to add "any new facts or new theories." ECF No. 90 at 2.[13] Because these claims are being dismissed based on the defects Defendants identified, the Court

---

[13] The Court denied Plaintiff leave to amend primarily because of Plaintiff's undue delay in requesting such leave. *See* ECF No. 92.

finds that leave to amend should be denied because Plaintiff has had ample opportunity to amend his complaint and these deficiencies were foreseeable.  *See Gray Gables*, 2022 WL 905393, at *4.

But, the Court concludes that Plaintiff should be given leave to file a motion to further amend his complaint with respect to his abuse-of-process claim.  Defendants' arguments with respect to this claim were grounded in New York law, and the Court dismissed Plaintiff's claim for a failure to comply with Florida law.  *See* US Def. Mem. at 29–30; *supra* section II.E.  Thus, Plaintiff may file a motion for leave to further amend his complaint with respect to his abuse-of-process claim within twenty-one days of this order.

## CONCLUSION

For the reasons stated above, Defendants' motions to dismiss are GRANTED.  The Clerk of Court is directed to terminate the motions at ECF Nos. 58 and 61.  By October 4, 2022, Plaintiff may request leave to file an amended complaint for the limited purpose stated above.

SO ORDERED.

Dated: September 13, 2022
      New York, New York

                                       _____
                                          ANALISA TORRES
                                  United States District Judge