**EXHIBIT B**

Irina Shpigel
Shpigel Law, P.C.

*Attorneys for Plaintiff*
250 Greenwich Street, 46th Floor
New York, New York 10007
E-mail: ishpigel@iselaw.com
T 212-390-1913
F 646-355-0242

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

AKHMED GADZHIEVICH BILALOV, an individual,

　　　　　Plaintiff,

Civil Action No.
20-Civ-9153 (AT)(JW)

　- against -

**THIRD AMENDED**
**COMPLAINT**

SBERBANK OF RUSSIA PJSC, and DOES 1-100
inclusive

　　　　　Defendants.

　　　Plaintiff, AKHMED GADZHIEVICH BILALOV (hereinafter referred to as "Plaintiff" or

"Akhmed Bilalov), by and through undersigned counsel, alleges upon information and belief the

following against Defendants SBERBANK OF RUSSIA PJSC, and DOES 1-100.; (hereinafter

referred to as "Sberbank").

**PRELIMINARY STATEMENT**

　　　1.　　　Between at least February 2013 and October 2019, the Defendants orchestrated and

led a conspiracy throughout Russia and the United States, aimed to defraud Plaintiff of his

1

ownership interest of Krasnaya Polyana AO, using classic Reiderstvo tactics including sophisticated methods of coercion, fraud, money laundering., mercury poisoning, and through use of politicians and legal institutions.

2. Defendants triggered a series of phony civil divestitures proceedings and criminal cases, which ultimately resulted in Defendants' takeover of Krasnaya Polyana.

3. This action arises out of a textbook case of Russian corporate raiding against Plaintiff and his company "Krasnaya Polyana, AO," and the subsequent abuse of process perpetrated by the Defendants in the United States in an attempt to silence the Plaintiff. This type of illicit scheme is a common *modus operandi* in Russia. *See* Dr. Louis Shelley and Judy Deane, *The Rise of Reiderstvo: Implications for Russia and the West* (2016).

4. On or about March 4th, 2018 the DEFENDANTS, acting through intermediaries, provided money or things of value to foreign officials to obtain an Interpol red notice and/or diffusion against Bilalov. Bilalov was located in the U.S.A at the time. The red notice and/or diffusion was based on false, unfounded, politically motivated accusations.

5. As demonstrated herein, Defendants' have engaged in the manipulation of local law enforcement to the laundering of assets through offshore companies, to the use of U.S. dollars, U.S. correspondent banks, and U.S. investments.

6. As more fully discussed below, this action is necessitated as a result of Defendants classic Reiderstvo scheme, which includes the malicious abuse of process within the United States. This civil action is based upon malicious abuse of process.

## THE PARTIES

7. Plaintiff Akhmed Gadzhievich Bilalov is an individual over the age of 18, and resident of Florida. He is a former Russian businessman and politician, and at all material times herein, was

a majority shareholder and owner of Krasnaya Polyana, AO.

8.   Sberbank of Russia PJSC (hereinafter "SberBank") is a Russian banking institution with offices and branches in New York. It conducts significant business operations in the State of New York and within the Southern District of New York, are subject to the personal jurisdiction of the courts in the Southern District of New York, and/or have agents within the Southern District of New York.

9.   At all relevant times, Sberbank of Russia maintained offices in New York City through a directly or indirectly controlled subsidiary, which was and is critical to Sberbank's combined corporate structure and operations.

10. Sberbank of Russia operates in the United States and New York through its subsidiary SberBank CIB USA Inc. ("SberBank CIB), which is located at 152 W. 57th Street, 46th Floor, New York, New York 100019.

11. Sberbank also offers alternative depository receipts which trade on U.S. over-the-counter markets. In an April 2018 interview with the *Financial Times,* Herman Gref, the Chairman of Sberabk's executive board, boasted that at least 25 percent of Sberbank's shareholders are located in the United States, claiming that its American ownership was so substantial that "[w]e don't need lobbyists. Our American shareholders do that for us." This makes Americans the single largest group of Sberbank shareholders other than the Government of the Russian Federation, which owns 51% of the bank.

12. Sberbank purposely avails itself of the courts of this Circuit to resolve its disputes, having done so as recently as 2018.

13. In recent years, according to public reports, Sberbank spent hundreds of thousands of dollars on lobbying the U.S. Government for the stated purpose of "assessing possible ways to

3

address sanctions relief."_____

14.  Herman Gref is a Russian politician and businessman.  At all relevant times herein, Herman Gref is and was the CEO and chairman of the executive board of Sberbank. Defendant Gref was a key participant in the scheme that undertook direct actions meant to strip Plaintiff Bilalov, of his assets and created conditions for other co-defendants to likewise take such action.

15. Upon information and belief Does 1-100 are individuals and entities whose names and addresses of residences are unknown.

16.  Does 1-100 are and were, during all relevant times, responsible for the acts and omissions of their employees, for acts undertaken within the general area of their authority and for the benefit of the DEFENDANTS. As alleged herein, the Does1-100 DEFENDANTS were central figures in the overall conspiracy that actively embarked on and extensively participated in the fraudulent scheme. By means of corporate policies that put the Does 1-100 DEFENDANTS' resources and strategy at the heart of the conspiracy, the Does 1-100 DEFENDANTS were and are aggressor entities that acted to harm the economic interests of the Plaintiffs.

17.  Does 1-100 during all relevant times, adopted a policy that purports to exercise control of the activities of their employees, as well as those of their direct and indirect subsidiaries. Under this policy, the Does 1-100 DEFENDANTS have undertaken responsibility for the acts of the employees of the Does 1-100 DEFENDANTS, wherever taken, including acts related to money-laundering activities within the United States.

### JURISDICTION AND VENUE

18.  This Court has jurisdiction under 28 U.S.C. §1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000.00.

19. Jurisdiction over Sberbank of Russia PJSC is proper in this court on the grounds that

Plaintiff's claim arise from Sberbank of Russia's conduct in New York. Sberbank of Russia trades on the New York Stock Exchange, conducts business within the United States and has purposefully availed itself of this Court's jurisdiction in previous litigation.

20. Jurisdiction over the remaining Defendants is proper on the grounds that they are all co-conspirators who committed acts in furtherance of a conspiracy which they knew included acts in the United States, as more fully described below.

21. Defendants are subject to this Court's personal jurisdiction under N.Y. C.P.L.R. §302(a), because Defendants in person or through an agent, transacts business within the state or contracts anywhere to supply goods or services in the state and regularly solicits business, and derives substantial revenue from goods used or consumed or services rendered, in the state.

22. Venue is proper in this Court pursuant to 18 U.S.C. § 1965(a) because DEFENDANTS reside, are found, have an agent, or transact affairs in this district. Venue is also proper in this Court pursuant to 18 U.S.C. § 1965(b) because, to the extent, any DEFENDANT may reside outside of this district, the ends of justice require such DEFENDANT or DEFENDANTS to be brought before the Court. Venue properly lies in this Court pursuant to 28 U.S.C. §1391(c)(3), which authorizes an action against an alien in any district. Venue is additionally proper in this court for all Defendants pursuant to 28 U.S.C. §1391(b)(2) because substantial actions in furtherance of the conspiracy giving rise to Plaintiff's claims occurred in this District, or, alternatively, pursuant to 28 U.S.C. § 1391(a)(2). Further, certain of the acts alleged herein took place within this judicial district.

23. Jurisdiction and venue are also proper in this District as many of the predicate acts, including multiple threats and acts of intimidation, as described herein, occurred in this District.

24. Jurisdiction and venue are thus proper.

5

**Deleted:** such as using U.S. banks for the transfer of the money and/or U.S. dollar payments for the assets of the company.

**Deleted:** <#>Pursuant to 28 U.S.C. § 1332(a), "[a] case falls within the federal district court's original diversity jurisdiction only if diversity of citizenship among the parties is complete, i.e., only if there is no plaintiff and no defendant who are citizens of the same State." *Wisconsin Dept. of Corr. v. Schacht*, 524 U.S. 381, 388, 118 S.Ct. 2047, 141 L.Ed.2d 364 (1998) (internal quotation marks and citation omitted). ¶ Additionally, Rule 4(k)(2), Federal Rules of Civil Procedure, provides federal courts with personal jurisdiction over a foreign defendant "in federal question cases and if the foreign defendant has sufficient contacts with the United States to satisfy due process requirements." See *Eskofot A/S vs. El Du Pont De Nemours & Company*, 872 F. Supp. 81 - Dist. Court, SD New York 1995.¶

**Deleted:** <#>) which provides that: "…a court may exercise personal jurisdiction over any non-domiciliary who, either "

**Deleted:** <#>": (i) "

**Deleted:** <#>any

**Deleted:** <#>"; (ii) "commits a tortious act within the state"; (iii) "commits a tortious act without the state causing injury to person or property within the state ... if he [a]

**Deleted:** <#>does or

**Deleted:** <#>or engages in any other persistent course of conduct, or

**Deleted:** <#>, or [b] expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce"; or (iv) "owns, uses or possesses any real property situated within the state." N.Y. C.P.L.R. §302(a)(1)-(4).

**Deleted:** <#>"[C]ourts have explained that section 302 is a `single act statute' and proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted." *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 170 (2d Cir.2010) (internal quotation marks omitted); see also *Baron Philippe de Rothschild, S.A. v. Paramount Distillers, Inc.*, 923 F.Supp. 433, 436 (S.D.N.Y.1996) ("Personal jurisdiction pursuant to section 302(a)(1) may be satisfied with proof that just one transaction occurred in New York so long as defendants' activities were purposeful and substantially related to plaintiffs' claim.").¶
Foreign defendants can be subject to personal jurisdiction where another party "engaged in purposeful activities in the state ... with the consent and knowledge of the defendants, who both benefited from those activities and exercised extensive control over [the party] in the transaction underlying th[e] suit." *Retail Software Servs., Inc. v. Lashlee*, 854 F.2d 18, 22 (2d Cir.1988); see also *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467, 527 N.Y.S.2d 195, 522 N.E.2d 40 (1988).¶

**Deleted:** <#> conspiratorial

### HISTORY OF PARTIES' PRIOR DEALINGS

25. In 2006, Plaintiff and his brother Akhmed Gadjievich Bilalov purchased a ski resort, "Gornaya Carousel," located in Krasnaya Polyana, Sochi Region, Russia – an ambitious project aimed at the construction of new expressway, lift, and other real estate development.

26. In 2006, Plaintiff's brother, Magomed Bilalov, became the owner of 84.85% shares of JSC "Krasnaya Polyana."

27. The shares mentioned above were jointly owned by Plaintiff. Plaintiff authorized his brother and his wife to manage the project because Plaintiff was involved in politics.

28. In 2007, the Olympic Committee awarded the 2014 Winter Olympic Games to the City of Sochi. The "Krasnaya Polyana" region of Sochi suddenly aroused the interest of investors. As a result, the Government of the Russian Federation announced that "Krasnaya Polyana" would be included as part of the prospective Olympic projects for the construction of the ski jumping complex with a planned 15,000 seats. The project also included "Gornaya Carousel," where a mountain media village and hotels for 2,658 rooms were to be constructed. The building and financing of the infrastructure, including roads, networks, and other projects, were to become the Russian government's fiscal responsibility.

29. At this time Herman Gref, was Russia's Minister of Economics. After the Olympic Committee awarded the 2014 Olympic Games to the City of Sochi, Herman Gref was removed as the Minister of Economics in the fall of 2007. In November 2007, Herman Gref was named as the Chairman of SberBank.

30. In 2008, under SberBank's initiative and pursuant to the direction of the Government of the Russian Federation, SberBank's Chairman Herman Gref and his vice-chair Stanislav Kuznetsov, SberBank Capital, a 100% subsidiary of SberBank, became the investor of "Krasnaya

6

**Deleted:** FACTUAL ALLEGATIONS COMMON TO ALL COUNTS¶

**Deleted:** Magomed

Polyana."

31. As per the terms of this agreement, SberBank and SberBank Capital took on the financial responsibility to issue a credit line in amount of 40 billion rubles for construction of the ski jumping complex and other objects and infrastructure.

32. However, the aforementioned obligations were never executed. SberBank only provided a bridge loan of 1 billion rubles at an interest rate of 10%-15%. SberBank, renegotiated the 40 billion financing commitment and instead offered to directly buy 25% of the company.  As a result of berBank's failure to fund the project, "Krasnaya Polyana" was forced to obtain additional high interest loans from the VneshEconomBank ("VEB") collateralizing its shares.

33. At the same time, Mr. Kuznetsov, Mr. Gref's vice-chair, became the Chairman of the Board of "Krasnaya Polyana"

34. As more fully described below, SberBank and German Gref set a plan in motion to obtain control of the company from Plaintiff and his brother by undue influence, fraud, and threat of bodily harm with the help of both private and state players which include SberBank, SberBank Capital, Herman Oskarovich Gref, his son, Oskar Olegovich Gref (as a beneficiary), Kuznetsov Stanislav Konstantinovich, Kozak Dmitry Nikolaevich, a Turkish construction company Sembol, as a company which had corrupt ties to SberBank Capital, Herman Oskarovich Gref and Kuznetsov Stanislav Konstantinovich), Rixon, Gutseriev Mikhail Safarbekovich, an individual who fraudulently obtained 41,429% of shares of "Krasnaya Polyana".

35. In 2008, despite guarantees of SberBank and SberBank Capital of investment of 40 billion rubles to "Krasnaya Polyana," only 2.7 billion rubles were invested, as a result of which SberBank Capital, which was a 100% subsidiary company of SberBank, gained control of 25.01% of shares of "Krasnaya Polyana."

7

36. From their entry into the project, in 2008, Defendants, specifically SberBank Chairman Herman Gref, his vice chair Stanislav Kuznetsov, and the Deputy Prime Minister of the Russian Federation Dmitriy Kozak, as well as other officials, jointly began to execute planned actions aimed to misappropriate shares of "Krasnaya Polyana," which were jointly owned by Plaintiff and his brother.

37. In 2008, under the State program for financing and construction of the Olympic objects, the government committed to build a road from the existing route A148 to the border of the "Krasnaya Polyana" location, where the ski-ramp was located.

38. However, as a result of negligent actions of Dmitry Kozak and Herman Gref, financing of said road was never completed, which consequently led to a substantial cost increase for construction of the ski-ramp.

39. This negligence and subsequent increase of the cost of construction created the necessity of additional financial involvement of SberBank, which is exactly what Defendant Herman Gref and his accomplices planned for to implement their unlawful actions to take over control of the "Krasnaya Polyana" shares, which belonged to Plaintiff and his brother.

40. As of 2010, Plaintiff and his brother were shareholders of 60% of the "Krasnaya Polyana", SberBank and its affiliate, SberBank Capital, under personal control of Herman Gref owned 25%, Krasnodar Region owned 11%, Independent fund InvestAD (UAE) owned 4% and "Krasnaya Polyana" remained the largest developer and builders in preparation of the 2014 Winter Olympic Games in the City of Sochi, while Mr. Kuznetsov continued to hold the Chairman of the Board position.

41. Prior to 2012, construction of the site was successfully performed by the company "Transcomstroy", which was controlled by Plaintiff's brother; and as a result of successful

8

performance, in the beginning of 2012, Plaintiff's brother received a State award from the President of the Russian Federation V.V. Putin for organization of construction of Olympic facilities and successful test competitions.

42. However, in the middle of 2012, under the pressure of the SberBank Chairman Herman Gref and without any sufficient reason and grounds, the subcontractor "Transcomstroy" which was controlled by Plaintiff, and which executed construction of the object at the price not exceeding $1,800.00 USD for 1 sq. m, has been replaced with the Turkish construction company "Sembol" (a partner of Rixos), which invoiced the same amount of work for more than $3,000 USD for 1 sq. m. and didn't guarantee deadline compliance.

43. After "Sembol" was contracted, the construction budget was increased by $1 billion USD, after which the company started to lose money.

44. It is a public information that "Sembol" is closely associated with and financed by DenizBank, and both have close ties to Turkish government.

45. When Herman Gref introduced "Sembol" as general contractors, he insisted on investing additional capital in the amount of $50 million USD for all partners to assure that the company's worth will be exceeding $800 million USD after which Sberbank and Herman Gref became managing partners.

46. There was an undisputed conspiracy between SberBank, Chairman of SberBank Herman Gref, SberBank Capital and Stanislav Kuznetsov, because the aforementioned persons imposed the company Sembol and its terms to "Krasnaya Polyana", and because the terms of Sembol were knowingly worse than the terms of Transcomstroy.

47. This situation led to a conflict between Plaintiff's brother and Herman Gref, as a result of which Herman Gref and his accomplices were able to remove Plaintiff's brother from management

9

of "Krasnaya Polyana" and started to threaten Plaintiff and his family with bodily harm and even death.

48. Thus, since the middle of 2012, the project implementation and the management of construction performed by "Krasnaya Polyana" was under personal control of Herman Gref and his entrusted persons, including Defendants named herein.

49. Plaintiff and his brother were no longer involved in the company's management or managerial decision-making.

50. The actions of Chairman of SberBank Herman Gref, Dmitriy Kozak, Stanislav Kuznetsov and other third parties, led to additional financial investment whereas a number of Plaintiff's shares in "Krasnaya Polyana" had been purposefully diluted to 41.429 %.

51. These actions were made under false pretenses of investment to be made by the Turkish construction company "Sembol" which, however, didn't comply with its financial obligations and in turn, needed to be funded with the help of the state capital issued by SberBank, which confirms the existence of unlawful and possible corruptive ties.

52. The unlawful actions of Defendants and the Turkish construction company Sembol increased the cost of construction, and therefore reduced the value of shares of "Krasnaya Polyana."

53. On or about February 2, 2013, an agreement was reached during a meeting which was held with participation of SberBank Chairman Herman Gref, Vice Prime Minister Dmitriy Kozak and Plaintiff's brother, whereas it was agreed, that after completion of the Olympic Games, an actual division of assets would be made, namely 1/3 of the assets (the upper part) which included elite buildings, had to be allocated and transferred to Plaintiff and his brother.  The other 2/3 (the lower part), had to be allocated and transferred to SberBank.

**Deleted:**

10

54. As a result of the aforementioned meeting, corresponding minutes were signed by Herman Gref; however, neither Herman Gref, nor Dmitriy Kozak performed under the reached agreement.

55. While continuing to exert and trying to influence Plaintiff and his brother, Herman Gref held another meeting with participation of Dmitriy Kozak and Plaintiff, whereas he demanded to transfer all shares of "Krasnaya Polyana" to him or his affiliates.

56. During this meeting, Herman Gref stated, that if the shares of "Krasnaya Polyana" would not be transferred in the shortest possible timeframe to the parties indicated by Herman Gref or Dmitriy Kozak, Plaintiff and his family personally would face serious problems, including bodily harm or death.

57. From then until this day, Plaintiff has reasons to be afraid for his life and health, because threats to life and health which were made during the meeting by Herman Gref and Dmitriy Kozak were brought to life; Plaintiff was poisoned with mercury (as confirmed by appropriate analysis and medical documentation) as Plaintiff had to go through a long medical treatment under the supervision of Professor Kelling in the Clinic of Baden-Baden, Germany.

58. In February of 2013, after Plaintiff and his brother refused to transfer shares owned in "Krasnaya Polyana" to affiliates indicated by Herman Gref, Dmitriy Kozak and Alexander Tkachev and in order to misappropriate shares of "Krasnaya Polyana", the aforementioned Defendants presented a libelous report to the President of the Russian Federation, Vladimir Putin, during a live TV broadcast, where Gref falsely indicated that Plaintiff's brother solely managed the construction site and was responsible for failure to meet construction deadlines as well as for increased cost of construction; which was false, because since 2012, the construction was performed by Herman Gref's institutions and by the Turkish construction company Sembol, which was personally selected by Herman Gref.

59. This falsified report of Herman Gref and Dmitriy Kozak against Plaintiff and his brother was an intentional and well-planned slander and was relied on by Putin to the detriment of Plaintiff. The purpose of the statement was aimed to obtainPlaintiff's assets (shares in "Krasnaya Polyana") and resulted in baseless and unlawful initiation of criminal prosecution of Plaintiff.

60. As of March 2013, Plaintiff's brother was an actual shareholder of 41.429% (1426 ordinary shares) of "Krasnaya Polyana", which was the largest developer of sports facilities in the capital of the 2014 Olympic Games in the City of Sochi.

61. "Krasnaya Polyana" was engaged in construction of the ski resort "Gornaya Carousel", which was one of the key centers of the ski infrastructure of the Winter Olympics. The complex included the Olympic ski-ramps K-125 and K-59 with a total capacity of 15 thousand spectators.

62. The second project of "Krasnaya Polyana" was the Olympic Media Village, which included the construction of commercial entertainment and sports centers, water park, tennis courts and other objects of service infrastructure.

63. In accordance with financial analysis prepared by "SberBank," the total value of 41.429 % of shares or 1426 ordinary shares (shares of the JSC "Krasnaya Polyana") totaled $328 million USD (800 million x 41/100).

64. In March of 2013, Plaintiff's brother had a meeting with Mikhail Gutzeriev.  In the meeting, he threatened Plaintiff and his family with the threat of violence, continuation of baseless and unlawful criminal prosecution and to deprive all of their possessions if they would not transfer the 41.429% (1426 shares of  "Krasnaya Polyana") for the price of $20 million USD, which was at least 40 times less than the actual value.

65. During the meeting, Mikhail Gutseriev called Herman Gref directly, and through the loudspeaker Herman Gref gave instructions: "take everything from Bilalov's family at the lowest

possible price, preferably for free."

66. Mikhail Gutzeriev guaranteed that if Plaintiff's brother would sign the documents, any prosecution would be terminated, and he would be "left alone."

67. Mikhail Gutzeriev also guaranteed that he would share with Plaintiff's brother, half of the acquired assets, including political and financial dividends equally, i.e., 50% to Mikhail Gutzeriev and its institutions and relatives, including Mikhail Osmanovich Shishkhanov, and 50% to Plaintiff.

68. In March of 2013, as a result of threats and actions taken against Plaintiff, being scared for his life and safety, Plaintiff's brother and Plaintiff were forced to sell 41.429% (1426 shares of "Krasnaya Polyana") for the price of $20 million USD, which was 40 times less than the actual value.

69. On March 14, 2013, under physical and emotional pressure, Plaintiff transferred 601 shares of "Krasnaya Polyana."

70. Plaintiff never gave any instruction to transfer nor personally transferred any other shares, however, as Plaintiff found out from mass media, the aforementioned deals were completed, illegally and without Plaintiff's consent or participation.

71. Presently, all illegal actions against Plaintiff and his family continue, criminal cases are being unlawfully initiated and investigated, informational personal attacks continue, and Plaintiff is still receiving threats of a physical and financial nature.

72. Mikhail Gutzeriev never fulfilled promised conditions after receiving 41.429% of shares of "Krasnaya Polyana", even further, he gave permission to Herman Gref to institute additional dilution of shares, where institutions of SberBank purchased additional issued shares of "Krasnaya Polyana" as well as part of Mikhail Gutzeriev's shares and allowing  SberBank to become the

13

owner of 92% of "Krasnaya Polyana."

73. As a result of these transactions, as reported by mass media, Mikhail Gutseriev received a number of financial preferential benefits from SberBank and its institutions, including unlimited lines of credit for the purchase of real estate, shopping malls, warehouses, etc.

74. As a result of these transactions, by the end of 2013, Gutseriev's family net worth reached $4.9 billion USD, and in subsequent years, namely 2015-2016, reached $15 billion USD.

75. In particular, while convincing Plaintiff and his brother to trust him, Mikhail Gutseriev cited his own situation as an example, namely initiation of the criminal case against him in 2007 on the basis of failure to pay taxes by "Rusneft" in an especially large amount (a company which is controlled by Gutseriev M.S.).

76. In 2007, Gutseriev sold his company to a "businessman from the government" Oleg Deripaska at the price indicated by him, and after he "resolved all of his issues," Gutseriev returned to Moscow and repurchased "Rusneft" from Deripaska; however, at that time, the company had serious financial problems and Gutseriev needed financial support of the SberBan" and Herman Gref,  in order to resolve financial problems and avoid bankruptcy.

77. Thus, Mikhail Gutseriev, who was in a desperate need of money for refinancing his shares of the company "Rusneft" and for repayment of other financial liabilities, offered Herman Gref his assistance in acquiring "Krasnaya Polyana" shares at knowingly lowered price in exchange for financial support from SberBank issued to him and his family.

78. After Plaintiff signed a consent to sell a part of shares (being threatened and under pressure) and when other transactions to which Plaintiff did not give his consent were completed, Mikhail Gutseriev got control of 41.429%  of "Krasnaya Polyana" shares, which belonged to Plaintiff and his brother, and while colluding with the Chief of SberBank Herman Gref, he approved an

additional emission and further purchase of shares by the institutions of "SberBank" at a substantially lowered price.

79. As compensation, Gutseriev received a possibility to hedge the risks of falling oil prices by more than $700 million USD from SberBank and its affiliates and Herman Gref personally.

80. As a result of illegal collusion with Herman Gref, Mikhail Gutseriev and his institutions received hundreds of millions of USD under the patronage of Herman Gref, and together with his institutions, he (Mikhail Gutseriev) purchased: MDM Bank, a number of development projects in New Moscow, Non-government pension fund "Raiffeisen", oil and construction companies, banks, pension funds, hotels and business centers, retailers "Eldorado" and "Tekhnosila", the Sberbank Ukraine, which is a subsidiary of the Russian SberBank and remitted $3 billion in debt of "Rusneft"; all of the above confirms the existence of close and informal ties between Mikhail Gutseriev and Herman Gref.

81. Even further, as a result of Defendants' unlawful actions, namely illegal deprivation of Plaintiff's assets, by forcing Plaintiff to sign an agreement, so that Plaintiff's brother would sell shares of "Krasnaya Polyana", and by organizing the execution of other documents, which led to the transfer of their stake in "Krasnaya Polyana" to the institutions of SberBank, Mikhail Gutseriev agreed to commit these illegal actions against Plaintiff in exchange to receiving from Herman Gref, the Chairman of SberBank, an unlimited access to unprecedented credit lines for purchase of the large-scale real estate, including shopping malls, at a deliberately low rate, which was implemented by using public funds for personal purposes on the terms which were obviously unfavorable to the State and it is an undisputed proof of corruption committed by a group of people with participation of D.N. Kozak, S.K. Kuznetsov, and the Chairman of SberBank Herman Gref.

82. Thus, the organized group consisted of the Defendants including SberBank, the institutions

controlled by SberBank, Herman Gref and third parties related to them, exercised their intention to deprive Plaintiff of his assets (41.429% of shares in "Krasnaya Polyana") through physical and moral threats, illegal initiation of criminal cases and attempt of physical elimination of Plaintiff and members of his family.

**DEFENDANT'S RETALIATION OF AND PERSECUTION OF AKHMED BILALOV**

83. In 2013, the Defendants acting through intermediaries, provided money or things of value to the Russian Interior Ministry to open a criminal case against Plaintiff and his brother. The Russian Interior Ministry charge Plaintiff in absentia under Part 1 of Article 201 of Russia's Criminal Code (abuse of office in a commercial organization).

84. In 2016, the charges against Plaintiff and his brother had been dropped.  However, the Interior Ministry denied this, saying that both brothers had been put on 'the wanted list.' At the same time, no court orders were issued in absentia to arrest Plaintiff or his brother.

85. Herman Gref and the Defendants either directly or through co-conspirators and intermediaries continued baseless and unlawful criminal persecution and investigations of Plaintiff. Herman Gref and the Defendants either directly or through cocospirators sent death threats against Plaintiff and his family which forced Plaintiff to initiate actions to protect his rights and the rights of his family members.

86. On or about April 27th, 2013 Herman Gref and the other Defendants either directly or through cocospirators and intermediaries attempted to poison Plaintiff with Mercury.

87. In or around May of 2016, Plaintiff and his family, in fear for their lives, fled Russia and moved to New York.

88. In late Spring of 2018, Plaintiff felt that sufficient time has passed, and he was now able to back- channel members of the "inner circle" in an effort to recover some of his assets.

16

**Deleted:**

**Deleted:** Money Laundering Scheme ¶
The DEFENDANTS have been actively involved in money laundering for many years through the Troika Laundromat, and have carried out their scheme through acts within this district and throughout the State of New York. Examples of the methods and means by which the DEFENDANTS have been complicit in the money-laundering scheme, directly and through the acts of their coconspirators, are set forth below.¶
Troika Dialog which was acquired by Sberbank CIB, was founded by the American Peter Derby in 1991. In March 2009, the company announced a strategic alliance with Standard Bank Group under which Standard Bank will become a 36% shareholder in Troika Dialog.¶
 In March 2011, Sberbank agreed to acquire Troika Dialog for US$1 billion, through the purchase of a 63.6 percent stake held by a shareholder group led by Ruben Vardanyan, and a 36.4 percent stake held by South Africa's Standard Bank.¶
 In 2012 the brokerage firm has been acquired by Russia's biggest bank, Sberbank, for US$1bn and continued operation as a part of its investment banking division.¶
The so-called Troika Laundromat was a financial network set up by a Russian investment bank to help high profile political and business clients move money out of the country and hide it in the United States and Europe. The scheme exported about $4.8 billion over seven years, with the help of U.S., Russian, and  Lithuanian banks. The Troika Laundromat was operated by staff at an independent arm of the Russian investment bank Troika Dialog, which now part of Sberabnk and Sberbank CIB.¶
The scheme consisted of at least 75 shell companies set up by Troika. Money was moved between them for deals that were entirely made up, including fake invoices, in order to disguise the recipients. In total, $8.8 billion of internal transactions were generated to obscure the source of the money. Clients used the funds to buy real estate or luxury yachts in the US and abroad, while criminal groups worked to launder illicit funds.¶
The Laundromat wasn't just a money laundering system. It was also a hidden investment vehicle, a slush fund, a tax evasion scheme, and much more. Troika's clients also used it to buy properties in Great Britain, Spain, and the United States; to acquire Real Estate,  luxury yachts and artwork; to pay for medical services and World Cup tickets; to cover tuition at prestigious Western schools for their children, and even to make donations to churches. In addition, the Troika Laundromat enabled organized criminal groups and fraudsters to launder the proceeds of their crimes.¶
In addition, the Troika Laundromat enabled organize… [3]

**Deleted:**

**Deleted:** Upon information and belief, in

**Deleted:** ,

**Deleted:** cocospiraators

**Deleted:**

**Deleted:**

**Deleted:** Plaaintiff. Hermaan

89. Plaintiff reached out to Defendant Kirill Androsov by telephone, a close friend and associate of Herman Gref for the purpose of settling his claims against Defendants in connection with the allegations contained in this Complaint.

Deleted:

90. Plaintiff's initial contacts with Androsov showed promise as he was told that Gref wanted to amicably resolve the conflict, however, some time was needed.  However, Plaintiff was told that if Plaintiff was to proceed with litigation, Gref would not be able to settle the case, as the matter would be taking a "political tone."

91. The Defendants misrepresented to Plaintiff that Defendants are negotiating in good faith. The whole purpose of the negotiations was to lull Plaintiff into a false sense of security and to prevent him from pursuing his claims against the Defendants in the United States.

92. Unbeknownst to Plaintiff, at the time of the negotiations, the Defendants had already filed false, unfounded, politically motivated charges against Plaintiff.

93. Plaintiff did not pursue any claims against the Defendants in 2018 in reliance on Defendants misrepresentations that the Defendants will settle Plaintiff's claims in good faith.

94. On or about March 4th, 2018 the DEFENDANTS, acting through intermediaries, provided money or things of value to foreign officials to obtain an Interpol red notice and/or diffusion against Bilalov. Bilalov was located in the U.S.A at the time. The red notice and/or diffusion was based on false, unfounded, politically motivated accusations. The defendant intended to cause Bilalov to be detained and deported to Russia, where Defendants would be able to use their influence to imprison and/or execute Bilalov, similar to the case of Magnitsky.

95. For almost a year, Plaintiff spoke with Androsov by telephone and had his representative speak with Oleg Gref, Herman Gref's brother, all in a perceived contemplation of an amicable settlement.

96. In late April of 2019, Plaintiff was informed by Andrasov via telephone that Defendants' representative would meet with him in May for the May/June San Francisco Annual Conference.

97. Defendants' representatives and/or agents traveled from Russia to the United States to meet with Plaintiff in furtherance of engaging in the criminal conspiracy, to manage, establish, carry on or facilitate the promotion, management establishment and carrying on of unlawful activity, mainly intimidation and extortion of Plaintiff.

98. At the end of May 2019, Plaintiff went to San Francisco, to attend what he believed to be a settlement meeting with Defendants' representative.  In the lobby of the W hotel, he met with a Russian individual who introduced himself as Alexander Igorevich.   Following initial introductions, they proceeded to have lunch at the hotel restaurant. During lunch, Alexander Igorevich once again confirmed that he works with internal security of Sberbank, and that he is an active FSB major, representing the interests of both the Russian Federation and the State Owned Sberbank.

99. Alexander Igorevich traveled from Russia to the United States to meet with Plaintiff in furtherance of engaging in the criminal conspiracy, to manage, establish, carry on or facilitate the promotion, management establishment and carrying on of unlawful activity, mainly intimidation and extortion of Plaintiff.

100.      In no uncertain terms, Alexander Igorevich informed Plaintiff that the Defendants and Sberbank had no intention of settling the matter and that if Plaintiff proceeds with an action against Sberbank or any member of the inner circle, such action would be perceived and presented back home as an act of treason, and the attempted poisoning would be nothing compared to what may happen to both Plaintiff and his family.   Alexander Igorevich further indicated that the Defendants will use their reach in the United States to have Plaintiff arrested and they will use

their reach in Russia to ensure that Plaintiff's family would have problems. The meeting lasted several minutes, as Alexander Igorevich simply concluded by telling Plaintiff to forget what he lost and start anew in the land of the free.

101.     Plaintiff returned to New York following the trip to San Francisco.  When he returned to New York, he contacted Androsov by telephone  and told him what had happened and that he would not surrender and that he will fight for his rights.  Androsov called Plaintiff "a fool" and that Plaintiff should be ready for "a new wave of problems."

102.     In July of 2019, as Plaintiff was exiting his apartment in New York, he was approached by two men, who were sent by the Defendants.  They both told him that they know where he lives, and they can get him anywhere.  They wished him a pleasant day and got into a car which was parked opposite the building.

103.     Two weeks later, one of the two men, who was sent by the Defendants, approached Plaintiff on his way home and showed him pictures of his wife entering and exiting their Miami apartment, and just told Plaintiff to "think of his family."

104.     In late August of 2019, Plaintiff once again contacted Androsov by telephone to see if things could be settled and to try and leave family out of the situation.  Androsov indicated that the situation is not within his control, but he would relay the message.  Within several days, almost immediately after the Labor Day weekend in September of 2019, when Plaintiff returned home to New York, he was greeted by the same two men from his prior encounter who were sent by the Defendants. The two men told him that Alexey Nikolaevich wanted to meet on Friday at the Plaza Hotel bar.

105.     That Friday, Plaintiff met an individual identified as FSB major Alexey Nikolaevich.  The meeting was very brief.  Alexey Nikolaevich was drinking his beer, and rudely

19

**Deleted:** telphone

told the Plaintiff that "trouble was coming," and that "U.S. authorities will arrest him soon," and "he will be extradited."  Plaintiff was further told that "everything was already arranged," that Plaintiff "will join his cousin in Lefortovo Prison," and while there, "many interesting things may happen including suicide, just like Vladimir Evdokimov" (former executive of RosKosmos, who allegedly committed suicide by stabbing himself numerous times while in solitary confinement).

106.     Fearing for his life, Plaintiff left New York that same day and went to Miami, where he believed to be safe.

107.     In or around October of 2019, while visiting the City of Miami, Plaintiff was wrongfully arrested based on the false information provided by Defendants to Interpol and to the United States Department of Homeland Security ("DHS").  The arrest took place just like Alexey Nikolaevich said he would be and there was an attempt to have him deported (extradited), however, following a brief detention, Plaintiff was released.

108.     Plaintiff filed an appeal with Interpol.

109.     Interpol blocked his file and removed the diffusion following a review of all relevant facts surrounding Plaintiff's situation.

110.     Based on the evidence to be presented by the Plaintiff, his situation clearly demonstrates that the Plaintiff is an unfortunate collateral victim of a politically and improperly motivated persecutory campaign. This campaign appears to be designed to destroy him and his cousin Ziyavudin Magomedov.

111.     This persecution campaign has the additional goal of misappropriating Plaintiff's assets and laundering the proceeds.

112.     Plaintiff is not alone in the view that the criminal allegations against him are a politically motivated fabrication.

113.    In his first correspondence with Interpol, which subsequently blocked access to his file and effectively removed the diffusion placed by Russia, Plaintiff highlighted the immediate reactions of well-informed observers, and the international press covering his case and the case of his cousin of Ziyavudin Magomedov; which point to the political nature of the arrests.

114.    It was established by Plaintiff that he was poisoned and the poisoning was linked to the persecution against him by the Defendants and the unlawful taking of his assets.

115.    Subsequently Defendant Gref and his associates illegally used their law enforcement and intelligence contacts to eliminate the Plaintiff and when that proved fruitless to incriminate him and have him arrested and extradited.

116.    In response to the authorities, the Defendants submitted further falsified information to the authorities in connection with process. Defendants further contacted the Plaintiff's family and continued to threaten them with repercussions in response to Defendants plans to publicize the Krasnaya Polyana story and subsequent poisoning.

117.    This undue influence, after Plaintiff's arrest,m was used to prevent Plaintiff from exercising his rights and he was afraid for his life due to the threats he received from credible and reliable individuals which represented agencies that acted on their threats in the past.

118.    Following his departure to Germany and then to the U.S., Plaintiff's concern was only to protect his life and the lives of his family members, he was recently poisoned and had to seek treatment in Germany to remove the toxic mercury form his system. Moreover, criminal charges were being fabricated against him and against members of his family.

119.    The type of ruthless Corporate and Government corruption that is seen in Russian Reiderstvo practices of which the Defendants regularly practice, is that which imperils the human rights of Plaintiff and the Russian people as a whole.

21

Deleted: <#>Based on recent events, it has been shown that poisoning is a popular and established method of removing undesired elements from Russian political and business society.¶
The recent poisonings of Alexei Navalny, Alexander Litvinenko, Sergei Skripal, and Julia Skripal are just some examples of the same methods used in the instant matter. ¶
The Magomedov, and Bilalov matters which are closely linked, are a well-orchestrated case of de-privatization ¶
As was also published by the United States Congress in its official records on March 28, 2019, the United States House Permanent Select Committee of Intelligence heard testimony from the U.S. Ambassador to Russia, Michael McFaul. ¶
Mr. McFaul raised the case of Ziyavudin Magomedov, as being a clear example of Putin's high-profile politically motivated nationalizations (or de-privatizations as McFaul puts it), of successful private enterprises.¶
In his testimony McFaul stated the following: "Putin and his proxies have considerably reduced the size of Russia's private sector and increased the role of the state in the economy" [...] "Not surprisingly, increased state ownership in the economy, a major redistribution of property rights guided by political motivation rather than profit maximization, and a growing system of patronage and corruption more generally have not fostered economic growth." [...] "High profile nationalizations (or de-privatizations)" such as the seizure of the oil company Bashneft in 2014, or the arrest of billionaire Ziyavudin Magomedov, underscore the fragility of private property rights a quarter of a century after the end of communism." ¶
Ambassador McFaul further indicated in his testimony that one of the principal goals in the persecution of legitimate businessmen, such as Ziyavudin Magomedov, is to reduce the size of Russia's private sector and increase the role of the State in the economy.  This is executed by using corrupt law enforcement officials, and a willing and highly dependent Criminal Court system which McFaul describes as follows: "Overall, the Russian court system has a reputation for being corrupt and easily manipulated for political ends. The selective application of the law – for example, why did Khodorkovsky go to jail, but oligarchs did not? – creates incentives to develop personal ties with Putin as the only rational strategy for preserving control over one's wealth. Russia's arbitration or economic courts used to be considered more independent than other courts, but their merger into the general system of courts in 2014 has decreased private access to the rule of law even further."¶
A blatant example of corrupt law enforcement officials having a direct role in the matter is Deputy Chief Prosecutor Viktor Grin, who personally took part in drawing up and presenting charges in the cases of Khodorkovsky and Lebedev (case of Yukos), Browder and Magnitsky ... [4]

Deleted: <#>, however, that too proved fruitless

Deleted: treats

Deleted: <#>In December 2019, Plaintiff, through his lawyers, sent a demand letter to Defendant Sberbank outlining his legal position.  No response was ever received.  However, following the letter, Plaintiff's family in Russia began to receive threats. Understanding that there is no other way to protect his interest but for litigation, Plaintiff brings the instant action.¶

120.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff has been financially damaged, deprived of ownership of Krasnaya Polyana AO, falsely accused of criminal activity, suffered loss of employment and employment opportunities due to Defendants actions as specified above. Defendants employed force, threats of force, fear and violence in an attempt to deprive plaintiff of pursuing civil and criminal claims against Defendants.

121.     Defendants through intermediaries, provided money or things of value to foreign officials to obtain an Interpol red notice and/or diffusion against Bilalov. Through their actions Defendants proximately and directly caused Bilalov to be detained. As a direct and proximate result of Defendants wrongful conduct as specified above, Plaintiff Bilalov suffered damages to his reputation and suffered a loss of employment opportunities.

122.     Defendant further suffered physical damages as a direct and proximate result of Defendants' attempt to poison Plaintiff with Mercury.

123.     Defendants obtained collectively more than $1,000,000,000.00 from Plaintiff through fraud and other Reiderstvo activities in Russia and the U.S. from 2013-2019.

## COUNT I
## MALICIOUS PROSECUTION
(All Defendants)

124.     Plaintiff reasserts and incorporates by reference the allegations in all preceding paragraphs above.

125.     DEFENDANTS provided money or things of value to foreign officials to obtain an Interpol red notice and/or diffusion against Bilalov. The red notice and/or diffusion was based on false, unfounded, politically motivated accusations.

126.     As specified above Defendants actions in bribing officials, and filing unfounded and false claims constitutes an illegal, improper, and perverted use of process.

22

127.    Defendants provided false and defamatory information to Interpol and to the United States DHS which led to Plaintiff's arrest in Miami.

128.    Defendants had ulterior motives or purpose in obtaining the issuance of the summons.

129.    Defendants purpose in obtaining the issuance of the legal process, was to intimidate and extort Plaintiff and to prevent him from publicizing Sberbank's illegal taking of Krasnaya Polyana, and the assassination attempts that the Defendants made on Plaintiff's life.

130.    Additionally, Defendants intended to extradite the Defendant back to Russia in order to murder him, to prevent him from publicizing the unlawful taking of his company Krasnaya Polyana and the subsequent prosecution and attempted murder of Plaintiff.

131.    Defendants' actions were retaliatory and malicious. Defendants threatened Plaintiff's life several times, and demonstrate that Defendants intended to kill him and/ or his family.

132.    Defendants previously attempted to kill Plaintiff with Mercury.

133.    Defendants' actions do not have any justification or excuse.

134.    Defendants worked in concert with Russian law enforcement agencies, the Courts, using their broad influence in order to have Plaintiff detained.

135.    Defendants further undertook "an act which constituted misuse of the process after process was issued, by submitting falsified information to the authorities, by continuing to threaten the Plaintiff and his family, and through acts of extortion.

136.    As a direct and proximate result of Defendants' conduct, Plaintiff has been emotionally and financially damaged.

Moved (insertion) [2]

23

## COUNT II
## MALICIOUS ABUSE OF PROCESS
### (All Defendants)

137.     Plaintiff reasserts and incorporates by reference the allegations in all preceding paragraphs above.

138.     Plaintiff reasserts and incorporates by reference the allegations in all preceding paragraphs above.

139.     DEFENDANTS provided money or things of value to foreign officials to obtain an Interpol red notice and/or diffusion against Bilalov. The red notice and/or diffusion was based on false, unfounded, politically motivated accusations.

140.     As specified above Defendants actions in bribing officials, and filing unfounded and false claims constitutes an illegal, improper, and perverted use of process.

141.     Defendants provided false and defamatory information to Interpol and to the United States DHS which led to Plaintiff's arrest in Miami.

142.     Defendants had ulterior motives or purpose in obtaining the issuance of the summons.

143.     Defendants purpose in obtaining the issuance of the legal process, was to intimidate and extort Plaintiff and to prevent him from publicizing Sberbank's illegal taking of Krasnaya Polyana, and the assassination attempts that the Defendants made on Plaintiff's life.

144.     Additionally, Defendants intended to extradite the Defendant back to Russia in order to murder him, to prevent him from publicizing the unlawful taking of his company Krasnaya Polyana and the subsequent prosecution and attempted murder of Plaintiff.

145.     Defendants' actions were retaliatory and malicious. Defendants threatened Plaintiff's life several times, and demonstrate that Defendants intended to kill him and/ or his

24

family.

146.    Defendants previously attempted to kill Plaintiff with Mercury.

147.    Defendants' actions do not have any justification or excuse.

148.    Defendants worked in concert with Russian law enforcement agencies, the Courts, using their broad influence in order to have Plaintiff detained.

149.    Defendants further undertook "an act which constituted misuse of the process after process was issued, by submitting falsified information to the authorities, by continuing to threaten the Plaintiff and his family, and through acts of extortion.

150.    As a direct and proximate result of Defendants' conduct, Plaintiff has been emotionally and financially damaged.

**WHEREFORE**, Plaintiff requests that this Honorable Court enter judgment against Defendants:

(1) Declaring that Defendants have abused the criminal and immigration process and engaged in Malicious Prosecution and Malicious Abuse of Process;

(2) Awarding Plaintiff damages in an amount to be determined at trial; and

(3) Awarding Plaintiff any other such relief as is deemed just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial on all triable issues herein.

Dated: New York, New York
        October 4th, 2022                     Respectfully submitted,

                                              */s/ Irina Shpigel*
                                              Irina Shpigel, Esq.

25

---

**Margin comments:**

Deleted: <#>Under New York law, "a malicious abuse-of-process claim lies against a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994).¶
A "collateral objective" is not the same as a "malicious motive" and must exist "beyond or in addition to [the] criminal prosecution," *Savino*, 331 F.3d at 77, but it is "usually characterized by personal animus," *Jovanovic v. City of New York*, 04-CV-8437, 2010 WL 8500283, at *9 (S.D.N.Y. Sept. 28, 2010) (Crotty, J.), affd, 486 Fed.Appx. 149 (2d Cir. 2012) (citation omitted). ¶
Such an objective may include "infliction of economic harm, extortion, blackmail [or] retribution. *Brandon v. City of New York*, 705 F.Supp.2d at 275.  In other words, "[a]buse of process resembles a form of extortion, by which the defendant invokes legal process to coerce the plaintiff into doing something other than what the process necessitates." *Krebs v. United States*, 98-CV-2590, 1999 WL 185263, at *5 (S.D.N.Y. Mar. 31, 1999) (Mukasey, J.).¶

Moved up [2]: <#>As a direct and proximate result of Defendants' conduct, Plaintiff has been emotionally and financially damaged.¶

Moved (insertion) [5]

Deleted: <#>Awarding Plaintiff damages in an amount to be determined at trial; and¶
Awarding Plaintiff any other such relief as is deemed just and proper.¶
**COUNT IX**¶
**UNJUST ENRICHMENT**¶
(All Defendants)¶
. → Plaintiff reasserts and incorporates by reference the allegations in all preceding paragraphs above.¶
→ As a result of Defendants' unauthorized dominion over the unlawfully transferred shares of Krasnaya Polyana  as set forth in detail above, they were unjustly enriched to the detriment of Plaintiff. ¶
    Defendants have unlawfully retained the subject funds and have refused to return them. ¶
    Defendants had no legal or equitable rights to Plaintiff's funds and corporate shares. ¶
    It is inequitable and against good conscience to allow Defendants to retain any benefit from the Companies' funds. ¶
**WHEREFORE**, Plaintiff requests that this Honorable Court enter judgment → → against all Defendants:¶
Awarding Plaintiff damages in an amount to be determined at trial; and¶
Awarding Plaintiff any other such relief as is deemed just and proper.¶

COUNT X¶
(AS TO ALL DEFENDANTS) ¶                 ... [13]

Formatted: Default Paragraph Font

Deleted: June

Deleted: 2021

26

| Page 2: [1] Deleted | Irina Shpigel | 10/4/22 6:31:00 PM |
|---|---|---|

| Page 2: [2] Deleted | Irina Shpigel | 10/4/22 6:31:00 PM |
|---|---|---|

| Page 16: [3] Deleted | Irina Shpigel | 10/4/22 6:31:00 PM |
|---|---|---|

| Page 21: [4] Deleted | Irina Shpigel | 10/4/22 6:31:00 PM |
|---|---|---|

| Page 22: [5] Deleted | Irina Shpigel | 10/4/22 6:31:00 PM |
|---|---|---|

| Page 22: [6] Deleted | Irina Shpigel | 10/4/22 6:31:00 PM |
|---|---|---|

| Page 24: [7] Deleted | Irina Shpigel | 10/4/22 6:31:00 PM |
|---|---|---|

| Page 24: [8] Deleted | Irina Shpigel | 10/4/22 6:31:00 PM |
|---|---|---|

| Page 24: [9] Deleted | Irina Shpigel | 10/4/22 6:31:00 PM |
|---|---|---|

| Page 24: [10] Deleted | Irina Shpigel | 10/4/22 6:31:00 PM |
|---|---|---|

| Page 24: [11] Deleted | Irina Shpigel | 10/4/22 6:31:00 PM |
|---|---|---|

| Page 24: [12] Deleted | Irina Shpigel | 10/4/22 6:31:00 PM |
|---|---|---|

| Page 25: [13] Deleted | Irina Shpigel | 10/4/22 6:31:00 PM |
|---|---|---|